**FILED**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEC 1 8 2006
DEC 18 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DONALD VANCE,

       Plaintiff,

       v.

DONALD RUMSFELD,

       Defendant.

)
)
)
)
)
)
)
)
)
)

**06CV6964**
**JUDGE SHADUR**
**MAG. JUDGE KEYS**

JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES Plaintiff, DONALD VANCE, by his attorneys, LOEVY & LOEVY, and complaining of Defendant, DONALD RUMSFELD, states as follows:

### Introduction

1.    Earlier this year, Plaintiff Donald Vance was indefinitely detained without due process of law in a United States military compound located on foreign soil. For months, he was neither charged with any crime, nor provided a lawyer, much less to challenge his detention in a legitimate court. None of his loved ones could find out if he was even alive.

2.    During this extended and unlawful detention, Mr. Vance was interrogated at length by United States military personnel. His interrogators utilized the types of physically and mentally coercive conditions which are supposedly reserved for terrorists and so-called enemy combatants.

3.    Unlike the other prisoners incarcerated and interrogated in this military installation, Mr. Vance is an American citizen. He was born and raised in Illinois. He

previously served the United States proudly and honorably as a member of the military. He never violated the laws of this country.

4.  Mr. Vance is not now, and never has been, a terrorist or an enemy of the United States. To the best of his knowledge, Mr. Vance was never even accused of being the same. Rather, he was detained, *incommunicado*, purely for purposes of conducting months of abusive interrogations.

5.  As an American, Mr. Vance is entitled to all of the protections of the United States Constitution, and the foregoing mistreatment completely violated his rights.

6.  Moreover, this mistreatment was imposed on Mr. Vance systematically pursuant to recently-enacted policies that purport to suspend the constitutional rights of Americans in a manner which is completely without precedent in the history of the Bill of Rights.

7.  Defendant Donald Rumsfeld devised these policies, and, in doing so, assumed a power that belongs to no public official. He, and every member of the United States government, must be subservient to the Constitution.

8.  This lawsuit seeks accountability and justice for those violations. Mr. Vance also brings this lawsuit at least in part so that other Americans will not have their civil rights suspended in a similar fashion in the future.

### Jurisdiction and Venue

9.  This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331. This Court has personal

2

jurisdiction over Defendant Rumsfeld because he is a citizen of Illinois, where he maintains his primary residence.

10. Venue is proper under 28 U.S.C. § 1391(b)(1).

### Background

11. Sometime earlier this decade, government officials, including Defendant Donald Rumsfeld, enacted a series of measures applicable to persons whom officials, in their unilateral discretion, decide to designate as enemies of the United States.

12. These new measures, crafted in secret by unelected officials and without resort to the democratic process, effectively suspended certain very basic human and civil rights.

13. For example, if federal officials decided to affix an "enemy" label to a given person, that person would be denied *habeas corpus,* as well as the right to see a neutral judge for a determination of probable cause and the right to be detained by the government only after being charged with an actual crime.

14. Persons designated as an enemy could thus be held indefinitely in secret prisons despite not having been charged with any crime, all the while without access to lawyers, much less courts, or even any communications with the outside world.

15. The rules acknowledged no limits on how long detainees may be held under these conditions. Nor did such a person have any recourse even to mount any challenge to his designation as someone to whom these special rules apply.

16. Furthermore, these secret rules abolished certain basic human rights for those labeled an enemy by the officials.

3

For example, the new rules contravened the protections embedded in the Geneva Convention, *i.e.,* the global norms for the treatment of detainees which were adopted by the communities of the entire world in the wake of the horrors of World War II.

17. As a result, persons for whom these new rules are deemed applicable are subject to being interrogated by United States agents under conditions amounting to torture.

18. After enacting them, the federal government endeavored to keep the new rules a secret, both from the general public and from the people's elected representatives. However, in a still-free society, such secrets remain difficult to keep.

19. When the public eventually learned through the freedom of the press that the United States was renouncing in such a fundamental way its historical respect for the rule of law, there was a measure of public outcry. Indeed, this country was founded on an inherent distrust of placing too much power in any federal branch, a condition deemed too amenable to the very tyranny the founding fathers were attempting to leave behind.

20. In response to the public's misgivings, Defendant Rumsfeld and other federal officials defended the new rules as only applying to "terrorists," a relatively-indeterminate label applicable to those who hate this country and the values for which it stands.

21. Though the rules were originally justified as applying only to terrorists, there is a very real potential for abuse and slippage. As with any concentration of extraordinary

4

power in the executive branch, this risk is more than hypothetical, as Plaintiff's experience demonstrates.

22.    In particular, while working as a civilian with privately-owned companies operating in Baghdad, Plaintiff came into contact with financial and operational information that he considered to be suspicious and potentially indicative of corruption.  Fulfilling what he believes to be his patriotic duties as an American citizen, Mr. Vance reported these irregularities to employees of the Federal Bureau of Investigation ("FBI"), the State Department, and other federal government officials.  He did this for his country, even though he knew full well that the disclosures could result in serious, if not deadly, retaliation by those on whom he was informing.

23.    After he took these selfless actions, certain low-level bureaucrats in the federal government apparently came to believe, quite incorrectly, that Mr. Vance might have more information, and they set out to extract it from him.  Because they hoped to discover information useful to their personal and professional agendas, and because Defendant Rumsfeld had imbued them with the unchecked authority to detain even American citizens as they please, these officials decided to have Mr. Vance arrested. They then held him *incommunicado* for three months of torturous interrogation, which revealed only that Mr. Vance was an innocent who had already volunteered everything he knew to the FBI.

24.    Specifically, Mr. Vance was imprisoned in a military camp in Iraq, incarcerated in a cell surrounded by cells

5

containing other prisoners believed to be enemy combatants. Like them, Mr. Vance was entirely deprived of all semblance of due process and held for months without ever seeing a legitimate judge.

25. Mr. Vance was also interrogated repeatedly without access to a lawyer, and was subjected to conditions of confinement and interrogation tantamount to torture. This included psychologically-disruptive tactics designed to induce compliance with his interrogators' will, such as exposure to intolerable cold and continuous artificial light (no darkness day after day) for the duration of his imprisonment; extended solitary confinement in cells without any stimuli or reading material; blasting by loud heavy metal and country music pumped into the cell; being awoken by startling if he fell asleep; threats of excessive force; blindfolding and "hooding"; and selective deprivation of food and water.

26. All of the foregoing mistreatment was carried out by Americans. Some of the soldiers who were Mr. Vance's captors were surprised to learn that a United States citizen was being detained in this fashion.

27. After almost 100 days, Mr. Vance was released, and made his way back to the United States. He was never charged with any crime, nor did he ever commit any.

28. Secret imprisonment and torturous interrogation of American citizens by their own government is antithetical to this nation's longstanding commitment to liberty. In designing the basic of scheme of our constitutional democracy, the founders

expressly intended that such infringements must be subject to meaningful challenge and review by the judicial branch.

## The Parties

29. Plaintiff Donald Vance is a 29 year-old United States citizen who was born and raised in Chicago, Illinois, where he currently resides.

30. Before beginning his career as a security consultant, Plaintiff served his country in the United States Navy, spending two years on active duty and four years in the reserves. Following 9/11, in an act of patriotism, he voluntarily upgraded his reentry code to reactivate if needed.

31. At all relevant times, Defendant Donald Rumsfeld was the Secretary of the United States Department of Defense ("DOD"). He has since resigned.

32. At all relevant times, Defendant Rumsfeld was personally responsible for developing, authorizing, supervising, implementing, auditing and/or reforming, the policies, patterns or practices governing the arrest, detention, treatment, interrogation and adjudication of detainees in Iraq.

33. Under the command of Defendant Rumsfeld, the United States military exercised control and authority over the detention of persons in Iraq, including at Camp Prosperity and Camp Cropper.

## The Sandi Group

34. In 2004, following the United States invasion of Iraq, Plaintiff went to that country to try to help native Baghdad citizens rebuild and achieve democracy.

35. In Iraq, Plaintiff went to work for the Sandi Group. The Sandi Group, in a joint venture with DynCorp International, provides security services for nongovernmental organizations ("NGOs"), as well as commercial and media firms operating in Iraq.

36. The Sandi Group was at one point the largest private employer of Iraqi citizens in Iraq, employing approximately 6,000 people.

37. Plaintiff began work for the Sandi Group in December 2004 as a supervisor of security personnel. Among other duties, Plaintiff was privileged to provide security escorts and to help secure polling facilities during Iraq's constitutional election period. Plaintiff also provided security for employees of various NGOs who strived, under difficult conditions, to improve the quality of life for Iraqi citizens.

38. While at the Sandi Group, Plaintiff met Nathan Ertel, a 30 year-old security contract administrator from Alexandria, Virginia. Mr. Ertel has spent the past 13 years working as a contract manager for numerous government contractors.

39. Frustrated with the Sandi Group's lack of concern for its employees, Plaintiff eventually quit, as did Mr. Ertel. Plaintiff returned home to Chicago and Mr. Ertel returned to Virginia.

## Shield Group Security

40. Shield Group Security ("SGS") is an Iraqi security services company owned by Mustafa Al-Khudairi, a dual Iraqi-British citizen.

41. SGS contracts with the Iraqi government, Iraqi companies, NGOs, and the Multinational Forces - Iraq ("MNF-I"). To the best of Plaintiff's knowledge, SGS is still operating, providing services, *inter alia,* for the Iraqi government and United States-aligned NGOs.

42. In the Fall of 2005, Plaintiff was contacted in Chicago by Dan Johnson, a former colleague who also had left the Sandi Group and now worked for SGS.

43. At that time, Mr. Johnson asked Plaintiff to return to Iraq to work for SGS. Plaintiff agreed and was hired pursuant to a one-year contract to provide security services and supervise security personnel.

44. A short time later, in November 2005, Mr. Ertel too was recruited to work for SGS by another former Sandi Group employee, Joseph Trimpert. Mr. Ertel was recruited by Mr. Trimpert to work for SGS as a contract manager tasked with ensuring contract compliance and developing business for SGS. In that position, Mr. Ertel reported directly to Mr. Al-Khudairi.

45. Both Plaintiff and Mr. Ertel were paid monthly by SGS in United States dollars.

46. At all relevant times, SGS maintained its offices in a gated community in the Red Zone in Baghdad, Iraq (the "compound"). Plaintiff, Mr. Ertel and Mr. Trimpert all lived in

9

dormitory-type housing on the compound. Mr. Al-Khudairi also maintained his residence on the compound. The two gates into the compound were controlled by armed guards.

47. The compound was essentially a neighborhood, populated by both native Iraqis and expatriates working for other companies. As was true for everyone living in Baghdad, there were frequent disruptions in electricity and the water was not potable.

### Plaintiff's Whistleblowing

48. Most of Plaintiff's work took place in SGS's main offices where, from time-to-time, he would observe payments being made by SGS agents to certain Iraqi sheikhs.

49. Based on his observations, Plaintiff came to believe that these payments were being made in exchange for some form of assistance in obtaining contracts. Plaintiff did not know whether these payments were legal or corrupt, but suspected the latter.

50. In October 2005, Plaintiff returned to Chicago to attend his father's funeral. Acting out of a sense of patriotism and moral obligation, Plaintiff took this opportunity to telephone the FBI to report what he had been observing at SGS.

51. Plaintiff was eventually connected to Travis Carlisle, an FBI agent. Mr. Carlisle asked Plaintiff to report to him any strange activity that he witnessed at SGS going forward. Plaintiff agreed, and pledged his cooperation.

52.   Upon returning to Iraq, Plaintiff regularly
emailed and called Mr. Carlisle in Chicago, sometimes as often as
twice per day, to report his observations.

53.   Approximately two and a half weeks after his in-
person meeting with Mr. Carlisle, Mr. Carlisle telephoned
Plaintiff and asked him to meet with Maya Dietz, a government
official who was working in Iraq.

54.   Plaintiff met with Ms. Dietz, who asked him to
capture SGS's computer documents on memory sticks and forward
them to her.   Plaintiff complied with this request.

### The Problems at SGS

55.   SGS was poorly run, and was generally non-
compliant with its various contracts.   Its poor performance was
well-known, and this reputation made it difficult for Plaintiff
and Mr. Ertel to fulfill the expectations placed on them in terms
of obtaining new business.

56.   Plaintiff and Mr. Ertel attempted to encourage
upper management to improve performance and fulfill SGS's
outstanding contractual obligations, indicating that until SGS
demonstrated proper performance it would be virtually impossible
for them to bring in new contracts.   There was, however, little
impetus at SGS to spend the money and resources needed to become
compliant and improve its reputation.

57.   As a result, Plaintiff and Mr. Ertel's repeated
entreaties to this effect were misinterpreted as showing a lack
of loyalty and enthusiasm.

11

58. Additionally, reports began filtering to Mr. Al-Khudairi that Plaintiff and Mr. Ertel had a "negative" approach and were hurting SGS's business. This perception was communicated to Mr. Al-Khudairi by the armed Iraqi SGS employees who accompanied Plaintiff and Mr. Ertel whenever they left the office to meet with present customers and to develop new leads.

59. Plaintiff and Mr. Ertel also ran into problems with the Iraqi sheikhs, mentioned above, who were among the stakeholders in SGS and who helped it obtain contracts.

60. In the local power structure, sheikhs maintain influence by providing for the needs of the members of their tribes, including their employment needs. To maintain influence, the sheikhs needed to be able to deliver jobs, and they relied on SGS for that purpose. Thus, the sheikhs helped bring SGS contracts and demanded jobs for their tribes and, apparently, cash, in return.

61. From time to time, the sheikhs would attend SGS business development meetings at which Plaintiff and Mr. Ertel would be pressured to obtain more contracts. When Plaintiff and Mr. Ertel would explain that SGS needed to invest in and improve its present performance before it could acquire new business, the meetings would become heated and argumentative.

62. At one point, during the highly-publicized spate of abductions and beheadings in Iraq, Sheik Abu Bakir made a threat in front of Mr. Al-Khudairi that he would have Plaintiff and Mr. Ertel kidnaped if they did not obtain more contracts.

12

### Joseph Trimpert

63. In addition to the tensions described above, Plaintiff's supervisor, Mr. Trimpert, was becoming dangerously violent, and, in Plaintiff's view, mentally unstable. The problem was compounded by the fact that it was not uncommon for civilians in the Red Zone to carry weapons, and Mr. Trimpert was often armed.

64. Plaintiff and Mr. Ertel were becoming concerned that Mr. Trimpert was a genuine threat to their and other's safety. Mr. Trimpert would threaten and accost both Plaintiff and Mr. Ertel, and brag to them about brutal acts of violence he claimed to be committing against Iraqi citizens.

65. Plaintiff and Mr. Ertel warned fellow workers at SGS about Mr. Trimpert, and they expressed their concerns directly to Mr. Al-Khudairi.

66. Mr. Trimpert, however, had more superiority at SGS. He had also been at the company significantly longer than either Plaintiff or Mr. Ertel, and he was very closely allied with Mr. Al-Khudairi.

### SGS's Weapons

67. Plaintiff and Mr. Ertel came to learn that SGS, with Trimpert's assistance, was amassing and selling weapons for profit. For example, SGS sold guns to the South Korean government.

68. As a security contractor, SGS was in fact licensed and permitted to have and to sell weapons. However, SGS came to

possess what Plaintiff considered to be unnecessary and alarming quantities of weapons.

69.    Plaintiff observed other suspicious activity as well.  For example, on one occasion, SGS came to be in possession of a United States military rifle that appeared badly burned. Mr. Al-Khudairi asked Mr. Trimpert to have the gun repaired, and Mr. Trimpert took the gun to Camp Victory, a United States military installation to do so.

70.    After the gun was repaired and returned to Trimpert, Sergeant Daniel Boone of the United States military contacted Plaintiff via email about the gun.  Sgt. Boone said that he had been trying to reach Mr. Trimpert to no avail, and he asked Plaintiff to let Mr. Trimpert know that there was a problem with the gun -- namely, the last time the weapon had been seen was in an attack with insurgents.  Sgt. Boone indicated that he needed the weapon returned to him.  Plaintiff relayed the message to Mr. Trimpert immediately, and the weapon was returned.

71.    Plaintiff duly passed along all of the foregoing information to Mr. Carlisle, including Mr. Trimpert's activities, SGS's connections to Iraqi officials, and the weapons that SGS was amassing.

72.    Plaintiff and Mr. Ertel were also in contact with Deborah Nagel and Douglas Treadwell, two United States government officials working in Iraq, about their concerns regarding SGS and Trimpert, and reported this same information to them.

14

## **Plaintiff is Taken Hostage**

73.  As a result of the above-described suspicious activity at SGS, Mr. Ertel tendered a letter of resignation to Mr. Al-Khudairi on April 1, 2006, stating that he would cease working for the company.

74.  Mr. Al-Khudairi called a meeting two days later to speak with Mr. Ertel about why he wanted to leave SGS. That meeting was delayed because Mr. Al-Khudairi had temporarily left the country.

75.  Unable to formally resign and wanting to find a way out of the company, Mr. Ertel sent Mr. Al-Khudairi an email on April 13 indicating that he was going on a brief vacation.

76.  The next day, a high-ranking Iraqi employee of SGS, essentially Mr. Al-Khudairi's second-in-command, came to Mr. Ertel's apartment and took Mr. Ertel's Common Access Card ("CAC card").  CAC cards are issued by the DOD to certain American civilian contractor personnel in Iraq in order to give them freedom of movement into the Green Zone.

77.  After taking Mr. Ertel's CAC card, the very same SGS employee proceeded to Plaintiff's apartment next door and took Plaintiff's CAC card.  When the two asked for an explanation, the SGS employee told them a dubious story about how Mr. Al-Khudairi was supposedly opening up bank accounts for them in Dubai, where he was vacationing, and therefore needed their cards.

78. Plaintiff called Mr. Al-Khudairi on his cellular telephone to protest, but Mr. Al-Khudairi would not answer any of their questions.

79. Without their CAC cards, Plaintiff and Mr. Ertel could not leave the Red Zone and the SGS compound. They could not get to the Green Zone to procure the proper documentation necessary to leave the country. They were trapped.

80. Increasingly afraid, the two turned to Ms. Nagel and Mr. Treadwell, their contacts in the United States government. Ms. Nagel and Mr. Treadwell told them that they should interpret SGS's actions as taking them hostage. Plaintiff and Mr. Ertel were advised to stay together and to stay armed at all times.

81. The next morning, when the two arrived for work, the SGS employee who had earlier taken Plaintiff's CAC card returned the card to Plaintiff. The same SGS employee told Mr. Ertel that he could not have his CAC card back.

82. This SGS employee then told Plaintiff that Plaintiff and Mr. Trimpert would be escorting Mr. Al-Khudairi's brother-in-law to Camp Victory so that Mr. Al-Khudairi's brother-in-law could obtain a CAC card.

83. Knowing that it is impossible to procure a CAC card for Mr. Al-Khudairi's brother-in-law because he was not a United States citizen, and knowing that Mr. Trimpert had been threatening him with violence, Plaintiff suspected that the assignment was a set-up calculated to lure him off of the compound where he would be injured or killed. Plaintiff also

16

feared for what would happen to Mr. Ertel if the two of them were separated.

84. Accordingly, Plaintiff called Mr. Treadwell for help. Mr. Treadwell advised Plaintiff and Mr. Ertel to barricade themselves inside a room in the SGS compound until United States forces could come rescue them. Plaintiff and Mr. Ertel gave Mr. Treadwell specific instructions for their rescue.

85. After Plaintiff and Mr. Ertel did as they were told and barricaded themselves in a room, United States military forces came to the SGS compound to rescue them.

86. Mr. Trimpert attempted to dissuade the forces from removing them, representing that he was an American citizen and that there were no problems at the compound. Mr. Trimpert's efforts to keep Plaintiff and Mr. Ertel on the SGS compound failed, and they were successfully removed.

87. In the course of removing them from the compound, the military personnel seized all of Plaintiff's and Mr. Ertel's personal property, including but not limited to their personal laptop computers.

88. Plaintiff and Mr. Ertel were then put into humvees and taken to the United States Embassy.

**Plaintiff's Arrest**

89. When they arrived at the Embassy, Plaintiff and Mr. Ertel were separately debriefed. Both were questioned by an FBI Special Agent who identified himself as "Doug," and by two persons who stated they were from United States Air Force Intelligence.

17

90.   Plaintiff and Mr. Ertel related their experiences at SGS, and explained that they had been reporting these problems regularly to another FBI agent, Travis Carlisle, as well as to Deborah Nagel and Douglas Treadwell. They told the questioners that many of the communications were documented on their laptops via emails with these parties, and they encouraged the questioners to review them.

91.   After the interviews, Plaintiff and Mr. Ertel were escorted to a trailer on the Embassy grounds to sleep. They slept for approximately two to three hours.

92.   Plaintiff and Mr. Ertel were awoken by a knock on the door, whereupon guards instructed them to exit the trailer and walked them to the gate of the Embassy, where they were both placed under arrest.

93.   They were handcuffed and blindfolded and pushed into separate humvees. They were not given any protective equipment for the drive through Baghdad, notwithstanding the dangers associated therewith.

### Plaintiff's Initial Detention at Camp Prosperity

94.   Plaintiff and Mr. Ertel were driven to Camp Prosperity, a military installation in Iraq controlled by the United States military.

95.   Upon their arrival, guards at Camp Prosperity placed them in a cage, strip searched and fingerprinted them, and issued them jumpsuits.

96.   Plaintiff and Mr. Ertel were told to keep their chins to their chests and not to speak; if they did either, the

18

guards told them that they would "use excessive force" on them, or words to that effect.

97. Plaintiff and Mr. Ertel were taken to separate cells. For the entire duration of their short detention at Camp Prosperity, they were held in solitary confinement 24 hours per day. The lights in their cells were kept on the entire time. There was no toilet in their cells, and they were allowed to go to the bathroom only twice per day. They also were fed only twice per day. The only surface for sleeping was a thin mat on concrete.

98. Plaintiff believes that he and Mr. Ertel were at Camp Prosperity for approximately two days. Thereafter, Plaintiff and Mr. Ertel were shackled, blindfolded, and taken in separate humvees to Camp Cropper.

99. As before, Plaintiff was not given any protective gear or bulletproof vests for the dangerous drive, which involved traveling along Highway Irish, a notorious sniper trap. At one point, the vehicle in which Plaintiff was traveling was stopped and Plaintiff heard gunfire. Plaintiff feared for his life.

**Unconstitutional Conditions of Confinement at Cropper**

100. Camp Cropper is a military facility near the Baghdad International Airport, which the United States military uses to house persons considered to be "high-value" detainees.

101. Plaintiff and Mr. Ertel arrived at Camp Cropper, and, while still blindfolded, were strip searched and given a jumpsuit.

19

102. They were each then taken to a military jail occupied by foreign prisoners. They spent the remainder of their respective detentions in solitary confinement, housed in tiny and unclean cells, mostly deprived of stimuli and reading materials. There were bugs and feces on the cell walls.

103. The cells were kept extremely cold, and the lights were always turned on, except when the electric generators for the Camp would fail.

104. Each cell contained a concrete slab for sleeping. Plaintiff and Mr. Ertel were furnished only very thin plastic mats.

105. Under these conditions, it was difficult to obtain meaningful rest. Often, the prison would play heavy metal or country music at intolerably-loud volumes. Guards would pound on the cell doors if they observed Plaintiff or Mr. Ertel to be sleeping.

106. The cells had no sinks nor any potable running water. Plaintiff and Mr. Ertel had to rely on guards for their drinking water, which was often withheld.

107. Plaintiff and Mr. Ertel often were denied food and water completely, sometimes for an entire day. When it did arrive, food and water were delivered through a slit in one of the walls.

108. During the entire length of their detention, Plaintiff and Mr. Ertel received only one shirt and one pair of overalls to wear. They were never given adequate shoes to protect their feet.

109. Furthermore, Plaintiff was repeatedly denied necessary medical care. Plaintiff, for example, requested and was denied basic dental hygiene equipment and treatment for severe tooth pain that he was experiencing. Plaintiff's requests in that regard were ignored until he eventually had to have his tooth pulled, an extreme procedure that could and should have been avoided.

110. When it was finally administered, this dental procedure was performed hurriedly and covertly, late at night. While the dentist had provided Plaintiff with pain killers and antibiotics, the guards took them all and refused to provide any to Plaintiff. As a result, Plaintiff experienced severe pain and the hole where the tooth had been became infected and filed with puss. No necessary follow-up care was provided.

111. Similarly, Mr. Ertel had been suffering from an esophageal ulcer which required regular doses of antacids. That medication, too, was often withheld from him.

112. The guards would also torment Plaintiff and Mr. Ertel, apparently trying to keep them off-balance mentally. For example, the guards would often "shake down" their cells, sometimes claiming falsely to have discovered contraband, a nonsensical accusation given their obvious lack of access to anything prohibited.

113. The guards also physically threatened and assaulted Plaintiff. For example, when Plaintiff was transported within the Camp, he would be blindfolded and a towel would be placed over his head. Plaintiff had to rely on the guards to

direct his movements such as when to walk forward or which way to turn. The guards would often purposefully steer him into walls. Mr. Ertel experienced similar mistreatment.

114. Plaintiff and Mr. Ertel were constantly threatened that guards would use "excessive force" against them if they did not immediately and correctly comply with every instruction given them.

115. Plaintiff and Mr. Ertel were not allowed to go outdoors at any time for approximately one week after their arrival. Thereafter, the two were occasionally allowed a brief period outdoors for recreation, but otherwise remained in complete solitary confinement.

116. These infrequent yard privileges were only permitted at midnight. Plaintiff was told that this was so because no one was supposed to know that Americans were being imprisoned at Camp Cropper.

117. In fact, from what Plaintiff and Mr. Ertel could ascertain, they were the only American citizens held there.

### Plaintiff's Isolation

118. For the first several weeks of their detentions, neither Plaintiff nor Mr. Ertel was permitted to make any phone calls to the outside world. During that entire time, their families did not know where they were, or whether they were alive or dead.

119. Over the entire duration of their detention, Plaintiff and Mr. Ertel were allowed only a few calls, the majority of which occurred toward the very end and related to

22

making financial arrangements for their eventual departures from
Iraq.

     120. Plaintiff was allowed to meet with a clergyman
only one time.  All of his other requests for clergy visits were
denied.  Mr. Ertel was never permitted such visits.

### Unlawful Interrogations

     121. Throughout their detention at Camp Cropper,
Plaintiff and Mr. Ertel were continuously interrogated by United
States officials.  These interrogations took place either in an
interrogation room or in their cells.

     122. Before each interrogation, both Plaintiff and Mr.
Ertel would always ask for an attorney, but each such request was
invariably denied.  Mr. Ertel wrote a letter to the Judge
Advocate General requesting counsel and asked his captors to send
it, though Plaintiff has no knowledge of whether it was in fact
sent.  The request was never granted.

     123. Without the assistance and advice of counsel,
Plaintiff and Mr. Ertel were each subjected to a series of
interrogations (always separate) conducted by FBI agents and Navy
Criminal Investigative Service officers, as well as possibly
Central Intelligence Agency and Defense Intelligence Agency
agents.

     124. At both Plaintiff's and Mr. Ertel's sessions, the
interrogators would not identify themselves by name, and none
would honor the requests for an attorney.

     125. At the initial interrogation sessions, both
Plaintiff and Mr. Ertel separately communicated to the FBI agent

present that they had been talking to Special Agent Carlisle, and that Mr. Carlisle would confirm their identities and their stories.

126. The initial interrogators confirmed that they knew Travis Carlisle, and were aware that Plaintiff had been speaking to him. Several sessions later, however, a different set of interrogators denied to both Plaintiff and Mr. Ertel that a Travis Carlisle even existed.

127. The numerous interrogations to which Plaintiff was subjected shared no consistent focus. The sessions were usually conducted by different interrogators, often inquiring into different sets of topics, and demonstrating differences in their apparent knowledge bases.

128. Some interrogators were interested in learning more about the Sandi Group, its operations and employees. Others focused on SGS, its political contacts in the Iraqi government and work with the NGOs operating in Iraq. Plaintiff was also asked about SGS's structure and hierarchy, its clients, and its relationships with the sheikhs described above.

129. Other interrogators questioned Plaintiff and Mr. Ertel about their relationships with State Department employees Deborah Nagel and Douglas Treadwell.

130. Still others focused on Mr. Trimpert's relationship with United States soldiers, and how Mr. Trimpert obtained United States weapons and ammunition. Plaintiff and Mr. Ertel were told that Mr. Trimpert had admitted to forging federal

documents to procure CAC cards, bribing government officials, and trading alcohol for weapons with military employees.

131. At least one interrogator focused solely on how Plaintiff had been treated at the camp, and what Plaintiff would do if he were released. Plaintiff was asked questions such as whether he intended to write a book or obtain an attorney.

132. The main constant throughout all of the sessions was the interrogators' aggressive techniques and their repeated threats that if Plaintiff and Mr. Ertel did not "do the right thing," they would be detained indefinitely.

### The "Detainee Status Board"

133. On April 20, 2006, Plaintiff and Mr. Ertel each received letters from Colonel Bradley J. Huestis, President of a body he called the Detainee Status Board, indicating that a proceeding would be convened no earlier than April 23 to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." A true and correct copy of Plaintiff's letter is attached as Exhibit A hereto.

134. The letters informed Plaintiff and Mr. Ertel that they did not have a right to legal counsel. They were further told that they would only be permitted to call witnesses for their defense and present evidence if the evidence and witnesses were "reasonably available" to them at Camp Cropper.

135. On April 22, 2006, another military official, Captain Plymouth D. Nelson, wrote separately to Plaintiff and Mr. Ertel explaining that they were being held as something called a "security internee." Captain Nelson's letters indicated that

Plaintiff and Mr. Ertel had the right to appeal their status determination.

136. On the very day that they received these April 22 letters, Plaintiff and Mr. Ertel prepared their appeals and requested evidence for the Board. Each requested to have the other be present as a witness, among other witnesses.

137. Each also requested, among other evidence, their previously-seized laptops and cellular telephone records, all of which would prove their numerous conversations with Travis Carlyle, Maya Dietz, Deborah Nagel, and Douglas Treadwell.

138. Despite the representations in the previously-mentioned letter from Col. Huestis, neither Plaintiff nor Mr. Ertel was ever provided with any of the evidence they had requested for their defense.

139. On April 26, 2006, both Plaintiff and Mr. Ertel were transported within Camp Cropper to appear before a group of military people who were calling themselves the Detainee Status Board. This "Board" consisted of two men and one woman, all of whom were in "sterilized" military garb, meaning that they wore no insignia of name or rank. There was also an additional person present in a sterilized uniform who directed the line of questioning. He appeared to be the prosecutor.

140. Mr. Ertel's Board proceeding convened first. Neither Mr. Ertel's request for evidence nor his request for witnesses at his proceeding were honored, including his specific request that Plaintiff (who was certainly "reasonably available" at Camp Cropper) be present.

141. At the outset of Mr. Ertel's so-called "Detainee Status Board" proceeding, one of the three panel members stated that he had the right to an attorney at no cost to MNF-I. Mr. Ertel told them that he had been provided the letter attached hereto as Exhibit A, stating that he had no such right, and, as a practical matter, he had been provided no opportunity to arrange for the presence of counsel.

142. When Mr. Ertel stated that he would like an attorney to be present, he was told that no one on the panel knew how to obtain an attorney for him. The panel told Mr. Ertel that they had to move forward with the proceedings and that he would simply have to do without an attorney.

143. Once the proceeding began, Mr. Ertel was not allowed to see most of the purported evidence concerning him. In particular, Plaintiff was told that a stack of documents, which was visible in front of the panel, was evidence in his case but that he would not be allowed to review it. At least some of these documents would have been presumptively exculpatory, given his innocence. He was told that he was only allowed to see "unclassified" portions of the materials.

144. Mr. Ertel was also denied the opportunity to hear the testimony of, much less cross-examine, whatever adverse witnesses the panel may have been relying upon in reaching its determination(s).

145. Plaintiff's proceeding before the "Detainee Status Board" followed the same format as Mr. Ertel's. Plaintiff too was denied (1) his evidentiary requests; (2) the right to

27

counsel; (3) the right to call Mr. Ertel and others as witnesses; (4) the right to see all of the evidence presented against him and to have exculpatory evidence provided to him; (5) the right to remain silent (although they had nothing to hide); and, (6) the right to confront adverse witnesses.

146. At the end of this proceeding, Plaintiff asked the tribunal if his family knew where he was, or whether or not he was even alive. Plaintiff was told that they did not know what, if anything, his family had been told.

147. In fact, neither Plaintiff's family nor his friends knew of his detention despite their vigorous efforts to contact United States officials to determine Plaintiff's whereabouts.

148. Plaintiff also asked when he would get an answer about his status. He was told that he would find out the results in three to four weeks. In the interim, he would remain in solitary confinement.

### Release From Camp Cropper

149. After their Detainee Status Board proceedings, Plaintiff and Mr. Ertel received little additional information regarding their detention until shortly before their respective releases, when travel arrangements had to be made.

150. First, about one month after the Detainee Status Board convened, on May 17, 2006, Major General John D. Gardner, the Commanding General of Task Force 134 (Detainee Operations) for the MNF-I, signed a letter authorizing the release of Mr. Ertel.

151. Mr. Ertel was subsequently released from Camp Cropper. Instead of securing his safety and transporting him on a military aircraft as Mr. Ertel requested, he was placed on a bus headed to Baghdad International Airport. Mr. Ertel was not provided with an exit visa nor other documentation necessary to permit him to leave the county. Mr. Ertel was able to get out of Iraq only after he ran into a friend in the United States Air Force Special Operations Unit who was able to help him.

152. For no legitimate reason, Plaintiff's detention was continued for more than two additional months after Mr. Ertel's release and, presumably, after the Detainee Status Board had exonerated him. This extended over-detention was used to continue Plaintiff's interrogations on topics apparently of interest to the persons who detained him.

153. Finally, on July 20, 2006, several days after Major General Gardner authorized his release, Plaintiff was dropped at the Baghdad Airport to fend for himself without the documentation needed to return to the United States.

154. Fortunately, without too much delay, Plaintiff was able to secure a flight out of Iraq to Ahman, Jordan; he subsequently flew home to Chicago.

155. All told, Plaintiff was held *incommunicado* by his own government just short of 100 days until his anonymous interrogators determined that there were apparently no more questions that they wanted answered. He was ultimately released without ever being charged with any wrongdoing.

156. Though he was finally allowed to go home, the cumulative effect of the foregoing ordeal has been devastating for Plaintiff. For more than three months, Plaintiff was deprived of his most basic human rights, to say nothing of those guaranteed him by the United States Constitution. As a result, Plaintiff has suffered serious emotional and physical distress.

157. Plaintiff is not a terrorist. He is an United States citizen, and a veteran at that, who loves this country, and everything for which it stands, as much as any other American. He has never committed, much less been charged with, any crime.

### Widespread Practices and Policies

158. The unlawful detentions and torment inflicted on Plaintiff and Mr. Ertel were not the spontaneous acts of individuals, nor the result of some officials' innocent misunderstanding of the restrictions that the United States Constitution and international law place upon the treatment of fellow human beings and United States citizens. Rather, their treatment was the direct result of recently-documented policies and practices implemented by Defendant Rumsfeld and high-level military commanders acting at his direction.

159. For example, on March 6, 2006, Amnesty International published a report criticizing United States-led MNF-I detentions in Iraq. The Amnesty Report references the arbitrary nature of the security internment system, and the ways in which MNF-I consistently denies detainees their rights to

30

counsel and to challenge the lawfulness of their detentions, as well as access to their families and the outside world.

160. The Amnesty Report also documents a repeated pattern of violations of Section IV of the Fourth Geneva Convention. This includes instances of torture and ill-treatment of detainees by United States troops, such as exposing detainees to extremes of heat and cold and unlawfully restraining and physically assaulting detainees.

161. A March/April 2006 Human Rights Report by the United Nations Assistance Mission for Iraq ("UNAMI") made similar findings, concluding that "[t]he general conditions of detention in Iraqi facilities are not consistent with human rights standards." The Report documents numerous instances in which detainees were deprived of sufficient food, hygiene and medical care.

162. Likewise, the May/June 2006 UNAMI Human Rights Report documents still more examples of detainee abuse in Iraq. That Report includes an accounting by DOD of its own wrongdoing, and references DOD admissions that United States soldiers have withheld food from and physically threatened detainees.

163. Similarly, the International Committee of the Red Cross has published a Report criticizing the United States military detention system in Iraq as appallingly defective. According to the Red Cross Report, military officials routinely deny detainees the opportunity to contact their families to notify them of their whereabouts. The Report further documents other forms of mistreatment, including solitary confinement,

31

hooding, physical threats, confiscation of property, exposure to loud noise or music and deprivation of food and water.

164. Most disturbingly, the Red Cross noted that military intelligence officers of the Coalition Forces in Iraq have admitted that, like Plaintiff, "between 70% and 90% of the persons deprived of their liberty in Iraq had been arrested by mistake."

## Defendant Rumsfeld's Role

165. These and numerous other examples of abuse all demonstrate a widespread and systematic pattern of the same violations that Plaintiff suffered. These violations have been directed, encouraged and condoned by Defendant Rumsfeld, and are consistent with, and inflicted pursuant to, the policies and requirements he implemented for United States operations in Iraq.

166. For many of these policies, Defendant Rumsfeld left a well-documented paper trail.

167. For example, on December 2, 2002, Defendant Rumsfeld personally approved a list of illegal interrogation techniques for use on detainees at Guantanamo. Contrary to established rules and military standards, as set forth in then-governing Army Field Manual 34-52, those techniques included the use of 20-hour interrogations, isolation for up to 30 days, and sensory deprivation.

168. On January 15, 2003, Defendant Rumsfeld officially rescinded his authorization for those techniques, but took no measures to end the practices which had by then become ingrained, nor to confirm that the practices were in fact being terminated.

Defendant Rumsfeld also took no action to prevent, investigate or punish the use of these methods. To the contrary, he authorized the Commander of the United States Southern Command to use them if warranted and approved by Rumsfeld in individual cases.

169. At the same time, Defendant Rumsfeld convened a "Working Group" to evaluate his interrogation policies. Following that Working Group, in April 2003, Rumsfeld approved a set of new interrogation techniques, which included isolation for up to thirty days, dietary manipulation and "sleep adjustment."

170. Just as before, Rumsfeld provided that harsher techniques could be used with his prior approval. At the time Rumsfeld approved these April policies, he was well-aware of the torture and other abuses of detainees that occurred in Guantanamo Bay, Afghanistan, and Iraq.

171. Instead of trying to stop and prevent such abuse, Defendant Rumsfeld took measures to increase the pressure on interrogators in a manner he knew was highly likely to result in further torture or cruel, inhumane, and degrading punishment, particularly in Iraq.

172. For instance, Defendant Rumsfeld sent Major Geoffrey Miller to Iraq in August 2003 to review the United States military prison system in Iraq and make suggestions on how prisons could be used to more effectively obtain actionable intelligence from detainees -- or, in more colloquial terms, to "gitmo-ize" Camp Cropper.

173. In so doing, Defendant Rumsfeld knew and tacitly authorized Major Miller to apply in Iraq the techniques that

Rumsfeld had approved for use at Guantanamo and others. At Rumsfeld's direction, Major Miller did just that.

174. On September 14, 2003, in response to Major Miller's call for the use of more aggressive interrogation policies in Iraq, and as directed, approved and sanctioned by Defendant Rumsfeld, Lieutenant General Ricardo Sanchez, Commander of the United States-led military coalition in Iraq (the "Coalition Joint Task Force-7") signed a memorandum authorizing the use of 29 interrogation techniques.

175. The approved-techniques included yelling, loud music, light control and sensory deprivation, some of which were used against Plaintiff and Mr. Ertel.

176. A month later, Commander Sanchez modified the previous authorization, but continued to allow interrogators to control the lighting, heating, food, shelter and clothing given to detainees.

177. At this point, Defendant Rumsfeld was well aware of the torture and other cruel, inhumane and degrading treatment occurring at United States detention centers in Iraq, but nonetheless consciously chose to ignore it.

178. Starting in May 2003, the Red Cross began sending reports detailing abuses of detainees in United States custody in Iraq to the United States Central Command in Qatar. Colin Powell, then the Secretary of Defense, confirmed that Defendant Rumsfeld knew of the various reports by the Red Cross, stating that he and Defendant Rumsfeld kept President Bush regularly apprised of their contents throughout 2003.

34

179. Indeed, Defendant Rumsfeld was not only aware of the 2003 Red Cross reports, but also of its February 2004 Report, discussed above, as well as a series of other investigative reports into detainee abuse in Iraq, including those of former Secretary of Defense James Schlesigner, Army Major General Antonio Taguba, and Army Lieutenant General Anthony Jones.

180. Despite the mounting evidence of widespread and systemic abuse, Rumsfeld did nothing to investigate his subordinates' misconduct, meaningfully punish wrongdoers, properly train his subordinates in detention and interrogation policy, or alter the policies and practices implemented in United States detention facilities.

181. Rumsfeld was aware that his policies were directing and causing this pattern of widespread abuse that injured Plaintiff, but he condoned and encouraged them. Rumsfeld was the official responsible for terminating this pattern of abuse and reforming the policies causing it. But, he nonetheless chose to condone, encourage, and turn a blind eye to this conduct.

182. As recently as December 30, 2005, Rumsfeld modified the Army Field Manual to continue the use of illegal and improper interrogation and detention tactics even in the face of congressional rebuke and condemnation by the American general pubic.

183. The December Field Manual included ten pages of classified interrogation techniques that apparently authorized, condoned, and directed the very sort of violations that Plaintiff

suffered.  To the best of Plaintiff's knowledge, the December
Field Manual was in operation during his detention.  It was not
replaced until September 2006.

184. Numerous instances of abuse occurring since
December 2005, including those documented by UNAMI, make clear
that Rumsfeld has breached his duty to make the policies and
practices comply with constitutional requirements.  Instead, he
has continued his unlawful policies and practices, turned a blind
eye to any misconduct, abandoned his responsibility to reform
unlawful conduct, and failed to meaningfully discipline any
wrongdoers.

185. Defendant Rumsfeld's policies and directives are
completely inconsistent with fundamental constitutional and human
rights.  No reasonable official could believe that the law allows
him to assume powers and authorize treatment so blatantly
contrary to applicable rights and norms.  Accordingly, Defendant
Rumsfeld is not entitled to any form of official immunity for his
knowing decisions to break with the laws protecting American
citizens and international treaties on human rights.

## Count I - United States Constitution,
## False Arrest

186. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

187. As described more fully above, Plaintiff was arrested and detained without legal justification.

188. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to this violation of Plaintiff's constitutional rights.

189. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

190. The misconduct described in this Count was undertaken under color of federal law.

191. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

192. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

## Count II - United States Constitution,
### Unlawful Detention

193. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

194. As described more fully above, Plaintiff was detained for an unreasonable length of time without being charged with a crime and without access to an attorney.

195. Plaintiff's detention also violated his constitutional rights because there was no judicial approval of the arrest/detention within a reasonable amount of time.

196. Plaintiff's detention was further unreasonable because his detention was unjustifiedly extended even after the time the Detainee Status Board determined that there were no grounds to continue detaining him.

197. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to this violation of Plaintiff's constitutional rights.

198. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

199. The misconduct described in this Count was undertaken under color of federal law.

200. The misconduct described in this Count was
undertaken with malice, willfulness and reckless indifference to
the rights of others.

201. As a result of the above-described wrongful
infringement of Plaintiff's rights, Plaintiff suffered damages,
including but not limited to loss of liberty, physical pain and
suffering, serious emotional distress, and anguish.

### Count III - United States Constitution, Unlawful Search and Seizure

202. Each of the Paragraphs in this Complaint is
incorporated as if restated fully herein.

203. As described more fully above, Plaintiff was
subjected to numerous searches of his person, including strip
searches, for which there was no justification.

204. Plaintiff's property was also searched and seized
without justification and is still being held today without
justification.

205. Defendant Rumsfeld's policies and practices, as
well his condoning of such conduct, authorized and/or foreseeably
led to this violation of Plaintiff's constitutional rights.

206. Defendant Rumsfeld had actual and constructive
knowledge that these very types of constitutional violations
would occur and were occurring routinely. Despite this
knowledge, Defendant Rumsfeld acted with reckless and deliberate
indifference to these violations -- facilitating, approving,

condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

207. The misconduct described in this Count was undertaken under color of federal law.

208. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

209. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of property, serious emotional distress, and anguish.

### Count IV - United States Constitution, Unlawful Interrogations

210. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

211. As described more fully above, Plaintiff was repeatedly interrogated without counsel despite requests for the same, was never warned of his rights to counsel or to remain silent, and in fact was not permitted to remain silent and threatened that his detention would be continued unless he cooperated with the questioning.

212. The statements obtained from Plaintiff in this manner were used to initiate and continue criminal and/or quasi-criminal cases against him, were used to detain him, and were used against him in other proceedings including the Detainee Status Board, all in violation of the Fifth Amendment.

40

213. Additionally, there was no procedure afforded Plaintiff to challenge the use of these statements against him in violation of the Fifth and Fourteenth Amendment rights to Due Process.

214. Moreover, Plaintiff's treatment by prison guards in the months of interrogations "shocks the conscience" in violation of Due Process.

215. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

216. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

217. The misconduct described in this Count was undertaken under color of federal law.

218. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

219. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

## Count V - United States Constitution, Denial of the Right to Counsel

220. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

221. As described more fully above, Plaintiff was not furnished with counsel and/or denied the opportunity to procure counsel during critical stages of the case against him, all in violation the Sixth Amendment.

222. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

223. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

224. The misconduct described in this Count was undertaken under color of federal law.

225. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

226. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

42

## Count VI - United States Constitution,
## Denial of the Right to Confront Adverse Witnesses

227. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

228. As described more fully above, Plaintiff was denied the right to confront, or even know the existence or identity of, the adverse witnesses against him.

229. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

230. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

231. The misconduct described in this Count was undertaken under color of federal law.

232. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

233. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

43

## Count VII - United States Constitution,
## Denial of the Right to Present Witnesses and Evidence, and to
## have Exculpatory Evidence Disclosed

234. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

235. As described more fully above, Plaintiff was denied the right to present witnesses and evidence at the Detainee Status Board and to have exculpatory evidence disclosed in violation of the Sixth Amendment.

236. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

237. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

238. The misconduct described in this Count was undertaken under color of federal law.

239. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

240. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

## Count VIII - United States Constitution,
## Conditions of Detention

241. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

242. As described more fully above, the conditions in which Plaintiff was transported and confined were unreasonable and shock the conscience. These conditions were inflicted by persons, including Defendant Rumsfeld, who were deliberately indifferent to the risks to Plaintiff and to his suffering.

243. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

244. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

245. The misconduct described in this Count was undertaken under color of federal law.

246. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

247. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages,

45

including but not limited to loss of liberty, serious emotional distress, and anguish.

### Count IX - United States Constitution, Denial of Necessary Medical Care

248. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

249. As described more fully above, Plaintiff repeatedly requested medical attention. Despite having actual knowledge of his objectively serious medical conditions, the Defendant's subordinates failed to provide Plaintiff with necessary medical care.

250. In this manner, the conduct of Defendant's subordinates was objectively unreasonable and deliberately indifferent to Plaintiff's serious medical needs.

251. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

252. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

253. The misconduct described in this Count was undertaken under color of federal law.

46

254. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

255. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

### Count X - United States Constitution, Denial of Property without Due Process

256. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

257. As described more fully above, Plaintiff was deprived of his property without due process of law.

258. Defendant Rumsfeld's policies and practices, as well his condoning of such conduct, authorized and/or foreseeably led to these violations of Plaintiff's constitutional rights.

259. Defendant Rumsfeld had actual and constructive knowledge that these very types of constitutional violations would occur and were occurring routinely. Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to these violations -- facilitating, approving, condoning and turning a blind eye to them, and failing to discipline violators in any meaningful way.

260. The misconduct described in this Count was undertaken under color of federal law.

47

261. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

262. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to loss of liberty, serious emotional distress, and anguish.

WHEREFORE, Plaintiff, DONALD VANCE, respectfully requests that this Honorable Court enter judgment in his favor and against Defendant DONALD RUMSFELD, awarding compensatory and punitive damages, as well as costs and attorneys fees and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, DONALD VANCE, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

Attorneys for Plaintiff

Arthur Loevy
Mike Kanovitz
Jon Loevy
Gayle Horn
LOEVY & LOEVY
312 North May St
Suite 100
Chicago, IL 60607
(312) 243-5900



# MULTI-NATIONAL FORCE - IRAQ
## CAMP VICTORY, BAGHDAD
### APO AE 09342-1400

REPLY TO
ATTENTION OF:                          8 0 APR 2008

Office of the Staff Judge Advocate

Name: Donald Vance
ISN: 200343
SSN: 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

Subject: Detainee Status Board

Dear Mr. Donald Vance:

A Detainee Status Board has been convened to determine your legal status as a U.S. citizen detained in the conflict in Iraq. The board has been scheduled to begin no earlier than 23 April, 2006. This Board will determine your status as one of the following:

(1) Enemy Combatant: An individual who is a member agent of Al Qaeda, the Taliban, or another international terrorist organization against which the United States is engaged in an Armed Conflict.

(2) Security Internee: An individual detained because there exists reasonable grounds to believe you pose a threat to security or stability in Iraq. Reasonable grounds consist of sufficient indicators to lead a reasonable person to believe that detention is necessary for imperative reasons of security, e.g. that you pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or otherwise pose a threat to security and stability in Iraq.

(3) Innocent Civilian: An individual who should be immediately released because there are no reasonable grounds to believe that you pose a threat to security or stability in Iraq. Detention is not necessary for imperative reasons of security, e.g. you do not pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or are otherwise not a threat to security and stability in Iraq.

The unclassified factual basis that will be used by the Board to determine your status is as follows:

On or about April 15, 2006 you were detained by members of the Coalition Forces for being a suspect in supplying weapons and explosives to insurgent/criminal groups through your affiliation with the Shield Group Security Company (SGS) operating in Iraq. Credible evidence suggests that certain members of SGS are supplying weapons to insurgent groups in Iraq. Further, you are suspected of illegal receipt of stolen weapons and arms in Iraq from Coalition Forces.



**EXHIBIT**

A

<u>You have the following rights at the Board</u>:

    (1) You have the right to be present at all open sessions of the Board.
    (2) You have the right to testify or not to testify.
    (3) You do not have the right to legal counsel, but you may have a personal representative assist you at the hearing if the personal representative is reasonably available.
    (4) You have the right to present evidence, including the testimony of witnesses who are reasonably available.
    (5) You have the right to examine and cross-examine witnesses.

<u>The following procedures apply at Board hearings</u>:

    (1) All relevant evidence, including hearsay evidence, is admissible. The Board hearing is not adversarial. A recorder may present evidence to the Board. Witnesses will testify under an oath or affirmation to tell the truth.
    (2) The Board's decisions are determined by a majority of voting members.

If you wish to have evidence, witnesses or a personal representative at the Board, you must deliver a written request to the Camp Commander of your detention facility before the Board convenes. The Board will attempt to accommodate reasonable requests for persons who it finds are immediately available. If you have any questions concerning this Board, please contact the Camp Commander with your inquiry and it will be forwarded to The Multi-National Force – Iraq Office of the Staff Judge Advocate for clarification.

Sincerely,

Bradley J. Huestis
LTC, U.S. Army
President of the Board

<u>ACKNOWLEDGEMENT OF RECEIPT</u>:

_____
Donald Vance (Signature)

Date: _____

Time: 21:42 _____

2

CERTIFICATE OF SERVICE

On _20 April_ 2006, I, _PHILIP REIMAN_, personally served a copy of "Detainee Status Board" dated _20 April 06_, on **Donald Vance, ISN: 200343**. This document notifies him of his rights and procedures at his Detainee Status Board.

Signed: _____

3