IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD VANCE and NATHAN ERTEL, | ) | |
| | ) | 06 C 6964 |
| Plaintiffs, | ) | |
| | ) | Judge Wayne Anderson |
| vs. | ) | |
| | ) | Magistrate Judge |
| DONALD RUMSFELD, UNITED STATES OF | ) | Arlander Keys |
| AMERICA and UNIDENTIFIED AGENTS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Plaintiffs' Motion for Limited
Discovery. Defendant United States argues that Plaintiffs are
not entitled to the requested discovery and that the Court lacks
jurisdiction to compel the production. For the reasons set forth
below, Plaintiffs' Motion is granted in part, and denied in part.

### BACKGROUND FACTS[1]

Plaintiffs Donald Vance and Nathan Ertel, both American
citizens, traveled to Iraq in 2004 to work for the Sandi Group,
which provides security services for the Unites States State
Department, nongovernmental organizations ("NGO's"), and
commercial and media firms operating in Iraq. Dissatisfied with
their working conditions, Plaintiffs resigned from Sandi and
returned to the United States.

---

[1] The Background Facts were taken from the allegations in
Plaintiffs' Amended Complaint, which, at this stage of the
proceedings and for purposes of the present Motion, the Court
will accept as true.

In 2005, Shield Group Security ("SGS"), another private security firm operating in Iraq, recruited Plaintiffs, separately, to join the firm. Both Mr. Vance and Mr. Ertel accepted positions with SGS, and returned to Iraq in late 2005.

SGS maintained its offices in a gated community in the "Red Zone" in Baghdad, Iraq. Plaintiffs resided in this gated community, which was patrolled by armed guards, and was essentially a neighborhood populated by native Iraqis, SGS employees, and other expatriates employed by private firms doing business in Iraq.

Plaintiffs allege that, while working with SGS, they observed suspicious and potentially illegal activity. Specifically, Plaintiffs claim that they witnessed SGS agents making payments to Iraqi sheikhs, in an attempt (they believed) to gain an advantage from these influential Iraqis. Concerned about the legality of SGS's actions, Mr. Vance purportedly contacted the Federal Bureau of Investigation ("FBI") during a visit to Chicago. Mr. Vance was put in contact with FBI agent Travis Carlisle, who arranged for Mr. Vance to continue to report on SGS's suspicious activity in Iraq. Mr. Vance agreed to do so, and reported to Agent Carlisle daily.

Agent Carlisle subsequently put Mr. Vance in contact with Maya Dietz, a United States government official working in Iraq.

Ms. Dietz asked Mr. Vance to copy SGS's computer documents and to forward them to her; Mr. Vance agreed.

Mr. Ertel apparently shared Mr. Vance's concerns, and subsequently became aware of Mr. Vance's communications with the FBI. Mr. Ertel agreed to assist Mr. Vance in reporting to Agent Carlisle, and the two also began communicating their concerns to Deborah Nagel and Douglas Treadwell, two U.S. government officials working in Iraq.

Plaintiffs reported to Agent Carlisle and other U.S. officials that SGS Vice President Jeff Smith[2] routinely sold arms, ammunition, night vision technology and infrared targeting systems throughout Iraq. Mr. Smith was well-connected politically, and had a direct relationship with both General George Casey and Iraqi President Jalal Talabani. Plaintiffs also informed both Agent Carlisle and Ms. Nagel that Laith Al-Khudairi, a well-connected employee in the detainee operations division of the United States State Department, conducted suspicious meetings at the SGS compound[3].

---

[2] Although Mr. Smith did not serve as SGS's Vice President at all relevant times, he was consistently "high-up in the chain of command at SGS." Amen. Compl. at ¶ 65. Plaintiffs also reported on a number of other SGS employees, including their supervisor, Mr. Josef Trimpert, who was involved in an illegal "Beer for Bullets" scheme.

[3] Plaintiffs also informed on a number of other SGS-Affiliated members of the Al-Khudairi family. Plaintiffs imply that, in addition to SGS, all of the individuals that they informed on would have a motive to have them arrested.

Plaintiffs found the government officials within Iraq to be unreceptive to their concerns, informing Plaintiffs that there was little the local officials could do to address the problem. Discouraged with the local officials' responses, Plaintiffs shared most of the information they gathered only with Agent Carlisle[4].

Plaintiffs allege that SGS began to question their loyalty to the firm. SGS's suspicions escalated, and on April 14, 2006, armed SGS agents confiscated Plaintiffs' access cards, effectively trapping Plaintiffs in the "Red Zone" within the SGS compound. Plaintiffs contacted Ms. Nagel and Mr. Treadwell, who advised Plaintiffs to barricade themselves in a secure room until U.S. forces could rescue them. Plaintiffs complied and were removed from the SGS compound by U.S. forces.

Plaintiffs were then escorted to the U.S. Embassy, where military personnel seized all of their personal property, including their laptop computers, cellular phones, and cameras. Plaintiffs claim that they were then separated and questioned by an FBI agent and two individuals from United States Air Force

Plaintiffs also find it suspicious that none of these individuals were detained and questioned in a manner similar to Plaintiffs, despite the incriminating information Plaintiffs presented about them to the FBI and other officials.

[4] Plaintiffs' Amended Complaint also alleges that, once these government officials working in Iraq realized they were being left out of the loop, they chose to retaliate by having Plaintiffs arrested and interrogated.

4

Intelligence. Plaintiffs revealed the suspicious activity that
they had observed while employed by SGS, and their communications
with the FBI. Plaintiffs informed their interrogators that
information contained on their seized computers would support
their statements. Following the interviews, Plaintiffs were
escorted to trailers, where they were permitted to sleep for two
to three hours.

Their rest was short-lived. Several armed guards arrested
Plaintiffs, handcuffing and blindfolding the men, and escorted
them into a humvee. Plaintiffs were taken to Camp Prosperity, a
U.S. military compound in Baghdad, where they were placed in a
cage, strip searched, and fingerprinted. They were then taken to
separate cells, and held in solitary confinement. Plaintiffs
were labeled "security internees" affiliated with SGS, and were
suspected of supplying weapons to insurgents. Plaintiffs were
allegedly informed that this information was sufficient,
according to the policies enacted by Defendant Donald Rumsfeld,
for the indefinite, incommunicado detention of Plaintiffs,
without due process or access to an attorney.

Two days later, Plaintiffs were again shackled and
blindfolded, and then transported to Camp Cropper, another U.S.
military compound in Baghdad. At Camp Cropper, Plaintiffs were
repeatedly interrogated and subjected to physically and mentally
coercive tactics by military personnel, who refused to identify

themselves. These unidentified individuals also denied Plaintiffs' repeated requests for an attorney.

On April 20, 2006, Plaintiffs received letters from the Detainee Status Board, indicating that a proceeding would be held on April 23rd, to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." The letter explained that Plaintiffs did not have the right to legal counsel at that proceeding, and that they could only present evidence and witnesses who were reasonably available at Camp Cropper. On April 22, 2006, Plaintiffs received a notice that the Detainee Status Board had determined that they were "security internees," and that they had the right to appeal the determination to Camp Cropper officials. Plaintiffs appealed, and requested that they be allowed to testify on the other's behalf, and that their seized personal property be admitted as evidence of their innocent civilian status.

On April 26, 2006, Plaintiffs appeared before the Board. However, they were not permitted to testify on the others' behalf, nor were they provided with the evidence that they had requested. In addition, the Board refused to allow Plaintiffs to see the evidence against them or to confront any adverse witnesses. Nevertheless, on May 17, 2006, Major General John Gardner authorized Mr. Ertel's release- 18 days after the Board officially acknowledged that he was an innocent civilian. Mr.

Vance's detention continued for an additional two months, where he was continually interrogated. Major General Gardner authorized Mr. Vance's release on July 13, 2006, but he was not permitted to leave Camp Cropper until July 20, 2006. Neither Plaintiff was ever charged with any crime.

Plaintiffs filed suit against Donald Rumsfeld on December 18, 2006, alleging that Mr. Rumsfeld should be held accountable for constitutional violations that occurred in Iraq at the hands of unidentified agents of the United States, as well as for the allegedly unconstitutional practices and policies enacted by Defendant Rumsfeld, which led to Plaintiffs' arrest and confinement.

On December 22, 2006, Plaintiff Vance filed a Motion for Leave to Serve Expedited Third Party Discovery on the United States. The United States filed a Motion in Opposition and a "Statement of Interest" on January 11, 2007. Plaintiffs and the United States appeared before Judge Milton I. Shadur, on January 16, 2007. At the hearing, Judge Shadur questioned the advisability of permitting the requested discovery directed at the United States, in the absence of Defendant Rumsfeld. However, Judge Shadur stated that it would be beneficial for the United States to facilitate the Plaintiffs in their quest to determine the identities of the unknown individuals responsible for their arrest, interrogation, mistreatment, and detention.

The United States agreed that the discovery of just the identities of other potential defendants would be less objectionable than allowing discovery against the United States on substantive issues, but argued that Plaintiffs had failed to demonstrate sufficient need that the information be obtained through expedited discovery. Judge Shadur, however, was sympathetic to Plaintiffs' concern that they likely would be faced with a statute of limitations defense if discovery were not expedited. In addition, Judge Shadur acknowledged the comparative difficulty Plaintiffs would face in attempting to secure the identities of the unknown defendants, most, if not all of whom, were stationed in Baghdad. Judge Shadur further stated that he did not believe "a reasonable inquiry on the part of the government would find any difficulty in identifying persons that the plaintiff is not in a position to identify." 1/16/2007 Hearing Transcript at p. 8. As such, Judge Shadur ordered the United States to "go back and inquire into the availability of such information through the kinds of sources that are available to you." *Id.* at p. 11.

The parties returned to Judge Shadur's courtroom ten days later, on January 26, 2007. The United States reported that initial conversations with officials at the State Department did not reveal any individuals who might be responsive to the relevant portion of Plaintiffs' discovery requests, but that the

8

officials would require more time for investigation. Counsel then stated that the Department of Defense had conducted some interviews, and that "they are more likely to have people who are responsive to those categories, but they are going to require more time as well. Based on my conversation with them I would say that it would take at least 60 days in order to conduct that investigation and come to a determination as to who is not responsive to those requests." 1/26/2007 hearing transcript at p. 3.

Although the United States initially agreed to turn over the identities of potential defendants on a rolling basis, counsel later balked, explaining that the United States would not disclose the information absent a competent court order to do so. Counsel reiterated the difficulty that even the United States government would face in attempting to conduct the requested discovery in an active war zone.

On February 12, 2007, Plaintiffs amended their Complaint, naming the United States of America as an additional Defendant. In Count XV of their Amended Complaint, Plaintiff asked that the Court, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C S. 701 *et seq.* (West 2007), order the United States to return personal property that Plaintiffs allege military personnel confiscated from them when they were arrested in Iraq.

On February 21, 2007, the case was reassigned to Judge Wayne R. Andersen. Defendants subsequently filed a Motion for Transfer of Venue, which Judge Andersen denied on September 19, 2007. Plaintiffs, who had agreed to stay their discovery requests until Judge Andersen issued his ruling on Defendants' Motion for Transfer of Venue, refiled their discovery Motion on October 1, 2007. Judge Andersen referred all discovery matters, including Plaintiff's Motion for Limited Discovery, to this Court.

The parties appeared before the Court on October 5, 2007. At the hearing, the United States argued that Plaintiffs' APA claim was moot, because the United States Department of Defense ("DoD") had already returned all of the property that it could reasonably locate, and that the Plaintiffs were barred from seeking any other form of redress against military personnel under the APA. In response, Plaintiffs stated that they had reason to believe that agencies in addition to the DoD may have had possession of their property; thus the DoD's bald assertion that it did not have any additional property belonging to Plaintiffs was, at best, inconclusive. Plaintiffs also raised the possibility that employees of private government contractors might be among the "unidentified defendants" acting in concert with military personnel— and thus, were potentially outside of the scope of the protections afforded by the military authority

exception -- further undermining Defendant's argument that Plaintiffs' claims were moot.

## DISCUSSION

Plaintiffs seek leave to discover the identities of the individuals responsible for their arrest, detention, and mistreatment in Iraq. Plaintiffs note that the facilities where they were held are "sterilized" facilities, meaning that all of the personnel are anonymous to the detainees. As such, Plaintiffs claim, they do not have effective means of identifying and naming these unknown defendants.

To that end, Plaintiffs have sought discovery from the United States since January of 2007, when the United States informed Judge Shadur and Plaintiffs that, despite the inherent difficulties involved in conducting such discovery, the United States' investigation into the identity of additional defendants would be complete in approximately 60 days. Obviously, more than 60 days has passed since the United States made this assertion, and the United States has never denied that it possesses much of the information that Plaintiff seeks. Yet, the United States has staunchly refused to divulge the fruits of its investigation.

In its Response, the United States argues that Plaintiffs are not entitled to the information and that their Motion must be denied, because: 1) Plaintiffs have not demonstrated that expedited discovery of any matters is appropriate in this case;

11

2)this Court lacks jurisdiction to order discovery against the
United States; 3) granting Plaintiffs' Motion would raise serious
Separation of Powers concerns; and 4) Plaintiffs' discovery
requests are futile. The Court will address each of the
government's arguments in turn.

## I. Expedited Discovery is Appropriate

The United States notes that, despite the fact that
Plaintiffs have been seeking this information for approximately
one year, Plaintiffs' Motion is actually one for expedited
discovery, because the parties have not conferred pursuant to
Fed. R. Civ. P. 26(f). The government asserts that Plaintiffs
bear the burden of demonstrating that expediting discovery is
necessary, and that any harm to Plaintiffs in not expediting
discovery outweighs the prejudice to the responding party if
discovery is expedited. *See generally, Merrill Lynch Pierce,
Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill.
2000).

Plaintiffs argue that delaying discovery would cause them
irreparable harm, because of the looming statue of limitations
deadline on their *Bivens'* claims. *Bivens v. Six Unknown Named
Agents,* 403 U.S. 388 (1971). The parties dispute whether
Illinois' two-year statute of limitations (which will expire in
approximately April of 2008) should apply to Plaintiffs' *Bivens*
claims or the District of Columbia's three-year limitations

12

period should- or at least- could have controlled. *Compare Delgrado-Brunet v. Clar,* 93 F.3d 339, 342 (7th Cir. 1996) (noting that courts applying Illinois law impose a two year statute of limitations on such claims) *with Carney v American Univ.* , 151 F.3d 1090, 1096 (D.C. Cir. 1998) (finding that D.C. Circuit law imposes a three year statute of limitations on *Bivens'* claims). Contrary to the government's assertion[5], the question of which jurisdictions' law applies depends not upon the forum in which Plaintiffs filed suit, but upon Judge Andersen's resolution of the choice of law issues[6]. It is conceivable that such a ruling would be issued after Illinois' two-year statute of limitations period has passed, forcing Plaintiffs to shoulder the risk that the district court's decision could effectively foreclose their ability to seek redress from the unknown defendants.

The government counters that conducting expedited discovery in a warzone outweighs any such concerns. The Court disagrees. There is no apparent end in sight to the hostilities in Iraq, and the United States is powerless to waive a statute of limitations defense on behalf of the unknown defendants. In addition, the government represented to Judge Shadur, almost one year ago, that

---

[5] The United States insists that Plaintiffs have effectively manufactured the purported prejudice by choosing to file in a forum with a shorter limitations period.

[6] Of course, the forum in which the suit is filed is a factor in the choice of law analysis.

13

it had already begun its investigation into the identities of the unknown defendants, and that it could conclude that investigation within about 60 days. The United States has never denied that it possesses some if not all of the information that Plaintiffs seek. Therefore, the Court finds that potential harm to Plaintiffs by delaying discovery outweighs any resulting prejudice to the United States.

## II. This Court has Jurisdiction to Compel Discovery

The United States bluntly asserts that this Court lacks jurisdiction to order the government to produce discovery for the reasons explained in its recently filed Motion to Dismiss Rule 12(b)(1). Of course, this Court lacks the authority to dispose of the arguments raised in Defendant's Motion to Dismiss. *See generally, Thomas v. Arn,* 474 U.S. 140, 141-42 (U.S. 1985); *see also, Brown v. City of Chicago,* No. 98-7949, 2001 WL 1064259, at *1 (N.D. Ill. Sept. 10, 2001) (noting that magistrate judges lack jurisdiction to rule on the City's motion to bifurcate trial, where the referral only encompassed discovery disputes.) But the Court need not resolve the United States' Motion to Dismiss to properly evaluate Plaintiffs' present Motion; an analysis of relevant law makes clear that the government's filing of a Motion to Dismiss-- even one challenging the district court's jurisdiction-- does not strip the Court of the authority to order appropriate discovery.

14

The resolution of a question concerning "jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1192 (U.S. 2007) quoting *Intec USA, LCC v. Engels,* 467 F.3d 1038, 1041 (7th Cir. 2006). In the instant case, it is clear that this discovery Motion is collateral to a resolution of the merits.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). "Where issues arise as to jurisdiction, or venue, discovery is available to ascertain facts bearing on such issues." *Id.* A district court has wide latitude in determining whether to grant a party's request for discovery and such decisions are reviewed for an abuse of discretion. *Doty v. Illinois Cent. R.R. Co.,* 162 F.3d 460, 461 (7th Cir.1998).

Courts have taken a rational approach to discovery requests made in advance of a determination regarding jurisdiction. Courts have generally found it unnecessary for a district court to order discovery or hold a hearing on a motion to dismiss for lack of subject matter jurisdiction where the facts are straightforward and the law is not complex. *See Hay v. Indiana State Bd. of Tax Com'rs*, 312 F.3d 876, 882 (7th Cir. 2002)

15

("Because of the minimal procedural requirements for 'plain, speedy and efficient' set forth by the Supreme Court in *Rosewell,* the district court could make a determination of adequacy based on the information before it, including by reviewing the applicable statutes establishing the procedures for tax assessment review. Consequently, it was not an abuse of discretion for the district court to grant the motion to dismiss without allowing the landowners to conduct discovery"); *Cook v. Providence Hosp.,* 820 F.2d 176, 178 (6th Cir.1987) (finding that no hearing is required on a motion to dismiss where the facts are relatively simple, substantially uncontroverted, and the law is not complex.)

However, where additional discovery would assist the court in resolving the jurisdictional issues, discovery is appropriate. *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C. Cir. 2001) (rejecting the district court's determination that the plaintiff's requested discovery was nothing more than a fishing expedition, and finding that the district court erred in granting the motion to dismiss for lack of subject matter jurisdiction without permitting discovery on the jurisdictional question.); *Rosner v. United States,* 231 F. Supp.2d 1202, 1218 (S.D. Fla. 2002) (permitting the plaintiffs to conduct discovery to determine whether the government's actions were non-military in nature, thus precluding the application of the APA's "military

16

authority" exception, prior to resolving defendant's motion to dismiss.)

In the instant case, Plaintiffs have argued that the APA military authority exception may not apply to certain unidentified defendants, if those defendants were not military personnel[7]. Absent the requested discovery, however, it would be impossible for Plaintiffs to support such an argument. A full and fair analysis of the government's Motion to Dismiss hinges on the disclosure of the identities and status of the unknown defendants. Similarly, the district court's resolution of the Defendant Rumsfeld's qualified immunity argument would benefit from information about the types of defendants involved in the abuses claimed by Plaintiffs.

The United States counters that discovery is not warranted in any event, because Plaintiffs' sole claim against the government— their claim for the return of personal property seized in Iraq-- is moot. The United States bases its mootness argument on: 1) the affidavit of Lt. David Melson, averring that the government has conducted a search of any and all places where the property would have been seized, stored or located; 2) Evidence/Property Custody documents ("Property Documents") that purportedly demonstrate the chain of custody of the property in

---

[7] Plaintiffs also argue that the exception may not apply, because the government's failure to return the Plaintiffs' personal property is not military in nature.

17

question; and 3) the fact that the government has made arrangements to return that property belonging to Plaintiffs that it was able to locate[8].

Plaintiffs first attack Lt. Melson's affidavit, noting that Lt. Melson claims to have contacted only the Joint Personnel Recovery Center ("JPRC"), the Evidence Custodian for the Military Policy Criminal Investigative Division ("CID") and the 494th MP Battalion in his search for Plaintiffs' property. Lt. Melson did not contact any other government agencies or military departments, despite the fact that FOIA documents that Mr. Vance received demonstrate that the Naval Criminal Investigative Service ("NCIS") had control over at least some of Mr. Vance's property, including his thumb drives and cell phone. As such, the investigation described in Lt. Melson's affidavit appears on its face to be incomplete.

Plaintiffs next highlight numerous inconsistencies in the Property Documents proffered by the government. For example, the Property Documents include a property receipt for Mr. Vance that does not match the receipt that Mr. Vance has in his possession. Mr. Vance claims that these discrepancies raise doubts about the authenticity and reliability of the property receipts.

---

[8] Plaintiffs note that the only item that the United States has found is Mr. Vance's laptop, and that the government has offered no explanation as to why it was able to locate this one item and no others.

18

Finally, Plaintiffs argue that their APA claim relates to the United States' failure to return property that was seized more than 18 months ago. Because Plaintiffs' challenge against any governmental actors would be limited to the government's failure to return their property, and not to the seizure itself, the act is not military in nature, and, therefore, falls outside of the scope of the military authority exception. *See Jaffe v. United States,* 592 F.2d 712, 720 (3rd Cir. 1979) (ruling that the plaintiff's APA claim for failure to warn about the medical risks associated with observing a nuclear test in Nevada did not fall within the military authority exception, as the challenged conduct did not occur in the field nor in time of war.) Indeed, Plaintiffs do not know if their property remains in military custody, with the State Department, the FBI, the CIA, or a host of other agencies. As such, Plaintiffs argue, their claim is neither clearly barred[9] by the military authority exception nor moot, and discovery is appropriate.

The Court agrees that the evidence proffered by the government is far from conclusive on the issue of mootness. Moreover, even if the government's evidence was not flawed, this evidence would not moot Plaintiffs' claims if the district court determines that the government's conduct was not military in

---

[9] The Court is not ruling on the validity of Plaintiffs' arguments, merely noting the existence of reasonable opposition to the government's position.

nature, or if the unidentified actors were private governmental
contractors- like many of the allegedly politically-connected
individuals who were the subject of Plaintiffs reports to Agent
Carlisle - who are not shielded by the APA's military authority
exception.  As such, it is difficult to see how the district
court can resolve Defendants' argument that the military
authority exception bars Plaintiffs' APA claim, without a more
clear understanding of the individuals involved in the complained
of abuses.

In conclusion, the Court finds that the issue of
jurisdiction in this case is complex and fact intensive.
Analysis of the issues raised in Defendants' Motion to Dismiss
would only benefit from appropriately tailored discovery.  As
such, the Court rejects the United States' claim that the
arguments raised in its Motion to Dismiss strip the Court of the
power to compel discovery.

## III. Tailored Discovery Would Not Violate Separation of Powers Concerns.

The United States next argues that separation-of-powers
concerns dictate against granting Plaintiffs' Motion for
discovery.  The government notes that the purpose of the APA's
"military authority" exception is to prevent federal courts from
interfering in military strategy, decision-making, and actions
occurring in "combat zones or in preparation for, or in the
aftermath of, battle."  Def.'s Resp. at 6, citing Doe v.

20

*Sullivan,* 938 F.2d 1370, 1380 (D.C. Cir. 1991) (finding that the plaintiff's challenge to a rule published by the FDA was not a military matter.) Notably, the district court has not ruled that the military authority exception to the APA applies in this case, and Plaintiffs have offered colorable arguments that the exception does not apply.

Nevertheless, the government argues, it is impossible to divorce this case from the realities of an ongoing war in Iraq. Agreed. However, the cases cited by the government are tangential, at best, to the issue of whether the requested discovery in this case is advisable or even permissible. For example, the government cites to *Chappel v. Wallace*[10], where the Court discussed the unique distinction between military and civilian life:

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

---

[10]     Similarly, *Alhassan v. Hagee,* 424 F.3d 518, 525 (7th Cir. 2005) concludes that it would be inappropriate for courts to review whether a soldier's evidence of his opposition to war was sufficient to establish that he was a conscientious objector, whether his objection to war was based on religious concerns, and whether his beliefs were deeply felt. Responsibility for making such determinations rest with the military, not the courts.

21

462 U.S. 296, 301 (1983) (quoting *Orloff v. Willoughby,*
345 U.S. 83, 93-94, 73 S.Ct. 534, 540 (1953)).

But the case at bar involves charges filed by civilians- not
soldiers attempting to avoid the jurisdiction of a military
tribunal.  And caselaw teaches that citizens have the right to
sue the government for abuses that occurred during wartime, and
that the judiciary retains the authority to adjudicate those
suits.  In *Hamdi v. Rumsfeld,* the United States Supreme Court
rejected "the Government's assertion that separation of powers
principles mandate a heavily circumscribed role for the courts in
such circumstances.  Indeed, the position that the courts must
forgo any examination of the individual case and focus
exclusively on the legality of the broader detention scheme
cannot be mandated by any reasonable view of separation of
powers, as this approach serves only to *condense* power into a
single branch of government.  We have long since made clear that
a state of war is not a blank check for the President when it
comes to the rights of the Nation's citizens." 542 U.S. 507, 535-
36, 124 S.Ct. 263, 265 (2004).

The *Hamdi* Court's decision demonstrates that, not only do
citizens detained during wartime have the right to seek redress
in the courts, but that the courts have the authority to require
the United States to afford those litigants certain processes,
despite the exigencies of war.  Mr. Hamdi, a United States

22

citizen, was taken into custody in Afghanistan, after he was allegedly found supporting Taliban soldiers against the United States. Mr. Hamdi was subsequently detained, indefinitely, in a military facility in the United States, and he filed a petition for habeas corpus. Mr. Hamdi argued that he was denied a meaningful and timely hearing on the issue of whether he was an enemy combatant, and that his extra-judicial detention, which began and ended with the submission of an affidavit based on third-party hearsay, violated his rights under the Fifth and Fourteenth Amendments. *Id*, 542 U.S. at 524-25.

The government argued that "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict" ought to eliminate entirely any individual process, restricting the courts to investigating only whether the broader detention scheme itself is legal. *Id.* at 527. A majority of the Supreme Court disagreed, and found instead that the "tension . . . between the autonomy that the Government asserts is necessary . . and the process that a citizen contends he is due before he is deprived of a constitutional right," should be resolved by balancing the plaintiff's constitutional rights against the government's separation of power and wartime concerns. *Id., citing Mathews v. Eldridge,* 424 U.S. 319 (1976).

The Court balanced Mr. Hamdi's assertion that he should have been afforded full due process rights, as the risk of an erroneous deprivation of liberty absent such protections was unacceptably high, with the government's claim that enemy combatants— even if they are citizens— are entitled to only minimal process. The government highlighted the "practical difficulties that would accompany a system of trial- like process" because "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried in the rubble of war." 542 U.S. at 531-32, 124 S. Ct. at 2648.

The Court concluded that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the government's assertions before a neutral tribunal. 542 U.S. at 533, 124 S.Ct. at 2648. In so ruling, the Court found it "unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts." *Id* at 534, 124 S. Ct. at 2639. The Court further noted that such a process would meddle little into the

waging of war, inquiring only into the appropriateness of certain
detentions, explaining:

> While we accord the greatest respect and consideration to
> the judgments of military authorities in matters relating to
> the actual prosecution of a war, and recognize that the
> scope of that discretion necessarily is wide, it does not
> infringe on the core role of the military for the courts to
> exercise their own time-honored and constitutionally
> mandated roles of reviewing and resolving claims like those
> presented here.

542 U.S. at 535, 124 S.Ct. at 1249-50.

Obviously, the issue presented here is distinguishable; the
United States has not contested the feasibility of asserting an
APA claim against it, but has instead challenged the validity of
Plaintiffs' claims, and its obligation to produce discovery as a
result. With the exception of the APA's military authority
exception – the applicability of which Plaintiffs contest– the
government has not argued that Congress has authorized the
suspension of APA suits against it. Nevertheless, *Hamdi* is
instructive in assisting this Court's balancing of Plaintiffs'
need for information relevant to this litigation against the
undeniable hurdles of gathering discovery in Iraq during wartime.

As discussed above, if the United States does not provide
Plaintiffs with the identities of the unknown defendants, there
is a very real possibility that the applicable statute of
limitations will prevent Plaintiffs from ever seeking redress
from potentially liable individuals. In addition, the Court is
not persuaded that gathering this information will require the

United States to "go out into the field to interview" soldiers "some of whom may be conducting combat operations." Def.'s Resp. at p. 7. Plaintiffs very specifically identified the dates and locations of their detention. It strains credulity to believe that the government and/or military does not have in place procedures for documenting individuals working in those facilities at specific times.

Moreover, the United States has already been ordered by Judge Shadur to begin such an investigation, and has stated that such an investigation would be completed in approximately March of 2007. The government does not deny that it already has the information that Plaintiffs seek, it simply refuses to divulge the information. As such, it is not clear the extent to which the separation of powers concerns cited by the United States are even implicated[11].

Finally, while the Court is sensitive to the extreme challenges presented by the ongoing hostilities in Iraq, the Court cannot accept the practical consequences of the United States' position -- that the existence of a war so diminishes the

---

[11] The United States complains that the requested discovery is inappropriate, because military personnel on active duty in Iraq should not be required to defend against a lawsuit, half way around the world. Plaintiffs correctly point out that such concerns can be appropriately addressed after the unknown defendants have been identified. For example, Congress has enacted the Servicemembers' Civil Relief Act, 50 U.S.C. app. § 501 et seq., which allows courts to stay litigation against defendants in the active duty military.

authority of the judiciary that it must suspend the normal routes of discovery, based on little more than the United States' own assessment of its opponent's position. It is the resulting concentration of power in the executive branch that would offend separation of powers concerns.

The Court concludes that Plaintiffs should be afforded that basic discovery necessary to enable Plaintiffs to avoid a potential statute of limitations' defense. As such, the United States shall produce to Plaintiffs the identities of the unknown defendants within 30 days of the entry of this Opinion.

## IV. Potential Qualified Immunity Arguments are Insufficient to Defeat Plaintiffs' Discovery Request.

The United States asserts that requiring it to undertake discovery in a war zone is inappropriate for the additional reason that Plaintiffs' claims against the unidentified defendants will be futile. The United States confidently asserts that any and all claims against both known and unknown defendants will be dismissed on qualified immunity grounds, and that caselaw dictates that any order compelling discovery should await a ruling on the district court's determination of the Defendants' qualified immunity arguments.

Many courts have noted the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (citing *Harlow v. Fitzgerald,*

457 U.S. 800, 818 (1982)). While *Harlow* and its progeny sought to protect government officials who were likely entitled to immunity from broad reaching discovery, the Supreme Court has acknowledged that "limited discovery may sometimes be necessary" before a court can resolve the issue of qualified immunity. *Crawford-El v. Britton,* 523 U.S. 574, 593 n.14 (1998); *see also, Fairley v. Fermaint* 482 F.3d 897, 900 (7th Cir. 2007) (noting that "qualified immunity gives the defendant a right not only to prevail but also to avoid entanglement in the litigation-sometimes dubbed a 'right not to be tried,' this entitlement includes a right to avoid discovery", but only if matters are "sufficiently clear" at the outset of the suit.)

In the instant case, it is impossible to determine whether the unknown defendants can raise a colorable claim for qualified immunity, precisely because they- and their positions either within the government, military, or the private sector-- are unknown. The only Defendant to have thus far filed a claim for qualified immunity is Defendant Rumsfeld. While Defendant Rumsfeld might present a viable argument[12] that he should not be required to engage in discovery until his claim for immunity is resolved, Plaintiffs are not seeking discovery from Defendant

---

[12] Of course, Plaintiffs challenge the viability of Defendant Rumsfeld's qualified immunity claim, noting that an American citizen's right to be free from involuntary confinement without due process, even while living abroad, was well established at the time they were detained. *Citing Hamdi,* 542 U.S. at 533.

28

Rumsfeld. Plaintiffs are seeking the identities of the unknown defendants from the United States, and the United States did not raise a claim for qualified immunity in its Response to Plaintiffs' Motion or in its Motion to Dismiss.

The government's position is simply untenable. There is no statutory or caselaw support for the proposition that a court should delay discovery based on the United States' bald representation that unknown defendants will be immune from suit. Nor do the allegations in Plaintiffs' Amended Complaint compel a conclusion that the unknown defendants are necessarily military employees entitled to immunity. See Fed. R. Civ. P. 15(a)(2) (noting that courts should "freely give leave" to allow plaintiffs to amend their complaints "when justice so requires.") Plaintiffs' allegations are consistent with theories advanced by counsel in court, that private government contractors may have been acting in concert with the military in orchestrating Plaintiffs' arrests. Only additional discovery will reveal if the government's predictions are accurate. Therefore, the Court rejects the United States' argument that the issue of qualified immunity prevents the Court from proceeding on Plaintiffs' discovery Motion.

In addition, Plaintiffs' unopposed request for leave to serve subpoenas on SBC Global for email correspondence and on Orascom for relevant cell phone records is granted.

## CONCLUSION

The present Motion seeks to discover the identities of those individuals responsible for Plaintiffs' arrest and detention in Iraq. Almost one year ago, the United States represented to Judge Shadur that it could obtain this information within 60 days, and the government has never denied that it possesses information responsive to Plaintiffs' request. In refusing to produce such information, the government has raised a dubious challenge to the court's jurisdiction, speculated as to the viability of potential defenses that might be asserted by presently unknown defendants, decided that its assessment of the weakness of Plaintiffs' claims should excuse the government's participation in discovery, and argued that separation-of-powers concerns counsel against the court performing its judicial duties, in favor of concentrating discretion and power within the executive branch.

The Court does not presume to foresee the ultimate validity of the claims and defenses raised in this lawsuit. But the Court is convinced that it has both the authority and the obligation to order the United States to discover and produce to Plaintiffs the identities of the individuals responsible for Plaintiffs' arrests, detention, and mistreatment in Iraq.

Therefore, the Court grants Plaintiffs' Motion to the extent that it seeks the identities of unknown defendants responsible

for their arrest, detention, and mistreatment while at Camps Prosperity and Cropper in Iraq. The Court denies Plaintiffs' Motion to the extent that it seeks all documents concerning Plaintiffs, as this evidence does not implicate the statute of limitations concerns that informed this Court's decision. Similarly, the Court denies Plaintiffs' Motion to the extent that it asks the government to identify all persons who issued and or signed any policy or order that relates to the topics listed in six broad categories, even if such policy and/or order was of general applicability and not specific to Plaintiffs' case.

Therefore, Plaintiffs' Motion to identify the unknown defendants is Granted, Plaintiff's Motion for leave to serve subpoenas on SBC Global and Orascom is Granted, but Plaintiffs' Motion for all additional discovery is Denied, without prejudice.

DATE: December 21, 2007     E N T E R E D:

_Arlander Keys_

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

31