IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD VANCE and NATHAN ERTEL, | ) | |
| | ) | 06 C 6964 |
| Plaintiffs, | ) | |
| | ) | Judge Andersen |
| v. | ) | |
| | ) | Magistrate Judge Keys |
| DONALD RUMSFELD, UNITED STATES of | ) | |
| AMERICA and UNIDENTIFIED AGENTS, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiffs, DONALD VANCE and NATHAN ERTEL, by his attorneys, LOEVY & LOEVY, and complaining of Defendants, DONALD RUMSFELD, the UNITED STATES OF AMERICA, and UNIDENTIFIED AGENTS, state as follows:

### Introduction

1.     In 2006, Plaintiffs Donald Vance and Nathan Ertel were indefinitely detained without due process of law in a United States military installation in Iraq. They were not charged with any crime, nor had they committed any crime. None of Plaintiffs' loved ones could find out if they were even alive.

2.     During this extended and unlawful detention, Mr. Vance and Mr. Ertel were interrogated repeatedly by United States military and civilian officials. Their interrogators utilized the types of physically and mentally torturous tactics that are supposedly reserved for terrorists and so-called enemy combatants. Throughout the ordeal, they were denied an attorney or even access to a court to challenge their mistreatment.

3. Plaintiffs are American citizens. Mr. Vance was born and raised in Illinois. He previously served proudly and honorably as a member of the United States Navy. Mr. Ertel was born and raised in Virginia. He has worked as a government contract administrator for over 13 years. Neither of them violated the laws of this country or any other law.

4. Plaintiffs are not now, and never have been, terrorists or enemies of the United States. To the best of their knowledge, Plaintiffs were never even legitimately accused of being the same. To the contrary, the people who caused them to be detained -- U.S. officials stationed in Iraq, including State Department officials -- knew Plaintiffs were innocent. They had Plaintiffs detained *incommunicado* for months, without just grounds, and denied them of the ability to seek *habeas corpus* so that they could extract information from Plaintiffs to learn what they had told to state-side law enforcement officials about misconduct occurring in Iraq. This misconduct was within the purview of these officials and potentially embarrassing to them.

5. As Americans, Plaintiffs are entitled to the liberties and protections of the United States Constitution, and these detentions blatantly violated their rights.

6. Nevertheless, officials at the highest levels of the United States government have endorsed just such abuses. In particular, Defendant Donald Rumsfeld devised policies that permit the use of torture in interrogations and the detention of Americans without just grounds and effectively without access to a court to seek habeas. Providing government officials such

2

powers over American citizens is completely unprecedented in the history of the Bill of Rights and, as Plaintiffs' experience shows, inherently susceptible to corruption and abuse.

7.     This lawsuit seeks accountability and justice for Defendants' violations.  Mr. Vance and Mr. Ertel also bring this lawsuit at least in part so that other Americans will not have their civil rights suspended in a similar fashion in the future.

## Jurisdiction and Venue

8.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.  This Court has personal jurisdiction over Defendant Rumsfeld due to his ties to Illinois. Venue is proper under 28 U.S.C. § 1391(b)(1).

## Background

9.     Earlier this decade, Defendant Donald Rumsfeld and others, enacted a series of measures applicable to persons whom government officials, in their unilateral discretion, decide to designate as possible enemies of the United States.  These new measures, crafted in secret and without resort to the democratic process, effectively suspended certain very basic human and civil rights for those whom the officials target.

10.    For example, once the federal officials decided to affix a "possible enemy" label to a given person, that person would lose fundamental procedural rights to challenge the truthfulness of the accusation or to seek a court's review of the official's determination.

11.    Americans designated as an enemy or possible enemy could thus be held indefinitely, in secret, cut off from the

3

courts, without access to an attorney, and with no fair procedure even to challenge the "enemy" designation assigned them.

12. Throughout these *incommunicado* detentions, the officials are free to interrogate Americans without the benefit of counsel. Furthermore, Defendant Rumsfeld has approved and, at times, ordered the use of interrogation tactics that are universally condemned as torture. These tactics contravene the protections embedded in the Geneva Conventions, *i.e.,* the global norms for the treatment of detainees that were adopted by the communities of the entire world in the wake of the horrors of World War II.

13. After enacting the new rules, members of the federal government endeavored to keep them secret, both from the public and from the people's elected representatives. However, in a still-free society, such secrets remain difficult to keep.

14. For example, upon discovering that Defendant Rumsfeld had endorsed the use of torture in interrogations, the American people were repulsed, and the United States Congress enacted laws, including the Detainee Treatment Act of 2005 ("DTA"), to forbid torture by or against Americans, stating:

> No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

DTA Pub. L. 109-148, Div. A, Title X, § 1003, 119 Stat. 2739-40 (Dec. 30, 2005).

15. As is explained below, Defendant Rumsfeld flouted Congress' command and continued the use of torture against

4

detainees, including American detainees, and Plaintiffs
themselves were tortured as a result.

16. Similarly, when family members of American
detainees sued Defendant Rumsfeld seeking to end to the
unconstitutional detentions, the Supreme Court made clear to Mr.
Rumsfeld that the government must afford detainees fair due
process rights with which to challenge a "possible enemy"
designation and must permit detainees to seek review of any
resulting detention decision in a court of law, stating:

> Thus, while we do not question that our due process
> assessment must pay keen attention to the particular
> burdens faced by the Executive in the context of
> military action, it would turn our system of checks and
> balances on its head to suggest that a citizen could
> not make his way to court with a challenge to the
> factual basis for his detention by his Government,
> simply because the Executive opposes making available
> such a challenge. Absent suspension of the writ by
> Congress, a citizen detained as an enemy combatant is
> entitled to this process.

Hamdi v. Rumsfeld, 542 U.S. 507, 536-537 (2004). Again, Mr.
Rumsfeld took matters into his own hands. He ignored the Supreme
Court's command to provide fair processes and to submit the
detention decisions to judicial review, as Plaintiffs' experience
(and that of many others) demonstrates.

17. Though Defendant Rumsfeld's rules were originally
justified as applying only to terrorists, there is a very real
potential for slippage and abuse. As with any concentration of
extraordinary power in the executive branch, this risk is more
than hypothetical. The Supreme Court also warned Mr. Rumsfeld
about the need for due process rights to prevent official abuse
of the detention powers Rumsfeld had given them, stating:

[A]s critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat.

Hamdi v. Rumsfeld, 542 U.S. 507, 530 (2004). Such abuse is exactly what happened to Plaintiffs in 2006 after Mr. Rumsfeld failed to reform his detention policies.

18.    While working as civilians with privately-owned companies operating in Baghdad, Plaintiffs came into contact with political, financial, and operational information that they considered to be suspicious and potentially indicative of corruption in Iraq. Fulfilling what they believed to be their patriotic duties as American citizens, Mr. Vance and Mr. Ertel reported these irregularities to law enforcement officials, primarily the Federal Bureau of Investigation ("FBI") in Chicago, but also to members of the State Department and other federal officials. Both Mr. Vance and Mr. Ertel undertook this reporting for their country, even though they knew full well that the disclosures could result in serious, if not deadly, retaliation by some of those on whom they were informing.

19.    The information they reported was also potentially embarrassing to U.S. bureaucrats in Iraq as it concerned misconduct and lawlessness within their assigned areas. When some of these bureaucrats learned of Plaintiffs' reports they labeled Plaintiffs "security internees" and invoked the powers Rumsfeld had given them to detain Plaintiffs and interrogate them

6

about what they had been reporting, particularly what they had told state-side FBI officials.

20. Mr. Vance was held *incommunicado* for three months and Mr. Ertel was so held for over one month, both is U.S. facilities under U.S. control.

21. During this time they were repeatedly subjected to torturous interrogations. This included psychologically-disruptive tactics designed to induce compliance with their interrogators' will, such as exposure to intolerable cold and continuous artificial light (no darkness day after day) for the duration of their imprisonment; extended solitary confinement in cells without any stimuli or reading material; blasting by loud heavy metal and country music pumped into their cells; being awoken by startling if they fell asleep; threats of excessive force; blindfolding and "hooding"; and selective deprivation of food and water, amongst other techniques. All of the mistreatment was inflicted by Americans, some of them military, some of them from civilian agencies.

22. The months of unconscionable interrogations revealed only that Plaintiffs were innocents who had already volunteered everything they knew to the federal government.

23. Secret imprisonment and torturous interrogation of American citizens by their own government is antithetical to this nation's longstanding commitment to liberty. The basic scheme of our constitutional democracy mandates that such infringements must be subject to meaningful challenge and review by the judicial branch.

**The Parties**

24.   Plaintiff Donald Vance is a 30 year-old United States citizen who was born and raised in Chicago, Illinois, where he currently resides.  Before beginning his career as a security consultant, Plaintiff served his country in the United States Navy, spending two years on active duty and four years in the reserves.  Following 9/11, in an act of patriotism, he voluntarily upgraded his reentry code to reactivate if needed.

25.   Plaintiff Nathan Ertel is a 30 year-old United States citizen who was born and raised in Virginia.  For over 13 years, Mr. Ertel has worked as a contract manager for numerous government contractors.

26.   Defendant Donald Rumsfeld is the former Secretary of the United States Department of Defense ("DoD").  At all relevant times, Defendant Rumsfeld was personally responsible for developing, authorizing, supervising, implementing, auditing and/or reforming the policies, patterns or practices governing the arrest, detention, treatment, interrogation and adjudication of detainees held in U.S. custody throughout the world.

27.   The Unidentified Defendants are the U.S. officials and agents who ordered, carried out, and failed to intervene to prevent, the torture and unlawful detention of the Plaintiffs.

**The Sandi Group**

28.   In 2004, following the United States invasion of Iraq, Plaintiffs separately went to Iraq to try to help rebuild the country and achieve democracy.

8

29.  Both went to work for the Sandi Group.  The Sandi
Group, in a joint venture with DynCorp International, provides
security services for the United States State Department,
nongovernmental organizations ("NGOs"), and commercial and media
firms operating in Iraq.

30.  The Sandi Group was at one point the largest
private employer of Iraqi citizens in Iraq, employing
approximately 6,000 people.

31.  Mr. Ertel began working for the Sandi Group in
August 2004 as a security contract administrator.  Mr. Vance
joined Sandi Group in December 2004, when he was hired as a
supervisor of security personnel.  Among their various duties,
Plaintiffs were privileged to provide security escorts and to
help secure polling facilities during Iraq's constitutional
election period.  Plaintiffs also provided security for employees
of various NGOs who strived, under difficult conditions, to
improve the quality of life for Iraqi citizens.

32.  Frustrated with the Sandi Group's lack of concern
for its employees, both Mr. Vance and Mr. Ertel eventually quit.
Mr. Vance returned home to Chicago and Mr. Ertel returned to
Virginia.

### Shield Group Security

33.  At all relevant times, Shield Group Security
("SGS") was an Iraqi security services company owned by Mustafa
Al-Khudairi, a dual Iraqi-British citizen.  He is also known as
Mustafa Kamel.  SGS was formed under Iraqi law as the Al-Dera'
Al-Watani Company for Security Services & General Guards Ltd.

34.  SGS contracts with the Iraqi government, Iraqi companies, NGOs, United States contractors, and the Multinational Forces - Iraq ("MNF-I").  To the best of Plaintiffs' knowledge, the company is still operating, providing services, *inter alia,* for the Iraqi government and United States-aligned NGOs.

35.  In the Fall of 2005, Mr. Vance was contacted in Chicago by Dan Johnson, a former colleague who also had left the Sandi Group and now worked for SGS.

36.  At that time, Mr. Johnson asked Mr. Vance to return to Iraq to work for SGS.  Mr. Vance agreed and was hired pursuant to a one-year contract to provide security services and supervise security personnel.

37.  A short time later, in November 2005, Mr. Ertel too was recruited to work for SGS by another former Sandi Group employee, Josef Trimpert.  Mr. Ertel was recruited by Mr. Trimpert to work for SGS as a contract manager tasked with ensuring contract compliance and developing business for SGS.  In that position, Mr. Ertel reported directly to Mustafa Al-Khudairi.

38.  Plaintiffs were paid monthly by SGS in United States dollars.

39.  At all relevant times, SGS maintained its offices in a gated community in the Red Zone in Baghdad, Iraq (the "compound").  Mr. Vance, Mr. Ertel, and Mr. Trimpert all lived in dormitory-type housing on the compound.  Mustafa Al-Khudairi also maintained his residence on the compound.  The two gates into the compound were controlled by armed guards.

40.   The compound was essentially a neighborhood, populated by both native Iraqis and expatriates working for other companies.  As was true for everyone living in Baghdad, there were frequent disruptions in electricity and the water was not potable.

### Plaintiffs Begin Whistleblowing

41.   Most of Plaintiffs' work took place in SGS's main offices where, from time-to-time, they would observe payments being made by SGS agents to certain Iraqi sheikhs.

42.   Based on these observations, Plaintiffs came to believe that these payments were being made to obtain influence. Plaintiffs did not know whether these payments were legal or corrupt, but suspected the latter.

43.   In October 2005, Mr. Vance returned to Chicago to attend his father's funeral.  Acting out of a sense of patriotism and moral obligation, Mr. Vance took this opportunity to telephone the FBI to report what he had been observing at SGS.

44.   Mr. Vance was eventually connected to Travis Carlisle, an FBI agent.  Mr. Carlisle asked Mr. Vance to report to him any strange activity that he witnessed at SGS.  Mr. Vance agreed, and pledged his cooperation.

45.   Upon returning to Iraq, Mr. Vance regularly emailed and called Mr. Carlisle in Chicago, sometimes as often as twice per day, to report his observations.

46.   Approximately two and a half weeks after the in-person meeting, Mr. Carlisle telephoned Mr. Vance and asked him to meet with Maya Dietz, a U.S. official who was working in Iraq.

11

47. Mr. Vance met with Ms. Dietz. She asked him to capture SGS's computer documents on memory sticks and forward them to her. Mr. Vance complied with this request.

48. Mr. Ertel was aware of and contributed information for Mr. Vance's communications with the FBI.

49. In addition, both Mr. Vance and Mr. Ertel were in contact with Deborah Nagel and Douglas Treadwell, who were working for civilian U.S. agencies including the State Department in Iraq, about their concerns regarding SGS.

50. Plaintiffs' whistleblowing ultimately expanded to cover a number of topics related to SGS, its dealings with the Iraqi government, other companies and contractors, and the sheikhs. Plaintiffs also reported on others associated with SGS, as well as on high-level officials in the Iraqi government.

51. Much of Plaintiffs' whistleblowing was directed towards Agent Carlisle in the United States rather than to United States officials on the ground in Iraq. Unlike Carlisle, the local United States officials were often unreceptive to Plaintiffs' whistleblowing, even going so far as to discourage Plaintiffs by telling them that there was nothing the local officials could do.

### Plaintiffs' Whistleblowing/Evidence of Pretext

52. As is explained in the following paragraphs, Plaintiffs' whistleblowing eventually triggered retaliation by their own government. Upon learning the magnitude of information Plaintiffs had been reporting to intelligence agents at home, these officials wanted to find out the specifics of what the law

12

enforcement agents in the United States knew about their territory and operations. The unconstitutional policies that Rumsfeld and other Unidentified Agents had implemented for detaining and interrogating "enemies" provided ample cover for them to extract information about Plaintiffs' whistleblowing.

53. These officials claimed that Plaintiffs could possibly be enemies because they were affiliated with SGS and that "certain [unnamed] members" of SGS were supposedly suspected of aiding insurgents. Under the applicable policies, no further explanation or evidence was required of them for their actions.

54. This supposed justification for detaining and interrogating Plaintiffs for months was a complete pretext as the following facts show.

1. *Plaintiffs' Whistleblowing About SGS Vice President Jeff Smith, Who Defendants Decided Not to Arrest*

55. Plaintiffs' whistleblowing included reports to Mr. Carlisle and other U.S. officials about Jeff Smith.

56. Mr. Smith was high-up in the chain of command at SGS. At one point, he was the Vice President of SGS.

57. In addition, Mr. Smith also operated several of his own companies in Iraq, with whom SGS would subcontract.

58. Mr. Smith was known in Iraq as a weapons merchant. He was capable of obtaining, and routinely sold, arms and ammunition, night vision technology, and infrared targeting systems (amongst other items), throughout Iraq, including to SGS. On information and belief, Mr. Smith also sold large quantities of weapons to the Iraqi Ministry of Interior, which desired to

13

obtain caches of arms other than through the United States military. At various times, SGS also sold weapons to Mr. Smith.

59. Given his line of business, Mr. Smith was also very well-connected, including having direct relationships with both General George Casey and Iraq President Jalal Talabani.

60. Indeed, Mr. Smith's activities and affiliations were a frequent subject of the interrogations Plaintiffs were subjected to during their unlawful detentions.

61. Although Defendants supposedly justify their actions against Plaintiffs on grounds that they suspected SGS of weapons dealing and that Plaintiffs were affiliated with SGS, Mr. Smith was also a person affiliated with SGS but he was not arrested (much less detained *incommunicado*, interrogated, or tortured). Moreover, unlike with Plaintiffs, there was actual evidence that Smith was a weapons merchant.

62. There was no legitimate impediment to arresting Mr. Smith. First, he was well known in the Green Zone and was often present in Baghdad.

63. Second, based on several photographs of Mr. Smith posing with U.S. General Casey and President Talabani, Smith was present with the aforementioned gentlemen at a party Smith hosted on July 4, 2006 (while Plaintiff Vance was being held in solitary confinement, interrogated, and tortured). It would have been easy for any agency to have arrested Mr. Smith at this party.

64. If the supposed basis for arresting and detaining Plaintiffs were legitimate and true, then Mr. Smith also would have been arrested. The reason Smith was never arrested was

14

because the supposed justification of affiliation with SGS was a pretext for Plaintiffs' detention and the Defendant officials were not in fact concerned about SGS or its associates. Rather, they were concerned about what Plaintiffs told the FBI in Chicago about Smith and others.

> *2. Plaintiffs' Whistleblowing About*
> *Laith Al-Khudairi, an SGS-connected U.S. State Department*
> *Employee in Baghdad, Who Defendants Decided not to Arrest*

65. Plaintiffs also reported to United States officials on other persons with clear connections to SGS, most of whom were family of Mustafa Al-Khudairi.

66. One of the persons about whom Mr. Vance reported to Mr. Carlisle and Ms. Nagel was Laith Al-Khudairi, Mustafa Al-Khudairi's uncle.

67. Laith Al-Khudairi is a citizen of the United States and a resident of Texas who was employed by the United States Department of State in detainee operations.

68. Because of his position in the United States government, Laith Al-Khudairi could not easily move between the Green and Red Zones. Mustafa would often task Mr. Vance with transporting Laith from the State Department to the SGS compound.

69. On numerous instances, Laith would come to the SGS compound and meet with large groups of sheikhs. During those meetings, SGS would shut down the entire floor on which the meeting was being held. Neither Mr. Vance nor Mr. Ertel were allowed in and they do not know what transpired during them. Nevertheless, they considered these meetings suspicious and dutifully passed on the information to Mr. Carlisle.

15

70. The nature of scope of Plaintiffs' reports to the FBI about Laith Al-Khudairi was a frequent subject of Plaintiffs' interrogations during their detentions.

71. Although Defendants supposedly justify their actions against Plaintiffs on grounds that they suspected SGS of weapons dealing and Plaintiffs were affiliated with SGS, Laith Al-Khudairi was also a person affiliated with SGS but the did not arrest him (much less detain, interrogate, or torture him).

72. It would have been easy for the Defendants to have arrested Laith Al-Khudairi. He lived in the Green Zone at the United States Embassy.

73. If the Defendants' supposed basis for arresting and detaining Plaintiffs were legitimate and true, then Laith Al-Khudairi also would have been arrested. Far from arresting him, the United States government continued to employ Laith Al-Khudairi at the State Department.

### 3. Plaintiffs' Whistleblowing About SGS Manager Mukdam Hassany, Who Defendants Decided Not to Arrest

74. Plaintiffs were also providing information to their contacts within the United States government on Mustafa's second-in-command, Mukdam Hassany.

75. Mr. Hassany was heavily involved in all of SGS's contracting, including the selling and procuring of weapons.

76. For example, Mr. Hassany brokered a deal with a Lieutenant Colonel in the South Korean Army, by which SGS sold South Korea a large quantity of weapons including AK-47s. There

were no end-user certificates issued for those weapons nor was any formal paperwork created to memorialize the sale.

77. In addition, Mr. Hassany networked with the Iraqi police for the questionable purchase of government-issued handguns. Handguns were in high demand but short supply in Iraq. Therefore, Mr. Hassany used his contacts within the Iraqi police to procure handguns for SGS and its clients.

78. Mr. Hassany also bribed the same Iraqi police officers to ensure their presence near the compound and thereby adequate protection for SGS.

79. Although Defendants attempted to justify their actions against Plaintiffs on grounds that they suspected SGS of weapons dealing and that Plaintiffs were affiliated with SGS, Mr. Hassany too was also a person affiliated with SGS but he was not arrested (much less detained *incommunicado*, interrogated, or tortured). Moreover, unlike with Plaintiffs, there was actual evidence that Mr. Hassany had committed crimes.

80. There was no impediment to arresting Mr. Hassany. On the morning of April 15, 2006, Mr. Hassany was on the compound and, to the best of Plaintiffs' knowledge he continued to live in Baghdad and to frequent the compound after that time.

81. To the best of Plaintiffs' knowledge, Mr. Hassany was never detained, interrogated, or even questioned by United States officials.

82. If the Defendants' supposed basis for arresting and detaining Plaintiffs were legitimate and true, then Mr. Hassany also would have been arrested.

17

*4. Plaintiffs' Whistleblowing About Other
SGS-Affiliated Al-Khudairi Family Members,
Whom Defendants Decided Not to Arrest*

83.  Plaintiffs also provided Mr. Carlisle information about Mazin Al-Khudairi and Haydar Jaffar.

84.  Mazin al-Khudairi is a Saudi Arabian citizen.  He lived at the SGS compound.  He is Laith Al-Khudairi's brother.

85.  Mazin somehow obtained a United States Embassy badge.  That badge enables freedom of movement among any United States-controlled property in Iraq.

86.  Mazin was the main link between SGS and Iraqi politicians.  For example, very early on in Plaintiffs' tenure at SGS, SGS sought to develop the capability to manufacture small arms.  Once SGS developed that technical ability, Mazin held a meeting with the Iraqi police and officials from the Ministry of Interior and Ministry of Defense to solicit buyers as well as support for a manufacturing license.  Shortly after this meeting, SGS was granted a certificate to manufacture M-16s.

87.  Mr. Jaffar was Mazin Al-Khudairi's nephew by marriage and Mustafa Al-Khudairi's brother-in-law.

88.  Mr. Jaffar was a co-founder of SGS and also ran a a very large construction company called National Buildings General Contracting Company ("National Buildings").

89.  National Buildings contracts with the United States Army Corp of Engineers and the Iraqi Ministry of Defense on multi-million dollar contracts.  On information and belief, both SGS and National Buildings are still operating in Iraq and Mr. Jaffar remains involved in both entities.

18

90.    During Plaintiffs' tenure at SGS, Mr. Jaffar had a close working relationship with SGS. Mr. Jaffar would frequently subcontract security work for his construction projects to SGS and provide SGS with tips about upcoming projects. He also worked extensively on developing SGS's security protocols.

91.    Although Defendants supposedly justify their actions against Plaintiffs on grounds that they suspected SGS of weapons dealing and that Plaintiffs were affiliated with SGS, Mr. Mazin Al-Khudairi and Mr. Jaffar were also persons affiliated with SGS but were not arrested (much less detained *incommunicado*, interrogated, or tortured).

92.    Moreover, both Mazin Al-Khudairi and Jaffar were available for arrest. They occupied conspicuous jobs in Baghdad and Mazin was a frequent visitor to the U.S. Embassy.

93.    If Defendants' supposed basis for arresting and detaining Plaintiffs were legitimate and true, both Mr. Mazin Al-Khudairi and Haydar Jaffar also would have been arrested.

### Additional subjects of Plaintiffs' Whistleblowing

94.    Plaintiffs were also providing Mr. Carlisle, Ms. Nagel, Mr. Treadwell and other United States officials information regarding their supervisor, Josef Trimpert.

95.    Mr. Trimpert would often obtain large quantities of cash from Mustafa Al-Khudairi and use it to buy liquor. He would then provide this liquor to American soldiers in exchange for U.S. government property, primarily weapons and ammunition, which SGS then used or sold. Mr. Trimpert referred to this as the "Beer for Bullets" program and called himself the "Director."

As with the other conduct they observed, Plaintiffs passed this information on to Carlisle and others in the U.S. government.

96.    Plaintiffs also reported on Mr. Trimpert's disturbing trend towards violence.  This problem was compounded by the fact that it was not uncommon for civilians in the Red Zone to carry weapons, and Mr. Trimpert was often armed.

97.    Plaintiffs were becoming concerned that Mr. Trimpert was a threat to their and other's safety.  He threatened and accosted Plaintiffs, and bragged to them about brutal acts of violence he claimed to be committing against Iraqi citizens.

98.    Plaintiffs warned fellow workers at SGS about Mr. Trimpert, and they expressed their concerns directly to Mustafa.

99.    Mr. Trimpert, however, had more superiority at SGS.  He had also been at the company significantly longer than Plaintiffs, and he was very closely allied with Mustafa.

100. In addition to providing information on certain persons, Plaintiffs duly reported information regarding SGS's suspicious activity -- most notably, its weapons sales and acquisitions -- to Mr. Carlisle, Ms. Nagel and Mr. Treadwell.

101. Plaintiffs came to learn that SGS, with Trimpert's assistance, was amassing and selling weapons for profit. As a security contractor, SGS was in fact licensed and permitted to have and to sell weapons.  However, SGS came to possess unnecessary and alarming quantities of weapons.

102.   In addition to reporting the existence of these weapons to United States officials, Plaintiffs tried to block

20

SGS's weapons transactions when they had the ability and when they could do so in a manner that protected their safety.

103. Plaintiffs also observed and reported on other suspicious activity relating to SGS's weapons acquisition. For example, on one occasion, SGS came to be in possession of a United States military rifle that appeared badly burned. Mustafa Al-Khudairi asked Mr. Trimpert to have the gun repaired, and Mr. Trimpert took the gun to Camp Victory, a United States military installation to do so.

104. After the gun was repaired and returned to Mr. Trimpert, Sergeant Daniel Boone of the United States military contacted Mr. Vance via email about the gun. Sergeant Boone said that he had been trying to reach Mr. Trimpert to no avail, and he asked Mr. Vance to let Mr. Trimpert know that there was a problem with the gun -- namely, the last time the weapon had been seen was in an attack with insurgents. Sergeant Boone indicated that he needed the weapon returned to him. Mr. Vance relayed the message to Mr. Trimpert immediately, and the weapon was returned.

### Operational Problems at SGS

105. SGS was poorly run, and was generally non-compliant with its various contracts. Its poor performance was well-known, and this reputation made it difficult for Plaintiffs to fulfill the expectations placed on them in terms of obtaining new business.

106. Plaintiffs attempted to encourage upper management to improve performance and fulfill SGS's outstanding contractual obligations, indicating that until SGS demonstrated proper

21

performance it would be virtually impossible for them to bring in new contracts. There was, however, little impetus at SGS to spend the money and resources needed to become compliant and improve its reputation.

107. Plaintiffs' repeated entreaties to change SGS were misinterpreted as showing a lack of loyalty and enthusiasm.

108. Additionally, reports began filtering to Mustafa that Plaintiffs had a "negative" approach and were hurting SGS's business. This perception was communicated to Mustafa by the armed Iraqi SGS employees who accompanied Plaintiffs whenever they left the office to meet with present customers and to develop new leads. Mr. Trimpert would disparage Plaintiffs to Mustafa for the same reason.

109. Plaintiffs also ran into problems with the Iraqi sheikhs, mentioned above, who were among the stakeholders in SGS and who helped it obtain influence.

110. In the local power structure, sheikhs maintain influence by providing for the needs of the members of their tribes, including their employment needs. To maintain influence, the sheikhs needed to be able to deliver jobs, and they relied on SGS for that purpose. Thus, the sheikhs helped bring SGS contracts and demanded jobs for their tribes and, apparently, cash, in return.

111. From time to time, the sheikhs would attend SGS business development meetings at which Plaintiffs would be pressured to obtain more contracts. When Plaintiffs would explain that SGS needed to invest in and improve its present

22

performance before it could acquire new business, the meetings would become heated and argumentative.

112. At one point, during the highly-publicized spate of abductions and beheadings in Iraq, Sheik Abu Bakir made a threat in front of Mustafa that he would have Plaintiffs kidnaped if they did not obtain more contracts.

### Plaintiffs are Taken Hostage and the Rescued

113. As a result of the above-described suspicious activity at SGS, Mr. Ertel tendered his resignation to Mustafa Al-Khudairi on April 1, 2006, stating that he would cease working for the company.

114. Mustafa called a meeting two days later to speak with Mr. Ertel about why he wanted to leave SGS. That meeting was delayed because Mustafa had temporarily left the country.

115. Unable to formally resign and wanting to find a way out of the company, Mr. Ertel sent Mustafa an email on April 13 indicating that he was going on a brief vacation.

116. The next day, a high-ranking Iraqi employee of SGS came to Mr. Ertel's apartment and took Mr. Ertel's Common Access Card ("CAC card"). CAC cards are issued by the DoD to certain American civilian contractor personnel in Iraq in order to give them freedom of movement into the Green Zone and various United States installations.

117. After taking Mr. Ertel's CAC card, the very same SGS employee proceeded to Mr. Vance's apartment next door and took Mr. Vance's CAC card. When the two demanded an explanation, the employee told them a dubious story that Mustafa was opening

23

up bank accounts for them in Dubai, where he was vacationing, and therefore needed their cards.

118. Mr. Vance called Mustafa on his cellular telephone to protest, but Mustafa would not answer any of Plaintiffs' questions.

119. Without their CAC cards, Plaintiffs could not leave the Red Zone and the SGS compound. They could not get to the Green Zone to procure the proper documentation necessary to leave the country. They were trapped.

120. Plaintiffs contacted Ms. Nagel and Mr. Treadwell, to report their situation. They were told that they should interpret SGS's actions as taking them hostage. Plaintiffs were advised to stay together and to stay armed at all times.

121. The next morning, when the two arrived for work, the SGS employee who had earlier taken Plaintiffs' CAC cards returned the card to Mr. Vance. The same SGS employee told Mr. Ertel that he could not have his CAC card back on direct orders from Mustafa Al-Khudairi.

122. This SGS employee then told Mr. Vance that Mr. Vance and Mr. Trimpert would be escorting Mustafa's brother-in-law to Camp Victory so that Mustafa's brother-in-law could obtain a CAC card.

123. Knowing that it would be impossible to procure a CAC card for Mustafa's brother-in-law because he was not a United States citizen, and knowing that Mr. Trimpert had been threatening him with violence, Mr. Vance suspected that the assignment was a set-up calculated to lure him off of the

24

compound where he would be injured or killed. Mr. Vance also
feared for what would happen to Mr. Ertel if the two of them were
separated.

124. Accordingly, Mr. Vance called Ms. Nagel and Mr.
Treadwell for help. They advised Plaintiffs to arm themselves
and barricade themselves inside a room in the SGS compound until
United States forces could come rescue them. Plaintiffs gave Ms.
Nagel and Mr. Treadwell specific instructions for their rescue.

125. After Plaintiffs did as they were told and
barricaded themselves in a room, United States military forces
came to the SGS compound to rescue them.

126. Mr. Trimpert attempted to dissuade the forces from
removing them, representing that he was an American citizen and
that there were no problems at the compound. Mr. Trimpert's
efforts to keep Plaintiffs on the SGS compound failed, and they
were successfully removed.

127. The military personnel seized all of Plaintiffs'
personal property, including but not limited to their personal
laptop computers, Mr. Ertel's cell phone and Mr. Vance's digital
and video cameras, as well as the associated data contained in
these items.

128. Plaintiffs were then put into humvees and taken to
the United States Embassy.

### Plaintiffs' Debriefing at the Embassy

129. When they arrived at the Embassy, Plaintiffs were
separately debriefed. Both were questioned by an FBI Special

Agent who identified himself as "Doug" and by two persons who stated they were from United States Air Force Intelligence.

130. Plaintiffs related their experiences at SGS, and explained that they had been reporting these problems regularly to another FBI agent in the United States, Travis Carlisle, as well as to Deborah Nagel, Douglas Treadwell and other officials. They told the questioners that many of the communications were documented on their laptops via emails with these parties, and they encouraged the questioners to review them.

131. After the interviews, Plaintiffs were escorted to a trailer on the Embassy grounds to sleep. They slept for approximately two to three hours.

### Retaliation and Disparate Treatment
### from the Whistleblowing

132. While Plaintiffs slept, the officials with whom they debriefed and/or other officials to whom the debriefing was reported digested the information and came to understand that Plaintiffs possessed a great deal of potentially "high-value" information. On information and belief, they also came to the realization that intelligence personnel in the United States had been privy to this high-value information via Plaintiffs' whistleblowing to Agent Carlisle and therefore knew more about the goings on in these officials' own territory than they knew themselves.

133. These officials, who are among the Unidentified Agents, and who include officials of civilian agencies, determined that they would authorize interrogation of the

26

Plaintiffs to learn what they knew and what they had reported to
Mr. Carlisle. Moreover, based on the policies enacted by
Defendant Rumsfeld and others, they also knew that they could
detain Plaintiffs indefinitely, without any legitimate review for
as long as they desired to extract this information.

134. Therefore, they accused Plaintiffs of being
possible threats which, under the applicable policies, would
allow Plaintiffs' indefinite detention without due process or
access to an attorney.

135. The supposed unclassified portions of
the justification for labeling Plaintiffs as such was that
Plaintiffs were affiliated with SGS and that "certain [unnamed]
members" of SGS were suspected of supplying weapons to
insurgents. Plaintiffs were never given notice of nor an
opportunity to rebut the classified portions of the supposed
grounds for holding them nor to marshal evidence in their favor
to prove that they were not a threat.

136. Even the unclassified portion of the justification
used to detain Plaintiffs was pure pretext, designed to keep
Plaintiffs in custody so that they could be interrogated at
length about any and all topics of information known to them.
The detentions were also at least in part to retaliate against
Plaintiffs and to punish them for reporting potentially
embarrassing information to Agent Carlisle.

137. Among the numerous facts proving this pretext,
is the fact that United States officials did not arrest other
persons within their grasp who were also affiliated with SGS.

27

For example Jeff Smith, Laith Al-Khudairi, Mazin Al-Khudairi, Mukdam Hassany, and others, were all affiliated with SGS, were all in Baghdad, and were all available for arrest. They did not arrest or interrogate any of these persons even though for some of them, like Jeff Smith, there was serious and disturbing evidence of weapons dealings.

**Plaintiffs Are Arrested and Detained**

138. After their debriefing at the Embassy, Plaintiffs were awoken by a knock on the door, whereupon armed guards instructed them to exit the trailer. These same guards walked Plaintiffs to the gate of the Embassy, where Plaintiffs were both placed under arrest by the military.

139. They were handcuffed and blindfolded and pushed into separate humvees. They were not given any protective equipment for the drive, notwithstanding the dangers. Plaintiffs believe that they were driven to Camp Prosperity, a military installation in Iraq controlled by the United States military.

140. Upon their arrival, guards at Camp Prosperity placed them in a cage, strip searched and fingerprinted them, and issued them jumpsuits.

141. Plaintiffs were told to keep their chins to their chests and not to speak; if they did either, the guards told them that they would "use excessive force" on them, or words to that effect.

142. Plaintiffs were taken to separate cells. For the entire duration of their short detention at Camp Prosperity, they were held in solitary confinement 24 hours per day. The lights

in their cells were kept on the entire time. There was no toilet in their cells, and they were allowed to go to the bathroom only twice per day. They also were fed only twice per day. The only surface for sleeping was a thin mat on concrete.

143. Plaintiffs believe that they were at Camp Prosperity for approximately two days. Thereafter, Plaintiffs were shackled, blindfolded, and taken in separate humvees to Camp Cropper. As before, Plaintiffs were not given any protective gear or bulletproof vests for the dangerous drive, which involved traveling along Highway Irish, a notorious sniper trap. At one point, the vehicle in which Mr. Vance was traveling was stopped and Mr. Vance heard gunfire. Mr. Vance feared for his life.

### Torturous Mistreatment and Interrogations at Cropper

144. Camp Cropper is a military facility near the Baghdad International Airport, which the United States military uses to house persons considered to be "high-value" detainees.

145. Plaintiffs arrived at Camp Cropper, and, while still blindfolded, were strip searched and given a jumpsuit.

146. They were each then taken to a military jail occupied mainly by foreign prisoners. They spent the remainder of their respective detentions in solitary confinement, housed in tiny and unclean cells, mostly deprived of stimuli and reading materials. There were bugs and feces on the cell walls.

147. The cells were kept extremely cold, and the lights were always turned on, except when the electric generators for the Camp would fail.

29

148. Each cell contained a concrete slab for sleeping. Plaintiffs were furnished only very thin plastic mats.

149. Under these conditions, it was difficult to obtain meaningful rest; Plaintiffs were purposefully deprived of sleep. Often, the cells were filled with heavy metal or country music at intolerably-loud volumes. Guards would pound on the cell doors when they observed Plaintiffs to be sleeping.

150. The cells had no sinks nor any potable running water. Plaintiffs had to rely on guards for their drinking water, which was often withheld.

151. Plaintiffs also often were denied food and water completely, sometimes for an entire day. When it did arrive, food and water were delivered through a slit in one of the walls.

152. During the entire length of their detention, Plaintiffs each received only one shirt and one pair of overalls to wear. They were never given adequate shoes to protect their feet.

153. Furthermore, Plaintiffs were repeatedly denied necessary medical care. Mr. Vance, for example, requested and was denied basic dental hygiene equipment and treatment for severe tooth pain that he was experiencing. Mr. Vance's requests in that regard were ignored until he eventually had to have his tooth pulled, an extreme procedure that could and should have been avoided.

154. When it was finally administered, this dental procedure was performed hurriedly and covertly, late at night. While the dentist had provided Mr. Vance with pain killers and

antibiotics, the guards took them all and refused to provide any to Mr. Vance. As a result, Mr. Vance experienced severe pain and the hole where the tooth had been became infected and filled with puss. No necessary follow-up care was provided.

155. Similarly, Mr. Ertel had been suffering from an esophageal ulcer which required regular doses of antacids. That medication, too, was often withheld from him.

156. The guards would also torment Plaintiffs, apparently trying to keep them off-balance mentally. For example, the guards would often "shake down" their cells, sometimes claiming falsely to have discovered contraband, a nonsensical accusation given their obvious lack of access to anything prohibited.

157. The guards also physically threatened and assaulted Plaintiffs. For example, when Plaintiffs were transported within the Camp, they would be blindfolded and a towel would be placed over their heads. Plaintiffs had to rely on the guards to direct their movements such as when to walk forward or which way to turn. The guards would often purposefully steer them into walls.

158. Plaintiffs were constantly threatened that guards would use "excessive force" against them if they did not immediately and correctly comply with every instruction given them.

159. Plaintiffs were not allowed to go outdoors at any time for approximately one week after their arrival. Thereafter,

31

the two were occasionally allowed a brief period outdoors, but otherwise remained in complete solitary confinement.

160. These infrequent yard privileges were only permitted at midnight. Plaintiffs were told that this was so because no one was supposed to know that Americans were being imprisoned at Camp Cropper.

### Plaintiffs' Isolation

161. For the first several weeks of their detentions, Plaintiffs were not permitted to make any phone calls to the outside world. During that entire time, their families did not know where they were, or whether they were alive or dead.

162. Over the entire duration of their detention, Plaintiffs were allowed only a few calls to family, the majority of which occurred toward the very end and related to making financial arrangements for their eventual departures from Iraq. At all times, Plaintiffs communications with their families was monitored. They were forbidden to share their whereabouts or discuss the nature of their detentions or interrogations, much less to criticize their treatment.

163. Plaintiffs were also forbidden to send correspondence to attorneys or to a court. Indeed, the only mail they were permitted to send were Red Cross letters to family and, even then, the mail was monitored and subject to the above restrictions on content.

164. Mr. Vance was allowed to meet with a clergyman only one time. All of his other requests for clergy visits were denied. Mr. Ertel was never permitted such visits.

## Unlawful Interrogations

165. Throughout their detention at Camp Cropper, Plaintiffs were continuously interrogated by military and civilian United States officials. These interrogations took place either in an interrogation room or in their cells.

166. Before each interrogation, both Mr. Vance and Mr. Ertel would always ask for an attorney, but each such request was invariably denied. Mr. Ertel wrote a letter to the Judge Advocate General requesting counsel and asked his captors to send it. He doubts it was in fact sent. The request was never granted.

167. Without the assistance and advice of counsel, Plaintiffs were each subjected to a series of interrogations (always separate) conducted by FBI agents and Navy Criminal Investigative Service officers, as well as possibly Central Intelligence Agency and Defense Intelligence Agency agents.

168. At both Mr. Vance's and Mr. Ertel's sessions, the interrogators would not identify themselves by name, and none would honor their requests for an attorney.

169. At the initial interrogation sessions, both Mr. Vance and Mr. Ertel separately communicated to the FBI agent present that they had been talking to Special Agent Carlisle, and that Mr. Carlisle would confirm their identities and their stories.

170. The initial interrogators confirmed that they knew Travis Carlisle, and were aware that Mr. Vance had been speaking to him. Several sessions later, however, a different set of

33

interrogators denied to both Mr. Vance and Mr. Ertel that a Travis Carlisle even existed.

171. The numerous interrogations to which Plaintiffs were subjected shared no consistent focus. The sessions were usually conducted by different interrogators, often inquiring into different sets of topics, and demonstrating differences in their apparent knowledge bases.

172. Some interrogators were interested in learning more about the Sandi Group, its operations and employees. Others focused on SGS, its political contacts in the Iraqi government, its structure and hierarchy, its relationships with the sheikhs described above and the persons at its helm. Other of Plaintiffs' interrogators were interested in Mustafa, Laith and Mazin Al-Khudairi, as well as Mr. Jaffar, Mr. Smith, and others.

173. Still other interrogators questioned Plaintiffs about their communications with Carlisle and their relationships with Deborah Nagel and Douglas Treadwell.

174. Some of the interrogators also focused on Mr. Trimpert's relationship with United States soldiers, and how Mr. Trimpert obtained United States weapons and ammunition. Plaintiffs were told that Mr. Trimpert had admitted to forging federal documents to procure CAC cards, bribing government officials, and trading alcohol for weapons with military employees.

175. At least one interrogator focused solely on how Mr. Vance had been treated at the camp, and what Mr. Vance would

34

do if he were released. Mr. Vance was asked questions such as whether he intended to write a book or obtain an attorney.

176. The main constant throughout all of the sessions was the interrogators' aggressive techniques and their repeated threats that if Plaintiffs did not "do the right thing," they would never be allowed to leave.

### The "Detainee Status Board"

177. On or about April 20, 2006, Plaintiffs each were served with letters from Colonel Bradley J. Huestis, President of a body he called the Detainee Status Board, indicating that a proceeding would be convened no earlier than April 23 to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." A true and correct copy of those letters are attached as Exhibit A hereto.

178. The letters informed Plaintiffs that they did not have a right to legal counsel. They were further told that they would only be permitted to call witnesses for their defense and present evidence if the evidence and witnesses were "reasonably available" to them at Camp Cropper.

179. On or about April 22, 2006, Plaintiffs each received a communication called a "Notice of Status and Appellate Rights" stating that each had now been determined to be a "security internee," which, according to the document meant "[a]n individual detained because there is reasonable grounds to believe you pose a threat to security or stability in Iraq." In fact there were no such grounds, and Plaintiffs' history of whistleblowing activity actually proved the exact opposite.

35

180. Plaintiffs were told only the "unclassified" basis for the false designation, which was:

> You work for a business entity that possessed one or more large weapons caches on its premises and may be involved in possible distribution of these weapons to insurgent/terrorist groups.

That affiliation alone was not sufficient to support a reasonable belief that Plaintiffs themselves were a threat justifying indefinite detention and could certainly not be considered so in conjunction with the facts of Plaintiffs' whistleblowing.

181. The letters indicated that Plaintiffs had the right to appeal their "internment" by submitting a written statement to camp officials. The Notice gave precious little other guidance as to what the appeal entailed, how it would be adjudicated, or any other salient aspects of the process. A true and correct copy of the April 22nd Notice to Mr. Ertel is attached as Exhibit B hereto.

182. Despite the lack of guidance, on the very day that they received these April 22 letters, Plaintiffs prepared their appeals and requested evidence for the Board. Each requested to have the other be present as a witness, among other witnesses.

183. Each also requested, among other evidence, their previously-seized laptops and cellular telephone records, all of which would prove their numerous conversations with Travis Carlisle, Maya Dietz, Deborah Nagel, and Douglas Treadwell.

184. Despite the representations in the previously-mentioned letter from Colonel Huestis, neither Mr. Vance nor Mr.

Ertel were ever provided with any of the evidence they had requested for their defense, all of which was readily available.

185. On or about April 26, 2006, Plaintiffs were both transported within Camp Cropper to appear before a group calling themselves the Detainee Status Board. This board consisted of two men and one woman, all of whom were in "sterilized" military garb, meaning that they wore no insignia of name or rank. There was also an additional person present in a sterilized uniform who directed the line of questioning. He appeared to be the prosecutor.

186. The "hearings" did not afford Plaintiffs any genuine opportunity to rebut the factual assertions against them nor to offer additional evidence showing their innocence. They were conducted merely as another interrogation.

187. Mr. Ertel's Board proceeding convened first. Neither Mr. Ertel's request for evidence nor his request for witnesses at his proceeding were honored, including his specific request that Mr. Vance (who was certainly "reasonably available" at Camp Cropper) be present.

188. At the outset, one of the three panel members stated to Mr. Ertel that he had the right to an attorney at no cost to MNF-I. Mr. Ertel told them that he had been provided the letter attached hereto as Exhibit A, stating that he had no such right, and, as a practical matter, he had been provided no opportunity to arrange for the presence of counsel.

189. When Mr. Ertel stated that he would like an attorney to be present, he was told that no one on the panel knew

37

how to obtain an attorney for him. The panel told Mr. Ertel that
they had to move forward with the proceedings and that he would
simply have to do without an attorney.

190. Once the proceeding began, Mr. Ertel was not
allowed to see most of the purported facts or evidence concerning
him. In particular, Mr. Ertel was told that a stack of
documents, which was visible in front of the panel, was evidence
in his case but that he would not be allowed to review it. At
least some of these documents would have been presumptively
exculpatory, given his innocence. He was told that he was only
allowed to see "unclassified" portions of the materials.

191. Mr. Ertel was also denied the opportunity to hear
the testimony of, much less cross-examine, whatever adverse
witnesses the panel may have been relying upon in reaching its
determination(s).

192. Mr. Vance's proceeding before the "Detainee Status
Board" followed the same format as Mr. Ertel's. Both were
denied: (1) all of their evidentiary requests; (2) the right to
counsel; (3) the right to call one another and others as
witnesses; (4) the right to see all of the evidence presented
against them and to have exculpatory evidence provided to them;
(5) the right to remain silent (although they had nothing to
hide); and, (6) the right to confront adverse witnesses.

193. At the end of this proceeding, Mr. Vance asked the
tribunal if his family knew where he was, or whether or not he
was even alive. Mr. Vance was told that they did not know what,
if anything, his family had been told.

38

194. In fact, neither Mr. Vance's nor Mr. Ertel's family or friends knew of their detention despite vigorous efforts to contact United States officials to determine the Plaintiffs' whereabouts.

195. Mr. Vance also asked when he would get an answer about his status. He was told that he would find out the results in three to four weeks. In the interim, he would remain in solitary confinement.

196. No legitimate investigation was ever undertaken. Indeed, Mr. Carlisle was not even contacted for at least three weeks after Plaintiffs were detained.

### Plaintiffs Were Victims Of A Pattern of Board Failures

197. The procedures actually afforded Plaintiffs to challenge their designations as security internees fell below the minimums for notice and opportunity to respond required by the Supreme Court in the 2004 Hamdi decision. While the procedures as stated in the April 22nd letters come closer to satisfying constitutional minimums, the Detainee Status Board did not in fact provide the procedures listed in the letters.

198. This is part of a widespread practice of which Mr. Rumsfeld intended, knew, or to which he was at least deliberately indifferent. As is explained below, there is a very high rate of erroneous detentions. Moreover, while actual board proceedings are kept secret, Plaintiffs have uncovered two other Americans who received similarly-flawed board proceedings: one is the person who was detained in Iraq from approximately November 2005 until approximately August of 2006 and who is described in

39

the Northern District of Illinois case of Doe v. Rumsfeld, 07-c-6220; and Cyrus Kar who was detained in Iraq in 2005 and whose release was highly publicized at that time.

199. Accordingly, the policies and/or the actual practices of the Detainee Status Board fall below minimum due process standards.

### Plaintiffs Were Victims of Discriminatory Policies

200. Under Defendant Rumsfeld's detention policy Plaintiffs were deprived of far better procedures that were afforded to other Americans alleged to have committed similar misconduct in the same locale but who were not labeled "security internees" or "enemy combatants." There was no government need for this discrimination and Mr. Rumsfeld's policies did not require one. Rather, the policies left the decision of which system an American will be detained under to the unbridled discretion of bureaucrats and of the Defendant Agents, here.

201. For example, in April 2007, Lt. Colonel William H. Steele, former Commander of Camp Cropper, was charged under the Uniform Code of Military Justice with aiding the enemy while at Camp Cropper from October 2005 through October 2006. Specifically, it was alleged that he gave cell phones to interned insurgents and violated rules regarding classified documents. In this was he was suspected of "pos[ing] a threat to security or stability in Iraq," conduct which meets the definition of the security "security internee" label attached to Plaintiffs.

202. However, Lt. Colonel Steele was not treated as a security internee. He was given access to an attorney upon

40

arrest. Prior to being formally charged, the Army held a grand jury proceeding to determine what violations, if any, Lt. Colonel Steele had committed. Once indicted, Lt. Colonel Steele had the opportunity to challenge his arrest and detention in court, including to learn of the complete factual allegations him, to confront all witnesses and evidence against him, and to compulsory process for obtaining evidence and testimony, as well as other procedures.

203. Further, numerous other Americans accused of conduct which poses a threat to security or stability in Iraq received the same high level of due process as Steele, including, for example, the soldiers to whom Trimpert provided alcohol in exchange for government weapons.

204. There was no principled distinction between these persons and Plaintiffs that would justify cutting off Plaintiffs from access to better procedures. Rather, Mr. Rumsfeld's policies give officials this discretion to discriminate in the provision of due process rights, without any form of review, despite the obvious potential for abuse.

205. Such discrimination violates the Constitution. Americans are entitled to be treated equally in the provision of due process rights, and the mere decision to label some as "security internees" cannot justify providing them lesser due process rights than those provided to other Americans in the same locales confronting similar allegations of misconduct.

41

### Release From Camp Cropper

206. After their Detainee Status Board proceedings, Plaintiffs received little additional information regarding their detention until shortly before their respective releases, when travel arrangements had to be made.

207. About one month after the Detainee Status Board convened, on May 17, 2006, Major General John D. Gardner, the Commanding General of Task Force 134 (Detainee Operations) for the MNF-I, signed a letter authorizing the release of Mr. Ertel.

208. Mr. Ertel was released some 18 days after the board officially acknowledged that he was an innocent civilian. Instead of securing his safety and transporting him on a military aircraft as Mr. Ertel requested, he was placed on a bus headed to Baghdad International Airport. Mr. Ertel was forced to sign a form agreeing to this manner of his release. Mr. Ertel was not provided with an exit visa nor other documentation necessary to permit him to leave the county. Mr. Ertel was able to get out of Iraq only after he ran into a friend at the Airport. Mr. Ertel's friend called someone in the United States Air Force Special Operations Unit who was able to help Mr. Ertel leave Iraq.

209. For no legitimate reason, Mr. Vance's detention was continued for more than two additional months after Mr. Ertel's release and, presumably, after the Detainee Status Board had exonerated him. This extended over-detention was used to continue Mr. Vance's interrogations on topics apparently of interest to the persons who detained him.

210. Finally, on July 20, 2006, several days after Major General Gardner authorized his release, Mr. Vance was dropped at the Baghdad Airport to fend for himself without the documentation needed to return to the United States.

211. Fortunately, without too much delay, Mr. Vance was able to secure a flight out of Iraq to Amman, Jordan; he subsequently flew home to Chicago.

212. All told, Mr. Ertel was held *incommunicado* for nearly 40 days and Mr. Vance was held *incommunicado* just short of 100 days until their anonymous interrogators determined that there were apparently no more questions that they wanted answered. Both were ultimately released without ever being charged with any wrongdoing.

213. Though both Mr. Vance and Mr. Ertel were eventually allowed to return home, the cumulative effect of the foregoing ordeal has been devastating for both. For months, Plaintiffs were deprived of their most basic human rights, to say nothing of those guaranteed them by the United States Constitution. As a result, Plaintiffs have suffered serious emotional and physical distress.

214. Plaintiffs are not terrorists. They are United States citizens, who love this country, and everything for which it stands, as much as any other American. They have never committed, much less been charged with, any crime.

**Plaintiffs' Claims Against Defendant Rumsfeld (Counts I-III)**

215. Defendant Rumsfeld is a highly experienced and dedicated former public official. He has served as an elected representative for the State of Illinois, as Secretary of Defense under two Presidents, as Ambassador to NATO, and in other executive branch appointments. Plaintiffs acknowledge Mr. Rumsfeld's long record of service and dedication to this country.

216. Plaintiffs have sued Mr. Rumsfeld because he exceeded his authority as the Secretary of Defense by crossing clear constitutional lines which all public officials are obligated to recognize and respect and by violating the direct commands of both Congress and the Supreme Court.

217. Plaintiffs' dispute with Mr. Rumsfeld involves three fundamental rights of which he deprived them. First, Mr. Rumsfeld is responsible for the cruel, inhuman, degrading and torturous interrogation tactics used on Plaintiffs' during their months-long interrogations. He authorized the general use of these tactics through specific policies and practices, as is explained further below. Moreover, Plaintiffs' understanding is that certain techniques which the interrogators used on them required Mr. Rumsfeld's personal approval on a case-by-case basis, and they accordingly infer that Mr. Rumsfeld gave specific authorization to use these techniques against them.

218. This torture violated Plaintiffs' rights under the Constitution as well as under the DTA, See e.g. DTA § 1003 ("[T]he term 'cruel, inhuman, or degrading treatment or punishment' means the cruel, unusual, and inhumane treatment or

44

punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States").

219. Second, Mr. Rumsfeld's policies deprived Plaintiffs of fundamental and cherished due process protections such as assistance of counsel, confrontation of adverse witnesses, and notice of, and the right to see and rebut, the evidence being used against them. Indeed, Plaintiffs' "board hearings," which were carried out according to the dictates of Mr. Rumsfeld's policies, were nothing more than a continued interrogation; Plaintiffs were allowed no counsel, no access to evidence, and no witnesses but themselves.

220. These procedures failed to meet even the minimum standards of notice and an opportunity to respond set out by the Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507 (2004). Moreover, the Supreme Court in Hamdi required procedural rights greater than these minimums where such procedures are reasonably available, which they were in the place where Plaintiffs were detained. Full Uniform Code of Military Justice ("UCMJ") procedural rights were routinely afforded in Baghdad and American civilians can have such rights under the UCMJ.

221. Indeed, as explained above, military personnel in Baghdad, who allegedly committed acts far more severe than those which the local U.S. officials falsely attributed to Plaintiffs, received counsel and the right to confront witnesses and test all of the evidence against them. For example, the soldiers who sold the U.S. weapons to Trimpert were afforded these rights, as was the commandant of Camp Cropper, Lt. Col.

William Steele, when he was alleged to have provided cell phones to enemy insurgents within the camp and committed other treasonous acts.

222. There is no legitimate governmental interest in affording these fundamental rights to soldiers who committed the same or more severe offences than Plaintiffs were accused of while withholding these rights from Plaintiffs. All American detainees are entitled to be treated equally with other Americans in the provision of due process rights, and the mere decision to label them "security internees" cannot justify providing lesser due process rights than those available to other Americans in the same locales confronting similar allegations. However, Mr. Rumsfeld's policies discriminate in the provision of these fundamental procedures, notwithstanding their ready availability.

223. Under his policies, a bureaucrat's decision to affix the "possible enemy" label to a fellow citizen prevents the citizen from accessing reasonably available UCMJ procedures to challenge the designation. Instead, Americans are shunted into the Detainee Review Board process. Thus, a bureaucrat's false accusation alone permits him to deprive a citizen of readily available procedures to refute the accusation.

224. Almost two years before the bureaucrats retaliated against Plaintiffs using these detention powers, the Supreme Court expressly warned Mr. Rumsfeld of the need for procedures which prevent this type of official abuse in Hamdi v. Rumsfeld, 542 U.S. 507, 530 (2004). Nevertheless, Mr. Rumsfeld

implemented and left in place procedures which permitted and, in fact, encouraged, the retaliation Plaintiffs suffered.

225. Thirdly, Mr. Rumsfeld's policies prohibit citizens who have been detained from accessing a court for help. As detainees, Plaintiffs were forbidden to correspond with counsel, forbidden to use the mails to present a petition to a court, and even forbidden from advising their families where they were being held. As a result, Plaintiffs could not petition a court to free them, or to require the government to provide better procedures, or to stop their torturous interrogations.

226. Again, Mr. Rumsfeld was warned by the Supreme Court almost two years before Plaintiffs' detentions that American citizens held under the detention system must be permitted access to a court to challenge a detention decision as well as access to counsel for that challenge in Hamdi v. Rumsfeld, 542 U.S. 507, 536-537 (2004). In the wake of that decision, Defendant Rumsfeld not only failed to enact policies that allow such access, he purposefully continued policies and practices calculated to prevent it in the misguided belief that courts should not review the detention and interrogation practices.

227. Plaintiffs are entitled to a judicial remedy against Defendant Rumsfeld for all of these violations. Their legal challenges are well within the competence of a court to adjudicate (indeed, the Supreme Court has already spoken on many of these topics), and it is entirely consistent with the

47

traditional role of the courts to afford damages remedies to
compensate and to ensure future compliance with the law.

228. Moreover, Congress has not precluded the remedy
Plaintiffs seek. To the contrary, Congress expressly recognized
in the DTA that civil remedies could be available for the sorts
of improper detentions and torture Defendant Rumsfeld approved,
and it declined to bar such actions.

229. This recognition is reflected in the amendments
to the DTA, in which Congress created a special extended "good
faith" defense for allegations of improper detentions and
torturous interrogations in claims brought by aliens against U.S.
officials, stating:

> In any civil action or criminal prosecution against an
> officer, employee, member of the Armed Forces, or other
> agent of the United States Government who is a United
> States person, arising out of the officer, employee,
> member of the Armed Forces, or other agent's engaging
> in specific operational practices, that involve
> detention and interrogation of aliens who the President
> or his designees have determined are believed to be
> engaged in or associated with international terrorist
> activity that poses a serious, continuing threat to the
> United States, its interests, or its allies, and that
> were officially authorized and determined to be lawful
> at the time that they were conducted, it shall be a
> defense that such officer, employee, member of the
> Armed Forces, or other agent did not know that the
> practices were unlawful and a person of ordinary sense
> and understanding would not know the practices were
> unlawful. Good faith reliance on advice of counsel
> should be an important factor, among others, to
> consider in assessing whether a person of ordinary
> sense and understanding would have known the practices
> to be unlawful.

DTA § 1004, PL 109-163, 119 Stat 3136, 3475 (Jan. 6, 2006).

230. Having adopted a civil affirmative defense
without foreclosing civil liability entirely, and having declined

48

to adopt a defense for claims by U.S. citizens, Congress clearly left courts the power to provide civil remedies where appropriate for unjustified practices that involve U.S. detention and interrogation of American citizens.

### The History of Defendant Rumsfeld's Approval of Torturous Interrogations and Unconstitutional Detentions

231. Most of Mr. Rumsfeld's unconstitutional policies were adopted in secret and far too few have seen the light of day. Nevertheless, there is a public record demonstrating the existence of the above-described policies and widespread practices and Mr. Rumsfeld's involvement in creating them.

232. For example, on December 2, 2002, Defendant Rumsfeld personally approved a list of torturous interrogation techniques for use on detainees at Guantanamo. Contrary to established rules and military standards for interrogations, which were set forth in the then-governing Army Field Manual 34-52, the techniques Rumsfeld approved included the use of 20-hour interrogations, isolation for up to 30 days, and sensory deprivation.

233. On January 15, 2003, Defendant Rumsfeld rescinded his formal authorization to use those techniques generally, but took no measures to end the practices which had by then become ingrained, nor to confirm that the practices were in fact being terminated. Moreover, he authorized the Commander of the United States Southern Command to use these very practices if warranted and approved by Rumsfeld himself in individual cases. Thus,

49

rather than terminate the torturous techniques, Mr. Rumsfeld encouraged them and involved himself in their case-by-case use.

234. At the same time, Defendant Rumsfeld convened a "Working Group" to evaluate his interrogation policies. Following that Working Group, in April 2003, Rumsfeld approved a new set of interrogation techniques, which included isolation for up to thirty days, dietary manipulation and "sleep adjustment," meaning sleep deprivation.

235. Just as before, Rumsfeld provided that additional harsh techniques could be used with his prior approval. At the time Rumsfeld approved these April policies, he was well-aware of the cruel, inhuman and degrading torture of detainees that occurred in Guantanamo Bay, Afghanistan, and Iraq. Instead of trying to stop and prevent such abuses, Defendant Rumsfeld took measures to increase their use.

236. For instance, Defendant Rumsfeld sent Major Geoffrey Miller to Iraq in August 2003 to review the United States military prison system in Iraq and make suggestions on how prisons could be used to more effectively obtain actionable intelligence from detainees -- or, in Mr. Rumsfeld's own terms, to "gitmo-ize" Camp Cropper.

237. In so doing, Defendant Rumsfeld knew and tacitly authorized Major Miller to apply in Iraq the techniques that Rumsfeld had approved for use at Guantanamo and elsewhere. At Rumsfeld's direction, Major Miller did just that.

238. On September 14, 2003, in response to Major Miller's call for the use of more aggressive interrogation

50

policies in Iraq, and as directed, approved and sanctioned by
Defendant Rumsfeld, Lieutenant General Ricardo Sanchez, Commander
of the United States-led military coalition in Iraq ("Coalition
Joint Task Force-7") signed a memorandum authorizing the use of
29 interrogation techniques which included yelling, loud music,
light control, and sensory deprivation, amongst others.

239. A month later, Commander Sanchez modified the
previous authorization, but continued to allow interrogators to
control the lighting, heating, food, shelter and clothing given
to detainees.

240. Starting in May 2003, the Red Cross began sending
reports detailing these abuses of detainees in United States
custody in Iraq to the United States Central Command in Qatar.
Colin Powell, then the Secretary of State, confirmed that
Defendant Rumsfeld knew of the various reports by the Red Cross,
stating that he and Defendant Rumsfeld kept President Bush
regularly apprised of their contents throughout 2003.

241. Indeed, Defendant Rumsfeld was not only aware of
the 2003 Red Cross reports, but also of its February 2004 Report,
discussed below, as well as a series of other investigative
reports into detainee abuse in Iraq, including those of former
Secretary of Defense James Schlesinger, Army Major General
Antonio Taguba, and Army Lieutenant General Anthony Jones.

*Defendant Rumsfeld Flouts*
*Congressional Restrictions on*
*Torturous Interrogations*

242. Further evidence that Defendant Rumsfeld made policy decisions to authorize and encourage the use of torture for interrogating detainees, including detained American citizens, occurred on December 30, 2005. On that day, Congress enacted the Detainee Treatment Act which *inter alia*, stated:

> No person in the custody or under the effective control of the Department of Defense or under detention in a Department of Defense facility shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation.

DTA Pub. L. 109-148, Div. A, Title X, § 1001(a), 119 Stat. 2739-40 (Dec. 30, 2005). Congress went on to state in the DTA that the U.S. shall not subject any detainees to " to cruel, inhuman, or degrading treatment or punishment." Id. § 1003.

243. Congress thereby evidenced its intent to limit U.S. interrogation techniques to those permitted by the Field Manual when the DTA was drafted. The Field Manual at that time limited the allowable techniques to those consistent with international norms which forbid cruel, inhuman and degrading treatment. In other words, the Field Manual forbade the interrogation techniques that Mr. Rumsfeld had authorized and to which Congress and the American people took exception.

244. In spite of this clear command, the same day Congress passed the DTA, Mr. Rumsfeld modified the Field Manual to include the cruel, inhuman and degrading techniques described above. He added ten pages of classified interrogation techniques

52

that apparently authorized, condoned, and directed the very sort of violations that Plaintiffs suffered. To the best of Plaintiffs' knowledge, the December Field Manual was in operation during their detention. It was not replaced until September 2006, shortly before Mr. Rumsfeld resigned.

245. Numerous instances of abuse occurring since Defendant Rumsfeld changed the Field Manual in December 2005, including Plaintiffs' experiences and those documented by UNAMI, make clear that Mr. Rumsfeld did not take measures to conform the interrogation techniques to Congress' command.

246. For example, on March 6, 2006, Amnesty International published a report criticizing United States-led MNF-I detentions in Iraq. The Amnesty Report references the arbitrary nature of the security internment system, and the ways in which MNF-I consistently denies detainees their rights to counsel and the ability to meaningfully challenge the lawfulness of their detentions, as well as access to their families and the outside world.

247. The Amnesty Report also documents a repeated pattern of instances of torture and ill-treatment of detainees by United States troops, such as exposing detainees to extremes of heat and cold and unlawfully restraining and physically assaulting detainees.

248. A March/April 2006 Human Rights Report by the United Nations Assistance Mission for Iraq ("UNAMI") made similar findings, concluding that "[t]he general conditions of detention in Iraqi facilities are not consistent with human rights

standards." The Report documents numerous instances in which detainees were deprived of sufficient food, hygiene and medical care.

249. Likewise, the May/June 2006 UNAMI Human Rights Report documents still more examples of detainee abuse in Iraq. That Report includes an accounting by DoD of its own wrongdoing, and references DoD admissions that United States soldiers have withheld food from and physically threatened detainees.

250. Similarly, the International Committee of the Red Cross ("ICRC") has published a Report criticizing the United States military detention system in Iraq as appallingly defective. According to the Red Cross Report, military officials routinely deny detainees the opportunity to contact their families to notify them of their whereabouts. The Report further documents other forms of mistreatment, including solitary confinement, hooding, physical threats, confiscation of property, sleep deprivation including exposure to loud noise or music, and deprivation of food and water.

251. Disturbingly, the Red Cross noted that military intelligence officers of the Coalition Forces in Iraq have admitted that, like Plaintiffs, "between 70% and 90% of the persons deprived of their liberty in Iraq had been arrested by mistake."

252. Faced with these and many other reports of similar violations by U.S. military officials, Mr. Rumsfeld took no steps to investigate or correct the abuses, despite his actual knowledge of same and despite the fact that he knew American

citizens were being and would be detained and interrogated under these systems. Defendant Rumsfeld was the official responsible for terminating this pattern of abuse and reforming the policies causing it. Mr. Rumsfeld took no such measures because these were not unwanted or random violations. Rather, this conduct was being carried out pursuant to the interrogation and detention policies Mr. Rumsfeld himself created and implemented.

**Global Applicability of the Policies**

253. Many of the policies which Mr. Rumsfeld implemented regarding detention and interrogation of detainees are not limited to Iraq, or, for that matter, to fields of battle generally. For example, see the definition of "detainee" contained in Detainee Operations Inspections, available at www4.army.mil/ocpa/reports/ArmyIGDetaineeAbuse/DAIG%20Detainee%20 Operations%20Inspection%20Report.pdf, which states: "Detainees include, but are not limited to, those persons held during operations other than war."

254. Thus, Mr. Rumsfeld did not intend to, and did not, limit his interrogation and detention policies to detainees in Iraq nor to persons seized on battle field. Rather, Defendant Rumsfeld adopted the policies against the background of the administration's Global War on Terror, which is a non-traditional and undefined conflict waged throughout the world.

255. Further, the detention and interrogation policies Mr. Rumsfeld created are not limited to military personnel. Torturous interrogation tactics are approved for use by members of civilian agencies such as DOJ/FBI working with the U.S.

military. Similarly, civilians in the Department of State,
Department of Justice and the Central Intelligence Agency can
have input into the decision of whether to release detainees.

## Defendant Rumsfeld's Personal Control Over
## Length of Detention and Release Decisions

256.  Aside from setting the inadequate and
discriminatory procedures for challenging a security internee
designation, explained above, Mr. Rumsfeld, as the Secretary of
Defense, also maintained control over the decision to release a
detainee.

257.  This practice is evidenced by a draft document on
detentions which is now publicly available. It states in
pertinent part: "[t]he permanent transfer or release of detainees
from the custody of US forces to the host nation, other
allied/coalition forces or outright release requires the approval
of the SecDef." See Joint Doctrine for Detainee Operations at
VII-6 (March 23, 2005), available at http://hrw.org/campaigns/
torture/jointdoctrine/jointdoctrine040705.pdf.

## Count I Against Defendant Rumsfeld –
## Dictating Torture, Cruel, Inhuman, and Degrading Treatment

258.  Each of the Paragraphs in this Complaint is
incorporated as if restated fully herein.

259.  As described more fully above, Plaintiffs were
subjected to torturous, cruel, inhuman, and degrading treatment.
This included threats of violence and actual violence, sleep
deprivation and alteration, extremes of temperature, extremes of
sound, light manipulation, threats of indefinite detention,
denial of food, denial of water, denial of needed medical care,

56

yelling, prolonged solitary confinement, *incommunicado* detention, falsified allegations and other psychologically-disruptive and injurious techniques.

260. This treatment was unnecessary. Indeed, many persons detained in the same facility were treated far better and far more humanely.

261. Rather, this treatment was intentionally used on Plaintiffs for its perceived value as an interrogation tactic.

262. This treatment was visited on Plaintiffs pursuant to and in accordance with the above-described policies and practices of Defendant Rumsfeld which apply to all persons, including Americans. This treatment was also knowingly condoned by him for use in interrogating and developing information from persons detained by U.S. forces, including Americans.

263. The misconduct described in this Count was undertaken under color of federal law.

264. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

265. This treatment violated Plaintiffs' rights under the United States Constitution. This treatment also violated Plaintiffs' rights under the Detainee Treatment Act, which includes either an express or implied right of action. This Count seeks a remedy only under the Constitution or, in the alternative, under the DTA.

266. These violations of Plaintiffs' rights were known and/or foreseeable to Defendant Rumsfeld. His policies

authorized the use of the above-described interrogation tactics
on all detainees, including Americans, and he was aware that the
interrogation practices were in use in facilities which included
American detainees and had in fact been used on Americans.

267. Finally and alternatively, Defendant Rumsfeld
reserved the use of the harsher interrogation techniques to his
prior, case specific, approval. Plaintiffs therefore infer that
Defendant Rumsfeld specifically authorized some or all of the
above mistreatment on them and knew they were experiencing same.
Further, based on the policies requiring approval of the
Secretary of Defense prior to permanently releasing a detainee,
Plaintiffs infer that even if Defendant Rumsfeld did not direct
their specific mistreatment, he had actual knowledge that they
were being detained and mistreated as described above, and that
he failed to intervene to sooner terminate this mistreatment.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL
respectfully demand judgement against Defendant DONALD RUMSFELD
awarding actual and punitive damages, costs and fees, together
with any and all other relief to which they may appear entitled.

## Count II Against Defendant Rumsfeld - Dictating Inadequate and Discriminatory Detention Procedures

268. Each of the Paragraphs in this Complaint is
incorporated as if restated fully herein.

269. As described more fully above, after being
labeled as security internees based on false allegations,
Plaintiffs were prevented from meaningfully challenging the

58

designation through fair procedures. Plaintiffs were denied notice of the complete factual basis being used for this designation and of the opportunity to rebut it or to introduce other evidence showing that they were not a threat. Indeed, the Detainee Status Board letter each Plaintiff received did not even state that they had the right to examine or rebut the complete factual assertions against them. Further, there was no basis to have withheld the "classified" portions of the factual basis and no method afforded to test the labeling of this factual basis as "classified" so that Plaintiffs could then rebut it.

270. Even as to the disclosed factual basis, Plaintiffs were denied a meaningful opportunity to challenge the designation. Plaintiffs were not provided with nor allowed to use reasonably available evidence and witnesses to demonstrate that they were not a threat. Moreover, the decision makers were not neutral. They conducted the hearing as an interrogation, using some of the improper tactics identified above.

271. This process fails to meet constitutional bare minimums which must always be applied when the government deprives a U.S. citizen of liberty for a prolonged period, as it did with Plaintiffs, regardless of the context.

272. The deficient process Plaintiffs actually received was in accordance with policies and actual practices of the Board and dictated and condoned by Defendant Rumsfeld. Defendant Rumsfeld was aware of the fact that the Detainee Status Boards actual practices were failing to provide the constitutional minimums for detaining Americans.

273. Alternatively, Mr. Rumsfeld was deliberately indifferent to the fact that the Detainee Status Board's actual procedures failed to provide the constitutional minimums. Notice of these failures of the Board were available to Defendant Rumsfeld through internal reports to him, through published reports on the high rate of erroneous detentions identified, and through news articles about the Board's practices.

274. In addition to the failures in each other's hearings, Plaintiffs are aware of similar failures in the hearing for two other Americans: the plaintiff in Doe v. Rumsfeld and Cyrus Kar.

275. Despite notice, Mr. Rumsfeld failed to take appropriate efforts to reform these policies and practices.

276. Further, Plaintiffs were entitled as a matter of due process to additional procedures including the assistance of counsel in connection with the Board hearing, the assistance of counsel in connection with their constant interrogations, the right to disclosure of exculpatory evidence, the right to disclosure of and to rebut all adverse evidence and witnesses, if any, and the right to offer evidence in their favor. These and other procedures were readily available in Baghdad to other Americans, such that there was no sufficient governmental need or justification to deny them to Plaintiffs.

277. However, Defendant Rumsfeld's detention policies never permit any such procedures to detainees, including security detainees and persons detained for other reasons, even when they are reasonably available and even when there is no actual or

sufficient governmental need to withhold these procedures. By prohibiting such procedures even when they are reasonably available and no legitimate interest in denying them, Defendant Rumsfeld's policies violate due process. On information and belief, Defendant Rumsfeld prohibited these procedures because of their likelihood to exonerate detainees and thereby prevent their further interrogation.

278. Defendant Rumsfeld's detention policies also violate equal protection in that they withhold readily available fundamental procedures which are given to other Americans suspected of similar misconduct in the same locale based solely on the label of "security internee" rather than on any legitimate particular government need.

279. An official's decision to call a citizen a security internee or any other label cannot justify depriving him of the due process afforded other Americans in the same place.

280. Finally and alternatively, based on the policies requiring approval of the Secretary of Defense prior to permanently releasing a detainee, Plaintiffs infer that Defendant Rumsfeld had actual knowledge that they were being detained unconstitutionally, as described above, and that he failed to intervene to sooner terminate their detentions.

281. The misconduct described in this Count was undertaken under color of federal law.

282. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

283. This Count seeks a remedy only under the Constitution.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against Defendant DONALD RUMSFELD awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count III Against Defendant Rumsfeld – Dictating Denial of Access to Courts and Counsel

284. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

285. As described more fully above, Plaintiffs were prohibited and/or prevented from obtaining judicial review of the decision to intern them and of the mistreatment that they were suffering, all of which is described above.

286. It was the policy of Defendant Rumsfeld that detainees in Iraq not be permitted to involve courts in the detention decision nor in their treatment. Defendant Rumsfeld's policies preventing access to the courts, and preventing access to counsel for assistance in seeking *habeas*, applied to all detainees, including Americans. Defendant Rumsfeld implemented these policies based on the misguided assertion that courts are not competent to adjudicate issues of detention and treatment of detainees in Iraq and in order to prevent courts from inquiring into his other policies as described above.

287. Alternatively, following the Supreme Court's *Hamdi* ruling, Defendant Rumsfeld was deliberately indifferent to

the need to adopt and/or enforce policies which permit American detainees to access courts or to contact an attorney following their detainee status determination. <u>Hamdi</u> was clear that. American detainees have both a right of access to the courts and a right to access an attorney to challenge a detention decision via the writ of *habeas corpus*.

288. Despite notice, Mr. Rumsfeld failed to take appropriate efforts to reform these policies and practices.

289. As a result, Plaintiffs were forbidden to contact or speak with attorneys or to send any correspondence to an attorney or to a court. In fact the only correspondence Plaintiffs could send was one ICRC letter per week and, even then, only to family. Moreover, when communicating with family, Plaintiffs further were forbidden, in accordance with Rumsfeld's policy, from informing family of their whereabouts or of the nature of their detentions and treatment.

290. Plaintiffs attempted to obtain access to a courts and attorneys during their detentions but were prohibited and prevented from doing so. Had Plaintiffs not been denied access, they could have challenged the torturous mistreatment, the deficiencies in their detention procedures, the false detentions themselves, and the taking of their property.

291. The misconduct described in this Count was undertaken under color of federal law.

292. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

293. This Count seeks a remedy only under the Constitution.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against Defendant DONALD RUMSFELD awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### The Role of the Unidentified Agents

294. The Unidentified Agents are employees of the United States and/or contractors working for the United States who, at least in part, exercise government authority. The Unidentified Agents made the decisions and took the actions to arrest, detain, retaliate against and mistreat Plaintiffs, and to violate their rights as described throughout this complaint. These Defendants also include all persons (other than Defendant Rumsfeld) who enacted unconstitutional polices and/or had knowledge that the violations Plaintiffs suffered would occur or were occurring and who failed to intervene to prevent them. Further, the Unidentified Agents include persons who are presently conspiring to unlawfully cover-up from Plaintiffs the identities of those who are liable to them in order to prevent them from exercising their rights in this lawsuit.

295. For example, Plaintiffs were interrogated by persons identifying themselves as members of various United States intelligence agencies. Other of their interrogators did not identify any agency and may very well be for profit contractors employed to engage in interrogation tactics that are

(at least in black letter law) illegal for United States agents to use. All of their interrogators violated Plaintiffs' rights.

296. Similarly the person or persons who retaliated against Plaintiffs for reporting to the FBI in Chicago and who made the decision to arrest and detain Plaintiffs, to deprive them of counsel, and of their due process rights are currently unidentified. Nevertheless, all of the individuals involved were exercising government authority. Moreover, all of the officials present for those decisions had an opportunity to insist that Plaintiffs' rights be respected and they failed to do so.

297. These Unidentified Agents are personally liable to Plaintiffs regardless of whether they were merely "following order" when they violated the Constitution and basic standards of decency. In other words, even though these actors may have been merely implementing an unconstitutional and unconscionable set of policies and widespread practices they cannot "blame the system." Any reasonable official should and does know that Americans cannot be treated in the way Plaintiffs have alleged.

### Count IV Against the Unidentified Agents - False Arrest

298. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

299. As described more fully above, Plaintiffs were arrested and detained without legal justification.

300. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

301. The misconduct described in this Count was undertaken under color of federal law.

302. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

303. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

304. This Count seeks a remedy only under the Constitution.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count V Against the Unidentified Agents - Unlawful Detention

305. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

306. As described more fully above, Plaintiffs were detained for an unreasonable length of time without being charged with a crime and without access to an attorney or legitimate court.

307. Plaintiffs' detentions also violated their constitutional rights because there was no judicial approval of their detention within a reasonable amount of time.

308. Plaintiffs' detentions were further unreasonable because their detentions were unjustifiedly extended even after

the time the Detainee Status Board determined that there were no grounds to continue detaining them.

309. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

310. The misconduct described in this Count was undertaken under color of federal law.

311. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

312. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

313. This Count seeks a remedy only under the Constitution.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count VI Against the Unidentified Agents, Torturous and Unlawful Interrogations

314. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

315. As described more fully above, Plaintiffs were repeatedly interrogated without counsel despite requests for the

67

same and were never warned of their rights to counsel or to remain silent. In fact they were not permitted to remain silent, but, rather threatened that their detentions would be continued unless they cooperated with the questioning.

316. Moreover, Plaintiffs were abused by their guards and interrogators for months, as described more fully above, all in a manner that "shocks the conscience" in violation of Due Process.

317. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

318. This treatment violated Plaintiffs' rights under the United States Constitution. This treatment also violated Plaintiffs' rights under the Detainee Treatment Act, which includes either an express or implied right of action. This Count seeks a remedy only under the Constitution and/or the DTA.

319. The misconduct described in this Count was undertaken under color of federal law.

320. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

321. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish..

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS

awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count VII Against the Unidentified Defendants, Denial of the Right to Counsel

322. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

323. As described more fully above, Plaintiffs were not furnished with counsel and/or denied the opportunity to procure counsel at any time.

324. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

325. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

326. The misconduct described in this Count was undertaken under color of federal law.

327. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

328. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS

awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count VII Against the Unidentified Defendants, Denial of the Right to Confront Adverse Witnesses/Evidence

329. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

330. As described more fully above, Plaintiffs were denied the right to confront, or even know the existence or identity of, the adverse witnesses against them. Plaintiffs were also denied the right to know all or even most of the evidence that was being used against them, to rebut it, to prepare to meaningfully dispute it, or to respond to it in any way.

331. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

332. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

333. The misconduct described in this Count was undertaken under color of federal law.

334. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

335. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages,

including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count VIII Against the Unidentified Defendants, Denial of the Right to Present Witnesses and Evidence, and to have Exculpatory Evidence Disclosed

336. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

337. As described more fully above, Plaintiffs were denied the right to present witnesses and evidence at the Detainee Status Board and to have exculpatory evidence disclosed.

338. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

339. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

340. The misconduct described in this Count was undertaken under color of federal law.

341. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

342. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages,

71

including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count IX Against the Unidentified Defendants, Torturous Conditions, Intentional Infliction of Suffering, and Denial of Medical Care

343. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

344. As described more fully above, Plaintiffs were subjected to torturous conditions, violence, mental anguish, and deprived on basic human needs all in a manner which shocks the conscience. These conditions were inflicted by the Unidentified Agents intentionally and/or through their deliberate indifference to Plaintiffs' suffering.

345. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

346. This treatment violated Plaintiffs' rights under the United States Constitution. This treatment also violated Plaintiffs' rights under the Detainee Treatment Act, which includes either an express or implied right of action. This Count seeks a remedy only under the Constitution and/or the DTA.

347. The misconduct described in this Count was undertaken under color of federal law.

72

348. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

349. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count X Against the Unidentified Defendants, Equal Protection: "Class of One"

350. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

351. The Unidentified Defendants arrested, detained, interrogated, and otherwise abused Plaintiffs, but did not treat Jeff Smith, Laith Al-Khudairi, Mazin Al-Khudairi, Haydar Jaffar, and/or Mukdam Hussany in a similar fashion.

352. These Defendants had no legitimate basis for so treating Plaintiffs and for treating Plaintiffs differently than these other individuals, all of whom were (in the best light to Defendants) similarly situated to Plaintiffs with regard to the purported justification for arresting, detaining, and abusing Plaintiffs as alleged herein.

73

353. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

354. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

355. The misconduct described in this Count was undertaken under color of federal law.

356. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

357. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count XI - United States Constitution, Denial of Access to the Courts and to Petition for Redress of Grievances

358. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

359. As described more fully above, Plaintiffs were denied access to the courts to challenge their unlawful detention, the conditions of their confinement and the taking of

74

their property in violation of the constitutional right to Due Process and the First Amendment.

360. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

361. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

362. The misconduct described in this Count was undertaken under color of federal law.

363. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

364. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

## Count XII Against the Unidentified Defendants, Retaliation for Speech

365. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

366. As described more fully above, Plaintiffs were retaliated against for speaking out on matters of public concern

including, *inter alia*, by being arrested, detained, interrogated, abused and having their property taken from them.

367. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

368. This treatment violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

369. The misconduct described in this Count was undertaken under color of federal law.

370. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

371. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish.

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count XIII - Conspiracy Among Unidentified Agents

372. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

373. The Unidentified Agents, or some of them, reached an agreement, or agreements, amongst themselves and/or with

76

others, to violate Plaintiffs' rights in the unlawful manner alleged herein.

374. As a result of the Unidentified Agents' conspiracies, Plaintiffs had their rights violated and were injured.

375. Additionally, the Unidentified Agents, or some of them, reached an agreement, or agreements, amongst themselves and/or with others, to unlawfully cover-up from Plaintiffs the identities of those who are liable to them for the violation of their rights as well as the evidence needed to prove those violations, all in order to prevent Plaintiffs from exercising their rights to challenge in this lawsuit the legality of what happened to them during their arrests and detentions. In the event that Plaintiffs lose or have lost any rights or causes of action relating to their arrests and detentions, it is due to this conspiracy to cover-up.

376. The Unidentified Agents committed and caused these violations of Plaintiffs' constitutional rights by their decisions, actions, and failures to act or intervene.

377. This misconduct violated Plaintiffs' rights under the United States Constitution. This Count seeks a remedy only under the Constitution.

378. The misconduct described in this Count was undertaken under color of federal law.

379. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

77

380. As a result of the above-described wrongful infringement of Plaintiffs' rights, Plaintiffs suffered damages, including but not limited to loss of liberty, physical pain and suffering, serious emotional distress, and anguish..

WHEREFORE, Plaintiffs DONALD VANCE and NATHAN ERTEL respectfully demand judgement against the UNIDENTIFIED AGENTS awarding actual and punitive damages, costs and fees, together with any and all other relief to which they may appear entitled.

### Count XIV - Return of Seized Property

381. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

382. As described more fully above, Plaintiffs' property, including without limitation their laptop computers, as well as their cell phones, digital and video cameras, and all data stored therein, and other personal property, were taken by United States officials in violation of the United States Constitution.

383. Plaintiffs have tried to secure the return of their property, inter alia, by petitioning the United States Army, but the Army has refused to produce same, and by working with the United States Department of Justice. To date the only piece of property that has been returned is Plaintiff Vance's laptop.

384. The Army's ruling on this matter, and the Department of Justice's statement that the government does not intend to return any other property constitute final agency actions under the Administrative Procedure Act, 5 U.S.C. §702.

385. These actions are arbitrary, capricious and an abuse of discretion.

386. As a result, Plaintiffs have not been able to secure return of all of their personal property, including data which may have critical importance for this suit.

387. This is the only claim that Plaintiffs bring directly against the United States.

WHEREFORE, Plaintiffs, DONALD VANCE and NATHAN ERTEL, respectfully request that this Honorable Court enter judgment in their favor and against Defendant UNITED STATES OF AMERICA ordering the return of all of Plaintiffs' personal property including computers, other electronics, and the data included therein.

### JURY DEMAND

Plaintiffs, DONALD VANCE and NATHAN ERTEL, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Michael Kanovitz
Attorneys for Plaintiff

Arthur Loevy
Mike Kanovitz
Jon Loevy
Gayle Horn
LOEVY & LOEVY
312 North May St
Suite 100
Chicago, IL 60607
(312) 243-5900

79



## MULTI-NATIONAL FORCE - IRAQ
### CAMP VICTORY, BAGHDAD
### APO AE 09342-1400

REPLY TO
ATTENTION OF:

**8 0 APR 2006**

Office of the Staff Judge Advocate

Name: Donald Vance
ISN: 200343
SSN: 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

Subject: Detainee Status Board

Dear Mr. Donald Vance:

A Detainee Status Board has been convened to determine your legal status as a U.S. citizen detained in the conflict in Iraq. The board has been scheduled to begin no earlier than 23 April, 2006. This Board will determine your status as one of the following:

(1) Enemy Combatant: An individual who is a member agent of Al Qaeda, the Taliban, or another international terrorist organization against which the United States is engaged in an Armed Conflict.

(2) Security Internee: An individual detained because there exists reasonable grounds to believe you pose a threat to security or stability in Iraq. Reasonable grounds consist of sufficient indicators to lead a reasonable person to believe that detention is necessary for imperative reasons of security, e.g. that you pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or otherwise pose a threat to security and stability in Iraq

(3) Innocent Civilian: An individual who should be immediately released because there are no reasonable grounds to believe that you pose a threat to security or stability in Iraq. Detention is not necessary for imperative reasons of security, e.g. you do not pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or are otherwise not a threat to security and stability in Iraq.

The unclassified factual basis that will be used by the Board to determine your status is as follows:

On or about April 15, 2006 you were detained by members of the Coalition Forces for being a suspect in supplying weapons and explosives to insurgent/criminal groups through your affiliation with the Shield Group Security Company (SGS) operating in Iraq. Credible evidence suggests that certain members of SGS are supplying weapons to insurgent groups in Iraq. Further, you are suspected of illegal receipt of stolen weapons and arms in Iraq from Coalition Forces.



EXHIBIT

A

You have the following rights at the Board:

    (1) You have the right to be present at all open sessions of the Board.
    (2) You have the right to testify or not to testify.
    (3) You do not have the right to legal counsel, but you may have a personal representative assist you at the hearing if the personal representative is reasonably available.
    (4) You have the right to present evidence, including the testimony of witnesses who are reasonably available.
    (5) You have the right to examine and cross-examine witnesses.

The following procedures apply at Board hearings:

    (1) All relevant evidence, including hearsay evidence, is admissible. The Board hearing is not adversarial. A recorder may present evidence to the Board. Witnesses will testify under an oath or affirmation to tell the truth.
    (2) The Board's decisions are determined by a majority of voting members.

If you wish to have evidence, witnesses or a personal representative at the Board, you must deliver a written request to the Camp Commander of your detention facility before the Board convenes. The Board will attempt to accommodate reasonable requests for persons who it finds are immediately available. If you have any questions concerning this Board, please contact the Camp Commander with your inquiry and it will be forwarded to The Multi-National Force – Iraq Office of the Staff Judge Advocate for clarification.

Sincerely,

Bradley J. Huestis
LTC, U.S. Army
President of the Board

ACKNOWLEDGEMENT OF RECEIPT:

Donald Vance (Signature)

Date: 4-21-06

Time: 21:42

2

<u>CERTIFICATE OF SERVICE</u>

On _20 April_ 2006, I, _PHILLIP REIMAN_, personally served a copy of "Detainee Status Board" dated _20 April 06_, on **Donald Vance, ISN: 200343**. This document notifies him of his rights and procedures at his Detainee Status Board.

Signed: _____

3



**MULTI-NATIONAL FORCE - IRAQ**
CAMP VICTORY, BAGHDAD
APO AE 09342-1400

REPLY TO
ATTENTION OF:

2 6 APR 2006

Office of the Staff Judge Advocate

Name: Nathan Adam Erpel
ISN: 200342
SSN: 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

Subject: Detainee Status Board

Dear Mr. Nathan Adam Erpel:

A Detainee Status Board has been convened to determine your legal status as a U.S. citizen detained in the conflict in Iraq. The board has been scheduled to begin no earlier than 23 April, 2006. This Board will determine your status as one of the following:

(1) Enemy Combatant: An individual who is a member agent of Al Qaeda, the Taliban, or another international terrorist organization against which the United States is engaged in an Armed Conflict.

(2) Security Internee: An individual detained because there exists reasonable grounds to believe you pose a threat to security or stability in Iraq. Reasonable grounds consist of sufficient indicators to lead a reasonable person to believe that detention is necessary for imperative reasons of security, e.g. that you pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or otherwise pose a threat to security and stability in Iraq.

(3) Innocent Civilian: An individual who should be immediately released because there are no reasonable grounds to believe that you pose a threat to security or stability in Iraq. Detention is not necessary for imperative reasons of security, e.g. you do not pose a threat to MNF-I or Iraqi security forces, or to the safety of civilians in Iraq, or are otherwise not a threat to security and stability in Iraq.

The unclassified factual basis that will be used by the Board to determine your status is as follows:

On or about April 15, 2006 you were detained by members of the Coalition Forces for being a suspect in supplying weapons and explosives to insurgent/criminal groups through your affiliation with the Shield Group Security Company (SGS) operating in Iraq. Credible evidence suggests that certain members of SGS are supplying weapons to insurgent groups in Iraq. Further, you are suspected of illegal receipt of stolen weapons and arms in Iraq from Coalition Forces.

You have the following rights at the Board:

    (1) You have the right to be present at all open sessions of the Board.
    (2) You have the right to testify or not to testify.
    (3) You do not have the right to legal counsel, but you may have a personal representative assist you at the hearing if the personal representative is reasonably available.
    (4) You have the right to present evidence, including the testimony of witnesses who are reasonably available.
    (5) You have the right to examine and cross-examine witnesses.

The following procedures apply at Board hearings:

    (1) All relevant evidence, including hearsay evidence, is admissible. The Board hearing is not adversarial. A recorder may present evidence to the Board. Witnesses will testify under an oath or affirmation to tell the truth.
    (2) The Board's decisions are determined by a majority of voting members.

If you wish to have evidence, witnesses or a personal representative at the Board, you must deliver a written request to the Camp Commander of your detention facility before the Board convenes. The Board will attempt to accommodate reasonable requests for persons who it finds are immediately available. If you have any questions concerning this Board, please contact the Camp Commander with your inquiry and it will be forwarded to The Multi-National Force – Iraq Office of the Staff Judge Advocate for clarification.

Sincerely,

Bradley J. Huestis
LTC, U.S. Army
President of the Board

**ACKNOWLEDGEMENT OF RECEIPT**:

Nathan Adam Erpel (Signature)

Date: 20 April 06

Time: 21:45

2

## CERTIFICATE OF SERVICE

On 20 April ___ 2006, I, Philip Reiman ___, personally served a copy of "Detainee Status Board" dated 20 April 06 ___, on **Nathan Adam Erpel, ISN: 200342**. This document notifies him of his rights and procedures at his Detainee Status Board.

Signed: _____

3



# DEPARTMENT OF DEFENSE
## LEGAL OFFICE – TASK FORCE 134
### MULTI-NATIONAL FORCE – IRAQ
### APO AE 09342

REPLY TO
ATTENTION OF:
Magistrate Office

Date: 22 April 2006

Detainee Name: NATHAN ADAM ERTEL
ISN: 200342
Internment Facility: CROPPER

Subject: Notice of Status and Appellate Rights

1. <u>Status.</u> This is to notify you of your status and the basis for your detention. You are being detained as a Security Internee pursuant to United Nations Security Council Resolution (UNSCR) 1546, 1637, and Coalition Provisional Authority (CPA) Memorandum 3 (Revised). You have been detained for the following reasons

You work for a business entity that possessed one or more large weapons caches on its premises and may be involved in the possible distribution of these weapons to insurgent/terrorist groups.

2. <u>Appellate Rights.</u> You have the right to appeal your internment in accordance with Article 78 of the Geneva Convention. You may use the appeal form provided, or any writing containing your full name and ISN. If you provide a written statement of appeal, the statement will be translated into English and included in your case file for consideration by subsequent competent review authorities. **To be considered, written material must be submitted to any guard, military police, or camp official for delivery to the Magistrate**

3. You may also have another person submit additional written material on your behalf. If another person is submitting written material, ensure they put your full name and ISN number on the document so it can be properly placed in your file. Written materials may be submitted to any military police or camp official at any visitation site at Abu Ghraib, Bucca, Cropper or Suse to be forwarded to the reviewing authority

4. Written material you wish to submit for consideration from any source must be received by the reviewing authority in a timely manner. It is imperative that you gather and submit your written appeal and any other written submissions AS SOON AS POSSIBLE. Untimely written submissions could result in the reviewing authority not having the all the information available when making a decision on your case. Written matters will be translated into English and included in your case file.

| Proof of Service |
|---|
| Date of Service: |
| Served By: |
| (Name / Rank) |

**EXHIBIT**
B

Magistrate Form 3 (March 06)