**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD VANCE and NATHAN ERTEL,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 06 C 6964** |
| | ) | |
| **v.** | ) | **Wayne R. Andersen** |
| | ) | **District Judge** |
| **DONALD RUMSFELD, UNITED STATES OF AMERICA and UNIDENTIFIED AGENTS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on defendant Donald Rumsfeld's motion to dismiss plaintiffs' second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the motion to dismiss [135] is denied as to Count I and granted with respect to Counts II and III.

## BACKGROUND

According to the complaint, plaintiffs Donald Vance ("Vance") and Nathan Ertel ("Ertel"), both American citizens, traveled to Iraq in the fall of 2005 to work for a private Iraqi security firm, Shield Group Security ("SGS"). In the course of their employment, plaintiffs allegedly observed payments made by SGS agents to certain Iraqi sheikhs. Plaintiffs also claim to have seen mass acquisitions of weapons by SGS and sales in increased quantities. Questioning the legality of these transactions, Vance claims to have contacted the FBI during a return visit to his hometown of Chicago to report what he had observed. Vance asserts that he was put in contact with Travis Carlisle, a Chicago FBI agent, who arranged for Vance to continue to report suspicious activity at the SGS

compound after his return to Iraq. Vance alleges that he complied with Carlisle's request and continued to report to him daily. Several weeks later, Vance claims Carlisle put him in contact with Maya Dietz, a United States government official working in Iraq. Dietz allegedly requested that Vance copy computer documents and forward them to her. Vance contends that he complied with that request.

Plaintiff Ertel claims to have been aware of Vance's communications with the FBI and alleges to have contributed information to those communications. Ertel asserts that both he and Vance communicated their concerns about SGS to Deborah Nagel and Douglas Treadwell, two other United States government officials working in Iraq.

Plaintiffs contend suspicions within SGS grew as to Vance and Ertel's loyalty to the company. On April 14, 2006, armed SGS agents allegedly confiscated plaintiffs' access cards which permitted them freedom of movement into the "Green Zone" and United States compounds. This action effectively trapped plaintiffs in the "Red Zone" and within the SGS compound. Plaintiffs claim to have contacted Nagel and Treadwell who instructed them to barricade themselves in a room in the SGS compound until United States forces could come rescue them. Plaintiffs subsequently were successfully removed from the SGS compound by United States forces.

Plaintiffs allege that they then were taken by United States forces to the United States Embassy. Plaintiffs allege that military personnel seized all of their personal property, including their laptop computers, cellular phones, and cameras. At the Embassy, plaintiffs claim they were separated and then questioned by an FBI agent and two other persons from United States Air Force Intelligence. Plaintiffs contend that they disclosed all their knowledge of the SGS transactions and directed the officials to their

2

laptops in which most of the information had been documented. Plaintiffs also assert that they informed the officials of their contacts with Agent Carlisle in Chicago and Agents Nagel and Treadwell in Iraq. Following these interviews, plaintiffs claim they were escorted to a trailer to sleep for two to three hours.

Next, plaintiffs claim they were awakened by several armed guards who placed them under arrest and then handcuffed and blindfolded them and pushed them into a humvee. Plaintiffs contend that they were labeled as "security internees" affiliated with SGS, some of whose members were suspected of supplying weapons to insurgents. According to plaintiffs, that information alone was sufficient, under the policies enacted by Rumsfeld and others, for the indefinite, incommunicado detention of plaintiffs without due process or access to an attorney. Plaintiffs claim to have been taken to Camp Prosperity, a United States military compound in Baghdad. There they allege they were placed in a cage, strip searched, and fingerprinted. Plaintiffs assert that they were taken to separate cells and held in solitary confinement 24 hours per day.

After approximately two days, plaintiffs claim they were shackled, blindfolded, and placed in separate humvees which took them to Camp Cropper. Again, plaintiffs allege they were strip searched and placed in solitary confinement. During this detention, plaintiffs contend that they were interrogated repeatedly by military personnel who refused to identify themselves and used physically and mentally coercive tactics during questioning. All requests for an attorney allegedly were denied.

Plaintiffs allege that on or about April 20, 2006 they each received a letter from the Detainee Status Board indicating that a proceeding would be held on April 23, 2006 to determine their legal status as "enemy combatants," "security internees," or "innocent

civilians." The letters informed plaintiffs that they did not have a right to legal counsel at that proceeding. The letters also informed plaintiffs they only would be permitted to present evidence or witnesses for their defense if evidence or witnesses were reasonably available at Camp Cropper. Vance and Ertel allege that on April 22, 2006 they each received a notice stating that they were "security internees." The letters informed plaintiffs they had the right to appeal by submitting a written statement to camp officials. Both Vance and Ertel appealed, requesting each other as witnesses and their seized personal property as evidence.

Plaintiffs allege they were taken before the Detainee Status Board on April 26, 2006. Ertel and Vance claim they were not provided with the evidence they requested, nor were they permitted to testify on the other's behalf. Plaintiffs assert that they were not permitted to see the evidence against them or confront any adverse witnesses.

On May 17, 2006, Major General John Gardner authorized the release of Ertel, allegedly 18 days after the Detainee Status Board officially acknowledged that he was an innocent civilian. Vance's detention continued an additional two months, and he alleges that he continuously was interrogated throughout his detention. On July 20, 2006, allegedly several days after Major General Gardner authorized his release, Vance was permitted to leave Camp Cropper. Neither Vance nor Ertel was ever charged with any crime.

On December 18, 2006, plaintiffs initiated this lawsuit against defendants for the alleged constitutional violations that occurred in Iraq by the unidentified agents of the United States as well as for the practices and policies enacted by Rumsfeld who allegedly

authorized such actions by those agents.   Rumsfeld has filed a motion to dismiss the claims against him.

## STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure has long required that a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a).  At the motion to dismiss stage, the court must accept the material facts contained in a plaintiff's complaint as true and generally construe the complaint in a light favorable to the plaintiff.  *See Jackson v. E.J. Branch Corp.*, 176 F.3d 971, 978 (7th Cir. 1999).  In two recent decisions, however, *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the United Supreme Court made clear that Federal Rule 8 is not a license for wild conspiracies or baseless speculation.

In *Twombly*, the Supreme Court held that pleading a sufficient antitrust violation requires more than a mere allegation of parallel conduct.  550 U.S. at 556.  Instead, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  The Seventh Circuit recently recognized that the lesson of *Twombly* is that "a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case."  *Limestone Dev. Corp. v. Village of Lemont, Illinois*, 520 F.3d 797, 802-803 (7th Cir. 2008).

In *Iqbal*, the Supreme Court clarified that *Twombly* is not limited only to the antitrust context and set forth the general burden plaintiffs face on a motion to dismiss. *Iqbal*, 129 S. Ct. at 1953.  In *Iqbal*, the plaintiff Javaid Iqbal was arrested as part of a

5

mass roundup of Muslim non-citizens in the period following September 11, 2001. *Id.* at 1951. He alleged that a policy of selectively detaining individuals based on race and religion improperly led to his arrest. *Id.* Iqbal named former Attorney General John Ashcroft and current Director of the Federal Bureau of Investigation Robert Mueller as defendants, arguing that each was an architect of the policy that permitted his detention. *Id.* Because these officials were named in the lawsuit, the Supreme Court was particularly concerned with ensuring that baseless or purely speculative allegations were properly dismissed. *Id.* at 1954. The Supreme Court recognized that it was "impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." *Id.*

*Iqbal* undoubtedly requires vigilance on our part to ensure that claims which do not state a plausible claim for relief are not allowed to occupy the time of high-ranking government officials. It is not, however, a categorical bar on claims against these officials. When a plaintiff presents well-pleaded factual allegations sufficient to raise a right to relief above a speculative level, that plaintiff is entitled to have his claim survive a motion to dismiss even if one of the defendants is a high-ranking government official.

## ANALYSIS

### I. Count I: Cruel and Inhumane Treatment Methods

In Count I, plaintiffs allege that they were subject to a number of cruel and degrading treatment methods during their respective periods of detention. Plaintiffs allege that the treatment methods included "threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of

6

needed medical care, yelling, prolonged, solitary confinement, *incommunicado* detention, falsified allegations and other psychologically-disruptive and injurious techniques." SAC ¶ 259. We must determine whether it is plausible that Rumsfeld was personally involved in the decision to implement the class of harsh treatment methods that allegedly were utilized against plaintiffs Vance and Ertel.

### A. Rumsfeld's Personal Involvement in Alleged Cruel Treatment

Plaintiffs bring their claim against Rumsfeld as a *Bivens* action. The United States Supreme Court in *Bivens v. Six Unknown Namaed Agents of Federal Bureau of Narcotics* established that victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of a statute conferring such a right. 403 U.S. 388, 396 (1999). In *Bivens*, the Supreme Court held that it is "well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946)). From its inception, *Bivens* has been based on "the deterrence of individual officers who commit unconstitutional acts." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001). Another purpose of extending a *Bivens* remedy to a person who has been subjected to the deprivation of constitutionally-guaranteed rights by an individual officer is to "provide a cause of action for a plaintiffs who lack any alternative remedy for harms caused by an individual officer's unconstitutional conduct." *Id.* at 70.

Consistent with its purpose to "deter individual officers from committing constitutional violations," liability under *Bivens* is limited to those "directly responsible" for such violations. *Malesko*, 534 U.S. at 69-71. This requires a plaintiff to sufficiently

7

allege that a defendant was "personally involved in the deprivation of [his] constitutional rights." *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997). We will later evaluate Rumsfeld's claim that this court should not imply a *Bivens* remedy even if a constitutional violation is found to exist. First, however, we address the threshold question of whether Rumsfeld's personal involvement has been sufficiently alleged. Because of the factually intensive nature of plaintiffs' allegations of Rumsfeld's personal involvement, our evaluation of this issue is filtered through the lens of *Iqbal* to ensure that the facts alleged go beyond bare assertions or mere speculation.

According to plaintiffs' allegations in their second amended complaint, Rumsfeld was personally involved in their unconstitutional treatment by his decision to approve the adoption of harsh treatment methods that were utilized at Camp Cropper during plaintiffs' confinement. While plaintiffs acknowledge that Rumsfeld did not personally subject them to the harsh interrogation and confinement methods, plaintiffs rely on a number of Seventh Circuit cases to establish the proposition that individuals who issue an order to engage in unconstitutional conduct can themselves be held liable for that conduct. In other words, a superior officer may be considered personally involved in a constitutional violation when his subordinates carried out such a violation pursuant to his policy directive. *See e.g., Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614-615 (7th Cir. 2002) ("Ms. Doyle and Mr. Konold allege that the DCFS Director and his deputy personally were responsible for creating the policies, practices, and customs that caused the constitutional deprivations. . . . [T]hese allegations . . . suffice at this stage in the litigation to demonstrate . . . personal involvement in the purported unconstitutional conduct."); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

8

Rumsfeld cites seemingly contrary language from the Sixth Circuit that appears quite favorable to his position. *See Nuclear Transp. & Storage, Inc v. United States*, 890 F.2d 1348, 1355 (6th Cir. 1989) (holding that an individual capacity claim against a cabinet officer cannot proceed simply based upon allegations that a cabinet officer "acted to implement, approve, carry out, and otherwise facilitate alleged unlawful policies"). Upon further review, however, it appears that the Sixth Circuit's objection was to the quality of the pleading—which the Court of Appeals characterized as a "mere assertion"—rather than to the principle of policymaker liability generally. *Id.* Thus, plaintiffs' complaint against Rumsfeld at this stage can proceed only if it properly alleges that Rumsfeld created a policy that expressly authorized those under his command to carry out a constitutional violation. *See Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859 (7th Cir. 1999).

In their second amended complaint, plaintiffs lay out a number of factual allegations in support of their claim that Rumsfeld personally crafted the policies responsible for their harsh treatment in Iraq. While the secretive, classified nature of many of the alleged policy decisions in this area makes precise identification of events more difficult, plaintiffs have identified a number of key dates and facts in support of their allegations. The following factual allegations are laid out in plaintiffs' second amended complaint.

First, plaintiffs allege that on December 2, 2002 "Rumsfeld personally approved a list of torturous interrogation techniques for use on detainees on Guantanamo." Second Amended Complaint ("SAC") ¶ 232. In defiance of established military rules and standards, plaintiffs allege that Rumsfeld added a number of methods to the Army Field

9

manual including, use of 20-hour interrogations, isolation for up to 30 days, and sensory deprivation. *Id.*

Plaintiffs allege that on January 15, 2003 Rumsfeld rescinded his formal authorization for those techniques. SAC ¶ 233. Plaintiffs allege that he instead authorized the Commander of the United States Southern Command to use these methods "if warranted and approved by Rumsfeld himself in individual cases." *Id.*

Around the same time, plaintiffs also allege that Rumsfeld convened a "Working Group" to evaluate the status of interrogation policy. SAC ¶ 234. Plaintiffs allege that in April 2003 Rumsfeld approved a new set of interrogation techniques, which included isolation for up to thirty days, dietary manipulation, and sleep deprivation and again provided that additional harsh techniques could be used with his approval. SAC ¶¶ 234-235.

Plaintiffs further allege that in August 2003 Rumsfeld sent Major Geoffrey Miller to Iraq to review the United States prison system. SAC ¶ 236. Plaintiffs claim that Rumsfeld informed Major Miller that his mission was to "gitmo-ize" Camp Cropper, a task that required recommendations on how to more effectively obtain actionable intelligence from detainees and "authorized Major Miller to apply in Iraq the techniques that Rumsfeld had approved for use at Guantanamo and elsewhere. At Rumsfeld's direction, Major Miller did just that." *Id.* at ¶¶ 236-237.

Plaintiffs allege that on September 14, 2003, in response to Major Miller's call for more aggressive interrogation policies in Iraq and as authorized by Rumsfeld, Lieutenant General Ricardo Sanchez, Commander of the Coalition Joint Task Force, "signed a

10

memorandum authorizing the use of 29 interrogation techniques which included yelling, loud music, light control, and sensory deprivation, amongst others." SAC ¶ 238.

Finally, plaintiffs allege that Rumsfeld, on the same day that Congress passed the Detainee Treatment Act, modified the Army Field Manual to include ten new interrogation techniques, including those allegedly used against plaintiffs. SAC ¶ 244. While plaintiffs acknowledge that these modifications to the Field Manual were subsequently repealed, it is their belief that this repeal did not occur until after their detention. *Id.*

Plaintiffs also assert a series of allegations regarding Rumsfeld's supposed knowledge of cruel and inhumane treatment of detainees in Iraq. *See generally* SAC ¶¶ 262-267. We do not agree that these allegations are sufficient to separately demonstrate personal involvement through deliberate indifference. These allegations, however, do give some support to the core assertion regarding Rumsfeld's role as the architect of the detainee treatment methods at issue in this case.

First, plaintiffs allege that in May 2003, the Red Cross began sending detailed reports that detainees within United States custody in Iraq were being mistreated. SAC ¶¶ 240-241. According to plaintiffs, Colin Powell, then the Secretary of State, confirmed that Rumsfeld knew of the various reports and regularly apprised the President of their content. *Id.* Second, plaintiffs allege that Rumsfeld similarly was aware of a series of investigative reports into detainee abuse in Iraq, including those of former Secretary of Defense James Schlesinger, Army Major General Antonio Taguba, and Army Lieutenant General Anthony Jones. *Id.*

11

These allegations, if true, would substantiate plaintiffs' claim that Rumsfeld was aware of the direct impact that his newly approved treatment methods were having on detainees held in Iraq. In cases like this one in which much of the decision-making at issue took place behind closed doors, courts have shown a willingness to accept outside documentation of abuse as a factor supporting the plausibility of a plaintiff's allegations. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 976 (9th Cir. 2009) (holding that the "abuses occurring under the material witness statute after September 11, 2001 were highly publicized in the media, congressional testimony and correspondence, and in various reports by governmental and non-governmental entities, which could have given Ashcroft sufficient notice to require affirmative acts to supervise and correct the actions of his subordinates").

Based on these allegations, we conclude that plaintiffs have alleged sufficient facts to survive Rumsfeld's motion to dismiss on account of a lack of personal involvement. Two federal courts forced to address similar issues share our conclusion. In *al-Kidd v. Ashcroft,* the Ninth Circuit addressed a United States citizen who claimed that Attorney General Ashcroft and the Department of Justice ("DOJ") unlawfully used a material witness statute as a pretext to arrest and confine him based on suspicions that he was involved in terrorism-related activities. 580 F.3d at 951-952. Ashcroft argued that he was entitled to absolute prosecutorial immunity as to two of the claims asserted by al-Kidd and that he was entitled to qualified immunity on all three claims asserted by al-Kidd. *Id*. at 957. With respect to the plaintiff's core Fourth Amendment claim, the Ninth Circuit agreed with the district court that al-Kidd had met his burden of pleading a claim for relief that was plausible and that his lawsuit on the material witness claim should be

12

allowed to proceed and the district court properly denied Ashcroft's motion to dismiss. *Id.* at 951-952.

While acknowledging that *Iqbal* compels courts to carefully scrutinize a plaintiff's claim against high-ranking government officials, the Ninth Circuit nonetheless determined that the specific facts alleged by al-Kidd were sufficient to survive a motion to dismiss. *Id.* at 974-977. The Ninth Circuit relied on the detailed nature of the plaintiff's complaint, the existence of a number of public statements from Ashcroft and the DOJ regarding their use of the material witness statute, and evidence from the media that the statute had been abused to support its conclusion that the plaintiff's allegations were plausible. *Id.*

This was not a circumstance, however, in which the evidence was crystal clear in establishing the underlying merit of the plaintiff's claim. The Ninth Circuit acknowledged that if it were deciding a motion for summary judgment on the facts pled in the complaint, it's decision "might well be different." *Id.* at 977. Nonetheless, the Ninth Circuit recognized that the requirement of plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence." *Id.* at 976 (quoting *Twombly*, 550 U.S. at 556.) In light of this standard, the Ninth Circuit determined that al-Kidd had sufficiently stated a claim for relief. *Id.* at 977.

The second relevant post-*Iqbal* case is *Padilla v. Yoo*, 633 F. Supp. 2d 1005 (2009). Jose Padilla, a United States citizen, was designated an enemy combatant as part of the "war on terror." *Id.* at 1012. Padilla alleges that he was imprisoned without charge, subject to extreme isolation from family and counsel, and interrogated under

13

threat of torture, deportation, or death. *Id.* at 1013-1014. The named defendant was John Yoo, a Deputy Attorney General in the Office of Legal Counsel and *de facto* head of war-on-terrorism legal issues under George W. Bush. *Id.* at 1014. Padilla alleged that Yoo was instrumental in designating him as an enemy combatant and in drafting the policy of employing harsh interrogation tactics against enemy combatants. *Id.* at 1014-1015.

To support these allegations, Padilla relied primarily on a host of memoranda written by Yoo that paved the way for the implementation of harsh interrogation methods. *Id.* at 1015-1016. The ten memoranda that were identified showed a pattern of statements from Yoo giving legal authorization for the use of these treatment methods. Based largely on these memoranda, the district court concluded that Padilla had alleged sufficient facts to satisfy the requirement that Yoo set in motion a series of events that resulted in the deprivation of Padilla's constitutional rights. *Id.* at 1034. The district court distinguished *Iqbal*, concluding that *Iqbal* rejected "bare assertions" that would only suffice if given an "assumption of truth." *Id.* In contrast, the district court recognized that Padilla alleged "with specificity that Yoo was involved in the decision to detain him and created a legal construct designed to justify the use of interrogation methods that Padilla alleges were unlawful." *Id.* The district court denied Yoo's motion to dismiss.

Like the Ninth Circuit in *al-Kidd* and the district court in *Padilla*, we conclude that the allegations of Rumsfeld's personal involvement in unconstitutional activity are sufficiently detailed to raise the right to relief above the speculative level and would

14

survive a motion to dismiss. Therefore, we must next cconsider whether Rumsfeld is entitled to qualified immunity on plaintiffs' claims.

### B. Qualified Immunity

Rumsfeld argues that he is entitled to qualified immunity on all claims, including Count I. The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). When established, qualified immunity operates as "*an immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (italics in original).

In *Saucier v. Katz*, the Supreme Court established a mandatory two-step sequence for resolving government officials' qualified immunity claims. 533 U.S. 194, 200-201 (2001). First, a court must determine whether the facts alleged show that the official's conduct violated a constitutional right. *Id.* Second, if the court concludes that a constitutional right was violated, then it must determine whether that right was clearly established at the time of the relevant events. *Id.* The Supreme Court in *Pearson v. Callahan* determined that the specific order of the qualified immunity inquiry is not required and held that "judges of the district court and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed in light of the circumstances in the particular case at hand." 129 S. Ct. at 818.

1. The Proscribed Treatment Methods Violated a Constitutional Right

It is clear that certain conduct may be deemed "so brutal and so offensive to human dignity" as to exceed the permissible limits of our Constitution. *Rochin v. California*, 342 U.S. 165, 174 (1952). When such conduct "shocks the conscience" of those belonging to a civilized system of justice, it can and should be deemed a violation of the Due Process Clause. *Id.* at 172-174. It is equally clear that the use of physical or mental torture on American citizens often will embody the paradigmatic example of "shocks the conscience" conduct. *See, e.g., Miller v. Fenton*, 474 U.S. 104, 109 (1985) ("[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause . . . ."); *Palko v. Connecticut*, 302 U.S. 319, 326 (1937), overruled on other grounds by *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (noting that the Due Process Clause must at least "give protection against torture, physical or mental").

As early as 1878, the United States Supreme Court declared that it is "safe to affirm that punishments of torture . . . are forbidden by . . . the Constitution." *Wilkerson v. State of Utah*, 99 U.S. 130, 136 (1878). The existence of a strong constitutional right to be free from torture is highly important to our evaluation of whether a right to be free from Rumsfeld's alleged actions exists in this case. However, this general right alone does not resolve our qualified immunity inquiry. Instead, as Rumsfeld correctly points

16

out, we must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 202.

Rumsfeld is correct that questions remain regarding whether the alleged treatment plaintiffs received is properly classified as torture. For now, however, we believe that the allegations set forth by plaintiffs are comprehensive enough to merit an invocation of the line of cases assessing torture in a constitutional light. As we have previously discussed, plaintiffs allege that the treatment methods used against them included "threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of needed medical care, yelling, prolonged, solitary confinement, *incommunicado* detention, falsified allegations and other psychologically-disruptive and injurious techniques." SAC ¶ 259. Accepting at this stage that these treatment methods were in fact used, we conclude that a court might plausibly determine that the conditions of confinement were torturous. *See Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1991) (noting that, for the purposes of evaluating an alleged constitutional violation, courts may often evaluate the effect of conditions of confinement "in combination" to determine their validity); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998) (holding that an "investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements").

Based on our assessment of the cumulative impact of the alleged practices, we feel comfortable distinguishing this case from the cases Rumsfeld cites in which the use of a single practice in isolation was insufficient to shock the conscience. Even if we were to agree with Rumsfeld that depriving plaintiffs of food and water or placing them in

17

extreme segregation alone passes constitutional muster, this would not change our conclusion that plaintiffs have set forth the cumulative allegations necessary to state a claim of mistreatment. While the evidence may ultimately show that neither the individual treatment methods nor their cumulative impact "shocks the conscience," that determination is not one we may properly make at this stage of the proceedings. *See Cole v. U.S. Capital, Inc.,* 389 F.3d 719, 724 (7th Cir. 2004) (noting that the proper task is to determine whether the plaintiff should be given a chance to offer evidence in support of their claims rather than whether they will ultimately prevail on the merits of those claims).

Additionally, plaintiffs correctly argue that this case is distinguishable from many in which detainee deprivation or suffering was upheld because the alleged injuries were unintentional or incidental. Indeed, the parties' briefs feature little dispute that, unlike many of these more traditional injurious actions, torturous treatment methods may manifest an inextricable aim to injure those subject to their use. In other words, these methods might at times themselves embody an intent to inflict harm. The importance of this factor is reflected in the Supreme Court statement that: "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property."

*Lewis* does not suggest that every practice aimed at inflicting injury will be deemed to shock the conscience absent a compelling governmental interest. Equally, it

18

does not rule out a "shock the conscience" finding in cases in which some governmental

interest is present. Instead, *Lewis* makes clear that evidence regarding an intent to injure

and an identifiable government interest may be relevant to evaluate a substantive due

process claim.

Viewed as one factor among many in what amounts to a balancing of the

justifications for the alleged behavior, it becomes clear that the scope of the

government's interest in this case is not something we can or should fully assess at this

stage. Such an inquiry would extend our role beyond that which is proper on a motion to

dismiss. *See Cole*, 389 F.3d at 724. It also would force us to examine justifications

proffered by Rumsfeld in a way that would lead us beyond the allegations contained in

the pleadings. *See Clair v. Harris Trust and Savings Bank*, No. 96-7311, 1998 WL

246482, at *2 (N.D. Ill. 1998) ("In considering a Rule 12(b)(6) motion to dismiss for

failure to state a claim, the court is limited to the allegations contained in the

pleadings."). Thus, while it is quite possible that we may later determine that the

justification for Rumsfeld's action was strong and/or the aim to injure embodied in the

relevant treatment methods weak, this is not a determination that is properly made at this

stage of the process in which no real evidence is before us. Plaintiffs have stated facts

sufficient to warrant giving them an opportunity to provide such evidence in support of

their claims.

At the conclusion of his brief on the constitutional right issue, Rumsfeld cites

facially powerful Seventh Circuit authority for the proposition that even conduct deemed

to be "abhorrent" does not give rise to a substantive due process claim. *See Tun v.

Whitaker,* 398 F.3d 899, 900 (7th Cir. 2005) ("It is one thing to say that officials acted

badly, even tortiously, but—and this is the essential point—it is quite another to say that their actions rise to the level of a constitutional violation.  We have declined to impose constitutional liability in a number of situations in which we find the officials' conduct abhorrent.").  From this, Rumsfeld would have us conclude that the contours of a right to be free from allegedly torturous behavior are murky and amorphous at best.

As plaintiffs correctly point out, the specific substantive issue dealt with in *Tun* makes a meaningful application of that case to ours difficult to rationalize.  *Tun* dealt with the six-week suspension of an Indiana high school student for possession of nude photographs.  *Id.* at 900-901.  The issue facing the court was whether the principal's decision to suspend the student gave rise to a substantive due process claim.  *Id.*  The Seventh Circuit concluded that no constitutional violation was present.  *Id.* at 904.  It was in this context, in which the court declined to create a new constitutional protection against the disciplinary decisions of a school principal, that the Seventh Circuit chose to note that a refusal to grant a constitutional remedy does not necessarily connote agreement with an official's behavior.  *Id.* at 903.  Rumsfeld certainly is correct that many questionable decisions by government officials do not give rise to a constitutional violation.  He errs, however, in assuming that a reference made in the context of a high school suspension is dispositive of the allegations of mistreatment made here.

Finally, Rumsfeld argues that, because the alleged abuse occurred in Iraq during a period of war, the scope of constitutional protection available is drastically limited.  This argument highlights many of the same issues we face in determining whether plaintiffs' constitutional rights were clearly established in the circumstances identified.  Accordingly, we will address the scope of the constitutional protections available to

20

plaintiffs in the context of determining whether the constitutional rights were clearly established.

## 2. The Applicable Constitutional Right Was Clearly Established

In determining whether a constitutional right was clearly established, we must assess whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533. U.S. at 213. It is not necessary for the particular violation in question to have "previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Instead, a clearly established constitutional right exists in the absence of precedent, 'where the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Nanda v. Moss*, 412 F.3d 836, 844 (2005) (quoting *Anderson*, 483 U.S. at 640). Here, we must determine whether it would have been clear to a reasonable official in Rumsfeld's position that the application of the alleged treatment methods on American citizens was unconstitutional. Because we already have determined that the alleged treatment methods exceeded the scope of generally permissible practices, we now must determine if any of the circumstances at the time and place of plaintiffs' confinement eliminated the knowing availability of these constitutional limits.

First, the fact that the alleged events occurred in a foreign war zone rather than within the confines of the United States does not eliminate the entitlement of United States citizens to the protections of the U.S. Constitution. In *Kar v. Rumsfeld*, a district court faced the claim of a United States citizen who alleged a Fourth Amendment and procedural due process claim relating to his detention by U.S. military officials in Iraq. 580 F. Supp. 2d 80 (D.D.C. 2008). The court ultimately granted the government's

21

motion to dismiss these claims. *Id.* at 86. In the process, however, the court first addressed the argument that Kar was not entitled to the protections of the Fourth and Fifth Amendment because he was seized and detained in a foreign war zone. *Id.* at 83. Stating that this argument was "easily disposed of," the district court noted that "the Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq." *Id.* For support, the court relied on the oft-cited Supreme Court plurality opinion in *Reid v. Covert*:

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

354 U.S. 1, 5-6 (1957) (plurality opinion). Also cited was the Second Circuit's conclusion that "[t]he Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed at United States citizens is well settled." *United States v. Toscanino*, 500 F.2d 267, 280 (2d. Cir. 1974)). Clearly, a plaintiff's citizenship often goes a long way in determining the scope of available constitutional protections.

In two recent cases, federal courts have entertained claims from plaintiffs asserting that they were subject to constitutional violations while detained outside United States territory. *See Rasul v. Myers*, 563 F.3d 527 (D.C. 2009); *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85 (D.D.C. 2007). In both cases, the court determined that the constitutional rights asserted were not clearly established. *Rasul*, 563 F.3d at 532; *In re Iraq*, 479 F. Supp. 2d at 108. In each case, the court drew a sharp distinction between citizens and non-citizens when determining what constitutional

22

rights were clearly established at the time of their injuries, and the plaintiffs' non-citizen status was the driving factor in the court's determination that no clearly established right was available. *Id.*

In *In re Iraq*, a group of Iraqi and Afghani citizens claimed that they had been tortured and abused by U.S. military officials at various locations in Iraq and Afghanistan. 479 F. Supp. 2d. at 88. The court determined that Rumsfeld and other high-ranking military officials were entitled to qualified immunity because they had not violated any clearly established right. *Id.* at 108-109. The court made clear that the plaintiffs' non-citizenship was the primary factor in reaching this conclusion: "[d]etermining whether the defendants' acts violated clearly established constitutional rights need not require extended explanation in this case because . . . Supreme Court precedent at the time the plaintiffs were injured established that the Fifth Amendment did not apply to nonresident aliens outside the sovereign territory of the United States . . . . [B]asic constitutional protections were unavailable to aliens abroad." *Id.* at 108-09.

In *Rasul*, the D.C. Circuit was asked to evaluate a series of constitutional claims from British nationals relating to their detention at Guantanamo Bay. 563 F.3d at 528. In concluding that Secretary Rumsfeld and ten other defendants were entitled to qualified immunity, the D.C. Circuit also relied on the plaintiffs' non-citizenship. *Id.* at 530-532. In addition to reiterating that limited constitutional protections were available to non-citizens abroad, the D.C. Circuit reaffirmed that American citizens are in fact entitled to such protections. *Id.* at 531. Discussing the Supreme Court's decision in *Verdugo-Urquidez,* 494 U.S. 259 (1990), the D.C. Circuit recognized that "[t]he majority noted that although American citizens abroad can invoke some constitutional protections . . .

23

aliens abroad are in an altogether different situations." *Rasul*, 563 F.3d at 531 (citing *Verdugo-Urquidez,* 494 U.S. at 270) (internal citations omitted).

These cases establish the importance of citizenship in circumstances in which federal agents outside the United States carry out constitutional violations. American citizens do not forfeit their core constitutional rights when they leave the United States, even when their destination is a foreign war zone. *See Kar*, 580 F. Supp. 2d at 83; *Toscanino*, 500 F.2d at 280. Given our previous determination that the right of American citizens to be free from torture is a well-established part of our constitutional fabric, we conclude that this right follows American citizens abroad.

Of course, our belief in the existence of such a generalized right does not conclude our inquiry. *See Saucier*, 533 U.S. at 201. This right must be evaluated in the context of the specific circumstances of each case. However, it is equally important that we not shirk from protecting against clear constitutional violations simply because the clear general right has not previously been enforced in the precise circumstances facing the court. *See Padilla*, 633 F. Supp. 2d at 1036 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that "officials can still be on notice that their conduct violates established law even in novel factual circumstances") (other citations omitted). As the Supreme Court noted in *United States v. Lanier*, "[t]here has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." 520 U.S. 259, 271 (1997) (internal citations omitted).

Because at this stage we generally accept the allegations set forth in the complaint as true, the particularized question we face is whether it was clearly established to a

24

reasonable official in Rumsfeld's position that the application of torturous treatment

methods against American civilians in Iraq might give rise to a constitutional violation.

We are cognizant of the difficult circumstances that situated Rumsfeld's decision-making

responsibilites.  As Rumsfeld correctly points out, someone in his position of

responsibility is "subject to an array of competing considerations." *See Benzman v.

Whitman*, 523 F.3d 119, 128 (2008).   Decisions by the Secretary of Defense in the

context of an ongoing conflict are undoubtedly difficult ones that should not be called

into question each time an alleged constitutional violation arises.  However, it is equally

true and important that American citizens must not be denied the opportunity to

challenge genuine mistreatment at the hands of a government official simply because that

official is tasked with difficult and extremely important decisions.

In *Lewis,* the Supreme Court recognizes that behavior is particularly prone to be

shocking when it comes after decision-makers have had "time to make unhurried

judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of

competing obligations."  523 U.S. at 853.  We do not think Rumsfeld's job can be

described as one uncomplicated by the pulls of competing obligations.  We do, however,

believe that there is merit to plaintiffs' assertion that Rumsfeld's position afforded him

an opportunity to reflect on the material and constitutional consequences of his alleged

actions.  The thrust of the allegations against Rumsfeld personally is not that he had to

make a split-second decision to use torture in a particular moment of unprecedented

emergency.  To the contrary, plaintiffs allege that Rumsfeld approved the use of torture

for general purposes as an interrogation technique and did so with ample time to consider

the consequences of his actions.

25

Our determination that American citizens have the right to offer evidence in support of a claim that they were subject to the type of treatment methods identified in this case does not reflect an attempt to second-guess the judgment of Rumsfeld or military officials. Instead, it represents a recognition that federal officials may not strip citizens of well-settled constitutional protections against mistreatment simply because they are located in a tumultuous foreign setting. Plaintiffs have set forth facts that if true could show a violation of a well-established constitutional right. As such, we believe it would be improper to deny them the ability to give evidentiary grounding for the allegations they have set forth.

### C. Availability of a *Bivens* Remedy

A determination that plaintiffs have sufficiently alleged a constitutional violation does not conclude our inquiry regarding Count I. We still must answer another fundamental question regarding whether a federal remedy arises out of this violation. As discussed above, the Supreme Court established in *Bivens* that victims of a constitutional violation by a federal official may recover damages despite the absence of a statute conferring such a right. 403 U.S. at 396. However, in *Wilkie v. Robbins*, the Supreme Court made clear that *Bivens* does not provide an "automatic entitlement" to a remedy when a federal official has committed a constitutional violation. 551 U.S. 537, 550 (2007).

In determining whether plaintiffs should be provided a federal remedy for their injury, the Supreme Court determined that courts should employ a two step process. *Id.* First, "there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing

26

a new and freestanding remedy in damages." *Id.* Second, "even in the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id.* (citing *Bush v. Lucas*, 462 U.S. 357, 378 (1983)); *see also Bivens*, 403 U.S. at 398 (holding that the right to such a cause of actions may be defeated if there are "special factors counseling hesitation in the absence of affirmative action by Congress). We analyze these questions in turn.

### 1. No Alternative Remedy Exists

Outside of a prospective *Bivens* action, there exists no remedy for plaintiffs' alleged injuries. As it was for the plaintiffs in *Bivens*, "it is damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring). Other than a brief discussion of the Detainee Treatment Act ("DTA") by each side, there appears little dispute regarding the absence of an alternative remedy. With respect to the DTA, we agree with Rumsfeld that the statute does not apply to the facts of this case and does not provide a remedy to vindicate a detainee's constitutional rights. There is no evidence in the record proffered by either party, and the court likewise has found none, that any alternative process exists to address the alleged constitutional deprivations suffered by plaintiffs in this case.

Historically, the absence of an alternative remedy has given strong support to the application of a *Bivens* remedy to an identifiable constitutional wrong. As the Supreme Court stated in *Davis v. Passman*, "unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, who at the same time have no effective means other than the judiciary to

27

enforce these rights, must be able to invoke the existing jurisdiction of the courts for the

protection of their justiciable constitutional rights." 442 U.S. 228, 242 (1979).

## 2. No Special Factors Counsel Hesitation

Because we have concluded there is no alternative forum for seeking a remedy,

we must examine step two of the *Bivens* analysis, which requires us to determine whether

thee are any "special factors counseling hesitation" and to weigh "reasons for and against

the creation of a new cause of action, the way common law judges have always done."

*Wilkie*, 551 U.S. at 554 (citing *Bush*, 462 U.S. at 378) . The bulk of special factors

concerns raised by Rumsfeld deal with warmaking authority and judicial deference.

Before addressing these particularized concerns, however, we must address

Rumsfeld's argument that the *Bivens* remedy has become generally disfavored amongst

federal courts. According to Rumsfeld, since the Supreme Court created the *Bivens*

remedy in 1971, it has consistently refused to extend *Bivens* to any new context or

category of defendants. *See, e.g., Malesko*, 534 U.S. at 68. Rumsfeld correctly asserts

that, in cases that have come before them since *Bivens*, the Supreme Court often has

declined to extend a *Bivens* remedy to the particular constitutional violation it was

addressing. *See*, *e.g. Wilkie,* 551 U.S. 537 (2007) (harassment of a landowner by federal

officials in violation of the Fifth Amendment), *Schweiker v. Chilicky,* 487 U.S. 412

(1988) (wrongful denials of Social Security benefits), *Bush v. Lucas*, 462 U.S. 367 (1983)

(First Amendment violations by federal employers). The Supreme Court, however, has

not been steadfast in its reluctance to extend a judicial remedy. *See e.g., Davis v.

Passman,* 442 US. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980)*; Wilkie*, 551 U.S.

at 550-551.

While the Supreme Court has been hesitant to apply *Bivens* in some of the particular circumstances brought before it, it can hardly be said to have adopted a steadfast rule against the application of *Bivens* constitutional remedies.  More importantly, the Supreme Court's refusal to apply *Bivens* in particular constitutional contexts does not remove the availability of a *Bivens* remedy to federal courts tasked with adjudicating distinct constitutional violations.  The frequency with which federal courts have been willing to apply *Bivens* to address a constitutional deprivation leaves us unwilling to decline such a remedy in this case based on Rumsfeld's assertion that *Bivens* is a generally disfavored vehicle for redress.

With respect to this case, Rumsfeld has identified three special factors: separation of powers; misuse of the courts as a weapon to interfere with the war effort; and other serious adverse consequences for national defense.  Special factors counseling hesitation "relate not to the merits of the particular remedy, but to the questions of who should decide whether such a remedy should be provided."  *Sanchaz-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 2004).  According to this reasoning, "courts should avoid creating a new, nonstatutory remedy when doing so would be 'plainly inconsistent' with authority constitutionally reserved for the political branches."  *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 103 (D. D.C. 2007 (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)).

We find two elements of Count I most important to our assessment of these special factors. First, Count I requires us only to determine whether the judiciary may properly provide a *post-hoc* remedy to American citizens who allege that, during a period of war, they were tortured.  While plaintiffs' second amended complaint as a whole urges

29

a much broader wartime role for the judiciary—specifically, providing robust procedural requirements for detention, hearings, and access to courts—Count I asks at a more targeted level whether it is appropriate to provide enforceable limits on the treatment of American citizens.

It is well-settled that the "Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (citing *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting the reluctance of the courts "to intrude upon the authority of the Executive in military and national security affairs") and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (acknowledging "broad powers in military commanders engaged in day-to-day fighting in a theater of war")). As Rumsfeld correctly argues, courts defer to the military for one primary reason: judges are not military leaders and have neither the expertise nor the mandate to govern the armed forces. *See Alhassen v. Hagee*, 424 F.3d 518, 525 (7th. Cir. 2005).

Count I, however, does not require this court to govern the armed forces. It equally does not require that we challenge the desirability of military control over core warmaking powers. The remedy requested does not implicate such powers. This conclusion follows an arc of reasoning quite similar to that employed in *Padilla*. Addressing analogous special factors concerns, the *Padilla* court considered "the possible constitutional trespass on a detained individual citizen's liberties where the detention was not a necessary removal from the battlefield." *Padilla*, 633 F. Supp. 2d at 1028. The

court was not "persuaded that such conduct implicated a core strategic warmaking power." *Id.* We reach a similar conclusion.

Future evidence may demonstrate that particular treatment methods or rationales for use that we have been asked to consider implicate military affairs in a more direct manner than has thus far been shown. At this stage, however, we are not yet in a position to consider such evidence. Based on the pleadings submitted and the backdrop of prior precedent, we are not convinced that dismissing the claim of these two American citizens is a proper exercise of judicial authority. Instead, we believe "a state of war is not a blank check" for the President or high-ranking government officials when it comes to the rights of the American citizens, and therefore, it does not infringe "on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here." *Id.* at 1027-1028 (citing *Hamdi*, 542 U.S. at 535).

The second element of Count I we find important to our special factors analysis is the American citizenship of plaintiffs Vance and Ertel. As the preceding discussion of *Hamdi* and *Padilla* illustrates, the existence of such citizenship has gone a long way for recent courts asked to assess the scope of constitutional protection overseas. In each case, the plaintiffs' American citizenship was a crucial factor in the decision to allow a suit to proceed. *See Hamdi*, 542 U.S. at 532 ("[I]t is . . . vital that our calculus not give short shrift to the values that this country holds dear or to the privilege that is American citizenship."); *Padilla*, 633 F. Supp. 2d at 1020 (distinguishing scope of constitutional protections available to citizens and non-citizens abroad).

This view of the relevant case law is confirmed by the most recent primary case Rumsfeld invokes in support of his special factors argument. *See In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85. As we discussed in our qualified immunity analysis, the plaintiff's non-citizenship in *In re Iraq* was a crucial factor in that court's decision to grant the government's motion to dismiss. *See Padilla*, 633 F. Supp. 2d at 1025 (citing *In re Iraq*, 479 F. Supp. 2d at 103-105) ("The holding in *In re Iraq* demonstrates that the courts are not willing to extend a *Bivens* remedy to a non-citizen detained abroad who engages in acts of war against this country."). In reaching its decision, the district court in *In re Iraq* raised the specter of allowing "the very enemies [a field commander] is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." 479 F. Supp. 2d at 105 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950).

More broadly, however, it is clear that the court's fears were directed at the prospect of a judicial remedy for non-citizens engaged in battle against the United States. *See In re Iraq*, 479 F. Supp. 2d at 105-106 (relying exclusively on precedent concerning "enemy aliens" to support the aversion to a judicial remedy against military officials). This is consistent with the general rationale underlying the court's reluctance to provide access to American courts in cases like these. *See, e.g. Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) ("[W]e think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.").

32

According to Rumsfeld, the Supreme Court's decision in *Munaf v. Geren* undermines the traditional force of American citizenship in cases like ours. 128 S. Ct. 2207 (2008). Faced with two American citizens who had been detained in Iraq, the Supreme Court did in fact conclude that habeas relief would be improper because it would result in "unwarranted judicial intrusion into the Executive's ability to conduct" both "military operations abroad" and the country's "international relations." *Id.* at 2218, 2224. The circumstances at issue in *Munaf*, however, are clearly distinct from ours. In *Munaf*, the citizen-detainees had been arrested by the Iraqi government for crimes allegedly committed within the confines of its sovereign territory. *Id.* at 2214. In denying habeas relief, the Supreme Court relied heavily on the principle that such relief cannot be used to defeat the criminal jurisdiction of a foreign sovereign. *Id.* at 2227-2228. A special interest in avoiding sensitive and direct foreign policy concerns, rather than a newfound hostility to the protections provided American citizens abroad, is what drove the Court's holding in *Munaf*. *Id.* at 2226. As such, we do not view *Munaf* as altering the principle that courts may provide a judicial remedy to American citizens abroad in circumstances in which such protection might not exist for a non-citizen.

Count I does not ask us to approve of a general expansion of judicial authority in matters of core military competence. When an American citizen sets out well-pled allegations of torturous behavior by executive officials abroad, we believe that courts are not foreclosed from denying a motion to dismiss such allegations at the very first stage of the trial process. "[T]he position that the courts must forgo any examination of the individual case . . . serves only to condense power into a single branch of government." *Hamdi*, 542 U.S. at 535-36. Because we do not believe that precedential or prudential

33

concerns counsel in favor of such a "blank check" for high-ranking government officials, we do not believe that any special factors counsel hesitation sufficient to foreclose a constitutional remedy for Vance and Ertel. *Id.* at 536. ["E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934). Therefore, Rumsfeld's motion to dismiss Count I is denied.

## II. Count II: Procedural Due Process

In Count II, plaintiffs allege that they were denied procedural due process during their confinement in Iraq. In particular, they allege that they were denied knowledge of the factual basis for their detention, access to exculpatory evidence, and an opportunity to appear before an impartial adjudicator. *See* SAC ¶¶ 58-62. Plaintiffs argue that the Supreme Court's decision in *Hamdi v. Rumsfeld* clearly establishes that the military cannot detain American citizens without affording them procedural due process, even in wartime. 542 U.S. at 532.

In *Hamdi*, the Supreme Court identified a set of core rights due to American citizen-detainees. 542 U.S. at 535. However, Rumsfeld argues that *Hamdi* is inapplicable because it addressed a domestic detention setting whereas the allegations in this case occur in the midst of a foreign war zone. We agree with Rumsfeld that Vance and Ertel must, at a minimum, demonstrate a violation of a *Hamdi* core right in order for their claim to proceed. If the procedures plaintiffs were afforded would have been acceptable in a domestic setting, we will not deem them insufficient in the context of a foreign status determination. *See Kar*, 580 F. Supp. 2d at 84-85 (holding that the interests considered in *Hamdi* "strike a different balance"—more deferential to the government—in a case in

34

which the detention occurred in the midst of a foreign war zone).  Indeed, plaintiffs agree

that the sufficiency of their claim depends on their ability to allege a violation of a core

right recognized in *Hamdi*.  This requires an allegation that, in part or in whole, plaintiffs

were denied "notice of the factual basis of [their] classification, and a fair opportunity to

rebut the Government's factual assertions before a neutral decisionmaker."  *Hamdi*, 542

U.S. at 533.

First, plaintiffs assert that the status board letters they received were not sufficient

to put them on notice of the factual basis for their detentions.  We disagree.  These letters

informed each plaintiff why he was being detained:

> for being a suspect in supplying weapons and explosives to
> insurgent/criminal groups through your affiliation with the Shield
> Groups Security Company (SGS) operating in Iraq.  Credible
> evidence suggests that certain members of SGS are supplying
> weapons to insurgent groups in Iraq.  Further, you are suspected of
> illegal receipt of stolen weapons and arms in Iraq from Coalition
> Forces.

SAC Ex. A.  Under *Hamdi*, we find that these letters did, in fact, provide sufficient

notice.  *Hamdi* does not require a detailed affidavit be provided to each detainee in a

foreign war zone, it merely requires "notice of the factual basis." 542 U.S. at 533.

Plaintiffs have given this court no reasoned means by which to reach a contrary

conclusion.  Moreover, our conclusion is confirmed by the holding of in *Kar*.  The

plaintiff in *Kar* was given a similar status letter that informed him that the military

suspected him of "possess[ing] explosive materials."  580 F. Supp. 2d at 85.  Referring to

this as the "formal notice of his detention," the court held that Kar "did receive notice of

the factual basis for his detention."  *Id.*

Second, plaintiffs argue that they were denied a fair opportunity to rebut the government's factual assertions. They assert that they sought to call each other and a handful of government officials as witnesses and to retrieve the cell phones and laptops from which they had communicated with the FBI. It is unrealistic, and out of line with *Hamdi*'s requirements, however, to assume that a citizen-detainee hearing like the one here would require the government to replicate the full complement of evidentiary protections afforded in criminal trials. *See Hamdi*, 542 U.S. at 533-534.

Again the court's holding in *Kar* court confirms our conclusion. The plaintiff in *Kar* claimed that the military denied his requests that government witnesses, including "the FBI agents and military officers who interrogated him" be made available at his hearing. *Kar*, 580 F. Supp. 2d at 82. In declining to find a due process violation, the court said that "[t]he government's inability or unwillingness to summon certain military personnel as witnesses and its refusal to turn over reports that might divulge interrogation techniques were acceptable given the interests at stake." *Id.* at 86. We find no reasoned basis to conclude differently here.

Third, plaintiffs assert that the Detainee Status Board that conducted their hearings was not impartial, but rather, outcome driven. Plaintiffs allege that were it otherwise, the Board would have provided them the reasonably available evidence they requested. As we noted above, however, given the legitimate considerations that may lead to reduced evidentiary access in a foreign status hearing, plaintiffs' assertion provides no support for their allegation of impartiality. We also agree with Rumsfeld that, because the outcome of this hearing was the release of each plaintiff, nothing beyond speculation grounds the claim of impartiality.

Finally, plaintiffs have asserted an equal protection theory as part of their procedural due process claim. Plaintiffs claim that civilian Americans who are detained by the military get cut off from a host of due process protections that the military affords to its own. This theory cannot support a right to relief.

In an equal protection claim, a plaintiff must prove he was treated differently than someone similarly situated—someone "prima facie identical in all relevant respects." *Landry v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). By plaintiffs' own admission, the only people who have received protections of the Uniform Code of Military Justice ("UCMJ") were military personnel. Because they were not military personnel at the time of their detentions, plaintiffs cannot satisfy the "similarly situated" requirement. Plaintiffs argument that the UCMJ is nonetheless relevant because it demonstrates the feasibility of providing due process protections is not an equal protection argument. Instead, it is simply an argument about the practicality of adding new protections for non-military officials. Because this argument is not sufficient to show a constitutional violation with respect to existing procedural due process rights, it does not provide a sufficient basis for plaintiffs' claims.

Plaintiffs have not alleged facts that go beyond a speculative level in support of a claimed violation of a constitutional right to procedural due process. Therefore, Rumsfeld's motion to dismiss Count II is granted.

## III. Count III: Denial of Access to Courts

In Count III, their final claim, plaintiffs allege that they were denied access to the court to challenge their detention. *See* SAC ¶¶ 284-293. This claim is properly broken into two parts. First, plaintiffs allege that they were prevented from challenging torturous

37

conditions of confinement. Second, they allege that they were prohibited from challenging the basis of their detention in Iraq. We will address each argument in turn.

First, plaintiffs claim that they had a right of access to the court to seek relief against the use of torture against them. Plaintiffs do not identify an actual predicate claim by which we would properly assess this as part of our habeas inquiry. In other words, a claim regarding their inability to challenge alleged torturous conditions is distinct from an assessment of their habeas right to access to the court during confinement. *See*, *e.g.*, *Cochran v. Buss*, 381 F.3d 637, 639 (7th Cir. 2004) (holding that a state prisoner "challenging the fact or duration of his confinement must seek habeas corpus relief; a prisoner challenging a condition of his confinement, by contrast, must seek relief under 42 U.S.C. § 1983").

Insofar as plaintiffs assert a right of access to the court to challenge their conditions of confinement, we believe that their claim is properly articulated and assessed as part of Count I of their complaint. This is consistent with the Supreme Court's requirement that a "backward-looking denial-of-access claim [must] provide a remedy that could not be obtained on an existing claim." *Christopher v. Harbury*, 536 U.S. 403, 421 (2002). Because the only remedy plaintiffs can seek for this part of their denial of access claim is monetary damages, the same remedy they are seeking in Count I, plaintiffs may not "maintain the access claim as a substitute, backward-looking action." *Id.* at 422.

In the second part of Count III, plaintiffs assert a habeas claim regarding their inability to gain access to the courts for the purpose of challenging the grounds for their detention. This claim is addressed by the well-established principle that the Executive is

38

"entitled to a reasonable period of time to determine a detainee's status before a court entertains that detainee's habeas corpus petition." *Boumediene v. Bush*, 128 S. Ct. 2229, 2276 (2008). We are not persuaded that six weeks and three months—the lengths of plaintiffs' respective detentions—were unreasonable amounts of time to make initial status determinations in Iraq. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (setting six months as a presumptively constitutional period for detention of non-citizens within the United States pending removal). In *Boumediene*, the Supreme Court's assessment of a reasonable period of time involved detainees who had been awaiting their status determinations for as long as six years. 128 S. Ct. at 2275. To sustain their claim, plaintiffs would need to establish that they possessed a "nonfrivolous, arguable" underlying claim that was frustrated by official acts impeding litigation of that claim. *See Harbury*, 536 U.S. at 415. Because existing precedent illustrates that plaintiffs would have not been able to seek habeas relief during their reasonably brief detentions in Iraq, they have failed to allege a predicate claim with even arguable legal merit. As such, Rumsfeld's motion to dismiss Count III is granted.

## CONCLUSION

For the reasons set forth in the court's Memorandum Opinion and Order, defendant Donald Rumsfeld's motion to dismiss [135] is denied as to Court I and granted with respect to Counts II and III.

It is so ordered.

_____
Wayne R. Andersen
United States District Court

Dated: March 5, 2010